## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PPF MANAGEMENT LLC

                   Plaintiff,

                   v.

OJSC SBERBANK OF RUSSIA
SBERBANK CAPITAL
SBERBANK CIB USA, INC.
NEO CENTRE
PROMSVYAZBANK PAO
JSC NATIONAL AGGREGATES COMPANY
KLEVER ASSET MANAGEMENT
KLEVER INTERNET INVESTMENT
ALETARRO LTD.
NISORAM HOLDING LTD.
URASAY LTD.
MOSTRA CONSULTING LTD.
SUINTEX LTD.
GERMAN GREF
OLEG GREF
ASHOT KHACHYATUREANTS
YURIY ZHUKOV
GREGORY SHIRIN
KIRILL NOGOTKOV
ALEXEY BAZARNOV
ZOYA GALEEVA
SERGEY KUBLITSKIY,

                   Defendants.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### I.    NATURE OF ACTION

1.    This Complaint arises out of a textbook case of Russian corporate raiding against

Sergey Poymanov and Irina Porgornaya ("Majority Shareholders") and their company Open

Joint Stock Company ("OJSC") Pavlovskgranit ("P-Granit"), one of the largest granite producers

1

in Europe. The Defendants wanted both to eliminate P-Granit as a major competitor on the Russian granite market and to seize its assets.

2.  Majority Shareholders assigned their claims against Defendants to Plaintiff PPF Management LLC in order to preserve and pursue them in a system adherent to the Rule of Law. Majority Shareholders' main bank and largest competitor conspired to take advantage of a downturn in the market by interjecting themselves into Mr. Poymanov's refinancing negotiations. While pretending to offer realistic restructuring options, they purposefully maneuvered Mr. Poymanov into a position where he was essentially trapped. Defendants then triggered a series of phony civil divestitures proceedings and criminal cases which ultimately resulted in the main competitor taking over P-Granit.

3.  Defendant Zhukov masterminded and oversaw the conspiracy executed by Defendants and others companies and individuals under his direct and indirect control. In order to steal a company of P-Granit's magnitude, Defendant Zhukov needed the participation and protection of Defendant German Gref, the chief executive officer of the largest bank in Russia, Defendant OJSC Sberbank of Russia ("Sberbank Russia"). Although Defendant German Gref was a former Minister of Economy and Trade and one of the few Russian politicians with a moderate reputation in both the East and West, he used his reputation and influence in the government to shield Defendants' actions from the investigations and reviews of the Federal Anti-Monopoly Service (FAS) and regional and federal law enforcement. Mr. Poymanov challenged every step taken by Defendants in the local courts, initiating more than 50 legal actions. A key component to Russian corporate raiding is, however, undue influence in the captured Russian courts. Thus, each claim was, predictably, rejected.

4.     Defendants furthered the illegal takeover of P-Granit by using multiple offshore companies and straw men to disguise the true participants and beneficiaries of the conspiracy. Defendants implemented a complex scheme in order to hide not only from the majority shareholders of P-Granit, but also from the Department of Economy and Finance of the Government of the Russian Federation under the Prime Minister (current President, V.V. Putin), that P-Granit's shares and assets were being transferred illegally to Defendant Zhukov's company. Defendants were so efficient that, for example, they identified the assignee of shares as the winner of an auction days before they had even conducted the auction. The cover-up and crimes were of sufficient enormity and sensitivity that Defendants Gref and Zhukov were compelled to mislead President Putin's advisor, Mr. Belousov, who was asked specifically to investigate the situation with the P-Granit/Sberbank Russia debt.

5.     P-Granit shares were transferred using four different procedures: (i) shares were foreclosed pursuant to an arbitration award; (ii) shares were auctioned; (iii) shares were assigned, and; (iv) the last were dissolved in a phony bankruptcy proceeding. The assigned shares were paid for with loaned money from Defendant Sberbank Russia. All P-Granit shares ended up in Zhukov's company.

6.     Defendants also used U.S. banks in order to further the conspiracy, subsequently investing some of the apparent proceeds of the crime in the United States.

7.     This type of illicit scheme is a common *modus operandi* in Russia. It is carried out through well-known techniques and is now internationally known as "Reiderstvo." These techniques include fraud, bribery, forgery, corruption, intimidation, manufactured bankruptcy and, ultimately, expropriation of the targeted company. Reiderstvo often involves private and public sector white collar criminals conspiring with state organizations, including law

3

enforcement agencies, as well as high level sitting politicians and their family members. *See* Dr. Louise Shelley and Judy Deane, *The Rise of Reiderstvo: Implications for Russia and the West* (2016). In the end, the prevailing level of corruption in Russia makes it easier for Defendant Zhukov and his co-conspirators to steal P-Granit than compete with or pay a fair price for it.

8. While nicknamed as a Russian phenomenon, Reiderstvo commonly includes activities outside of Russia: *e.g.*, the use of shell companies in various jurisdictions to hide the beneficial owners, the use of foreign correspondent banks to move funds in more efficient foreign currency—such as Euros and dollars—and investment of the proceeds.

9. As demonstrated in detail below, Defendants' actions fit the pattern from the very launch of the attack; from the manipulations of local law enforcement, to the laundering of assets through offshore companies, to the use of U.S. dollars, U.S. correspondent banks and U.S. investments.

10. A compromised, corrupt Russian judiciary facilitates the Reiderstvo phenomenon and is, thus, part of the problem. By design, it leaves victims of Reiderstvo no meaningful forum in which to seek damages for the expropriation of their assets. In this case, all of Majority Sharcholders' claims for restitution and/or compensation have been denied, and its attempt to seek justice in Limassol court in Cyprus is under threat of being curtailed by the receivers from the P-Granit Invest and Mr. Poymanov's personal bankruptcy. The receivers are members of an association of receivers whose members have a well-established history of engaging in Reiderstvo. It is this same receivers association—SRO "Delo"—that manipulated the Russian bankruptcy system in the infamous case of Sergei Magnitsky and the ongoing attacks against William Browder and Hermitage Capital.

11.     Plaintiff, as the assignee of Mr. Poymanov and Mrs. Podgornaya's claims, now seeks redress from a competent and independent judicial authority.  Specifically, this is an action for fraud and misrepresentation, conspiracy to commit fraud, breach of fiduciary duty, negligent supervision, abuse of process and unjust enrichment under common law seeking to recover, *inter alia*, damages for losses suffered as a result of the conspiracy described below.

## II.     PARTIES

12.     Plaintiff PPF Management LLC is a corporation registered under Delaware law with headquarters in Wilmington, Delaware.  The purpose of the PPF Management LLC is to preserve and pursue the claims of this lawsuit in a system adherent to the Rule of Law.  Plaintiff holds an assignment of the Majority Shareholders' claims for the actions against P-Granit.

13.     Sergey Poymanov is a citizen of the Russian Federation and former majority shareholder of P-Granit.  P-Granit is and was at all material times a Russian company engaged in granite mining and production.  Established in 1976 on the base of the Shkurlatovsk granite deposit—the largest in Europe—P-Granit has long been an industry leader.  The company's assets have included full-scale quarries and equipment for the mining of raw materials and facilities for the production of reinforced concrete framings and other products.  In 2008, Mr. Poymanov was the majority shareholder of P-Granit Group with a combined 90.5% shares owned directly and indirectly through Vitera and PNH/Zinika.  Irina Podgornaya is a citizen of the Russian Federation and a former minority shareholder of P-Granit.  In 2008, she owned 2.32% of P-Granit.  She is Mr. Poymanov's former wife, the couple having divorced in 2011.  They share joint custody of three minor children, and a fourth child over 18 is in school and still dependent on his parents.  Mr. Poymanov's father owned 4.57%, and Mr. Poymanov's brother owned 1.61% of P-Granit.  They both assigned their rights to Ms. Podgornaya.  Other minority shareholders owned the remainder of approximately 1.04% of P-Granit.

1.      **Defendants**

   a.      **Russian Corporate Defendants**

14.      Defendant Sberbank Russia, a/k/a Savings Bank of the Russian Federation is a Russian commercial bank and financial services company headquartered in Moscow, Russian Federation.   Since 2011, Sberbank Russia has been trading Level II ADRs on the New York Stock Exchange.   Defendant Sberbank Russia is also trading its bonds on the London Stock Exchange.   Defendant Sberbank Russia interfered deliberately with Majority Shareholders' attempt to restructure their debt.   Defendant Sberbank Russia assigned P-Granit's debt to Defendant Sberbank Capital, which in turn implemented—together with Defendant Zhukov and other co-conspirators—the illegal scheme to take over ownership of P-Granit shares, dismantle the company by distributing its assets to Defendant NAC and, ultimately, liquidate P-Granit.

15.      Defendant Sberbank Capital LLC is a Russian company and wholly-owned subsidiary of Defendant Sberbank Russia that, according to its website, manages assets, provides financial consultancy, and makes direct investments, including the creation of new and acquisition of existing businesses.   Defendant Sberbank Capital was a key participant in the conspiracy that undertook direct actions meant specifically to strip Majority Shareholders of their assets and created the conditions for other co-Defendants to likewise take such actions.

16.      Defendant JSC National Aggregates Company (NAC) is one of the largest crashed stones (including granite) company in Russia and it is owned by Defendant Zhukov. Until 2010, P-Granit was the main competitor of Defendant NAC.   Defendant NAC implemented the conspiracy developed by Zhukov and emerged as the new owner of P-Granit's assets.

17.      Defendant NEO Centre LLC is a Russian appraisal company established in 1997. Defendant Oleg Gref owns 19.9% of the company.   Defendant NEO Center appraised the shares of P-Granit at a value grossly below market value, which created the conditions for the

implementation of the conspiracy to transfer P-Granit shares to Defendants Zhukov and NAC. Defendant NEO Center also appraised the shares of Defendant NAC in 2009-2010 supposedly for the purpose of negotiating a loan with Defendant Promsvyazbank. Although NAC's assets constituted a fraction of P-Granit's real value, NEO Centre appraised NAC at a value of RUR 7,607,172,909 (seven billion six hundred and seven million one hundred seventy two thousand nine hundred and nine), equivalent to USD 257,908,736 (two hundred fifty seven million one hundred nine thousand seven hundred thirty six) that is 2.48 times higher for the supposed purposes of receiving the loan from PSZB compared to the NAC deflated valuation of P-Granit shares which were valued by NEO Centre at 3,145,969,598.00 rubles, equivalent to USD 103,654,622.00 on the date of valuation.

18.     Defendant Promsvyazbank PAO ("PSZB") is a Russian-based commercial bank. Defendants Aletarro, Nisoram, Suintex, and Urasay opened bank accounts at PSZB's branch office in Limassol, Cyprus that were used to funnel the proceeds of the crime and make payments to Defendants Sberbank Russia and Sberbank Capital. Atlantic LLC also had accounts with PSZB in Moscow. PSZB uses the following banks for payments in U.S. dollars: Deutsche Bank Trust Company Americas, New York, NY, USA; JP Morgan Chase Bank, New York; American Express Bank, and; The Bank of New York. PSZB also participated in the conspiracy by (i) misrepresenting to P-Granit the intent to restructure Sberbank Russia's debt, and; (ii) improperly disclosing P-Granit's confidential information to further the conspiracy to steal the company while masking the role of Zhukov.

### b.     Defendant Offshore Companies

19.     Defendant Klever Group Limited ("Klever") is a Cyprus corporation specializing in private equity investments and owned by Defendant Zhukov. Klever has a representative

office in Moscow, and the company uses the brand name "Klever Asset Management." Klever owns Defendant Klever Internet Investment. Defendant Shirin is the Director of Defendant Klever. Co-conspirator Mayorova is the CFO of Klever.

20.     Defendant Klever Internet Investment ("KII") is, upon information and belief, a British Virgin Islands ("BVI") special-purpose vehicle established by Klever in order to diversify exposure in Internet technology markets. Defendant KII kept all its investment in Russia until 2014, when—using the proceeds of P-Granit's raid—it participated in the $5M investment to purchase a minority interest in CityAds Media Inc., which operates in the U.S. through its office in Alexandria, VA. Further, in 2015, KII made an additional investment—through the $9M Series B round of funding—in Humanity.com Inc., a company incorporated in California and headquartered in San Francisco. Defendant Shirin is a Director of KII.

21.     Defendant Aletarro is a company incorporated in Cyprus. Aletarro's director is co-conspirator Georgios Charalamous. Defendant Sberbank Capital assigned 11.37% of Vitera's shares in P-Granit to Defendant Aletarro. Upon information and belief, Defendant Aletarro is owned by Defendant Zhukov. Aletarro's corporate secretary was, during the relevant time, Totalserve Management, a services company based in Cyprus with registered offices at 17 Gr. Xenopoulou Street, Limassol 3106, Cyprus that subsequently became C. ARGYROU & ASSOCIATES SECRETARIAL LTD. In 2014, Defendant Sberbank Russia granted C. ARGYROU & ASSOCIATES SECRETARIAL LTD a $1M contract for providing services with regard to debt collection. Defendant Aletarro entered into service agreements with co-conspirator PI for the implementation of this illegal scheme.

22.     Defendant Nisoram Holding is a company incorporated in Cyprus at the same address as Defendant Alettaro. At the time of the Reiderstvo in question, Nisoram also used

Totalserve Management as company secretary.  Defendant Sberbank Capital assigned 25% of Vitera's shares in P-Granit to Defendant Nisoram.  Defendant Nisoram then entered into service agreements with co-conspirator PI for the implementation of the illegal scheme.  The beneficial owner of Nisoram is unknown.

23.     Defendant Urasay is a company incorporated in the British Virgin Islands. Defendant Urasay, like Alteraro and Nisoram, hired Totalserve Management as company secretary.  Co-conspirator Trade LLC, which acquired 24.67% of Mr. Poymanov's shares in P-Granit at the auction where the other bidder was Defendant Sberbank Capital, transferred those shares to Defendant Urasay. Defendant Urasay then entered into service agreements with co-conspirator PI for the implementation of the illegal scheme.  Upon information and belief, Defendant Zhukov is the beneficial owner of Urasay.

24.     Defendant Mostra Consulting is a company incorporated in the British Virgin Islands that owns 100% of the shares in Atlantic LLC.  Totalserve Trust is also the registered agent of Mostra.  Under Defendant Atlantic's loan agreement with Defendant Sberbank Russia to finance its obligations to Sberbank Capital under the Assignment Agreement, Atlantic—being the new owner of P-Granit shares—could be sold by its sole shareholder/co-conspirator Natalia Mayorova to Mostra Consulting. Upon information and belief, the end beneficial owner of Defendant Mostra is Defendant Zhukov.

25.     Defendant Suintex is a company incorporated in the BVI in 2012 by Defendant Klever for the purposes of implementing the conspiracy and laundering money out of Russia.  In 2013, the new shareholders of P-Granit—Defendants Aletarro, Nisoram, Urasay, and Atlantic LLC—voted to sell the rights of claim to Defendant Suintex at a fraction of their value.  Upon information and belief, the end beneficial owner of Suintex is Defendant Zhukov.

c.     **Russian Individual Defendants**

26.     Defendant German Gref is a citizen of the Russian Federation and the CEO and Chairman of the Executive Board of the Sberbank of Russia.  Defendant German Gref is also a close associate of Defendants Khachyatureants and Zhukov.  Defendant German Gref met with Zhukov during and in furtherance of the conspiracy by, *inter alia*, engaging in: a pre-determined restructuring process through phony negotiation of the restructuring; a manipulation of the appraisal of P-Granit shares; baseless criminal proceedings, and; shielding Zhukov's participation in the endeavor.

27.     Defendant Oleg Gref is a citizen of the Russian Federation and the Vice President of Defendant NEO Centre, a Russian appraisal company.  Defendant Oleg Gref is a close associate of Defendant Zhukov and worked on appraisals for his company, Defendant NAC.  Defendant Oleg Gref engaged in multiple communications with Zhukov during and in furtherance of the conspiracy by, *inter alia*: supervising the bogus and artificially-deflated appraisal of P-Granit; improperly disclosing P-Granit's confidential information, and; laundering the P-Granit shares.  Defendant Oleg Gref owns 19.9% of Neo Center.

28.     Defendant Ashot Khachyatureants is a citizen of the Russian Federation and the CEO of Sberbank Capital.  Defendant Khachyatureants worked for Defendant German Gref at the Ministry of Finance and is now part of his inner circle.  Defendant Khachyatureants is also a close associate of Defendant Zhukov.  Defendant Khachyatureants participated in and furthered the conspiracy by, *inter alia*, engaging in: a pre-determined restructuring process through phony negotiations; a manipulation of the appraisal of P-Granit shares, and; the shielding of Zhukov's participation.

29.     Defendant Yuriy Zhukov is a citizen of the Russian Federation, the founder of PIK Group, a publicly-traded company on the London Stock Exchange, and the owner of

Defendant NAC.   Defendant Zhukov is also a close associate of the Defendants Gref and Khachyatureants and, according to media reports, was proposed to be the CEO of a new Sberbank Russia subsidiary, overseeing real estate assets.   Defendant Zhukov drove the conspiracy by, *inter alia*: interfering with and corrupting P-Granit's restructuring process; manipulating the criminal justice and bankruptcy court proceedings against Poymanov and P-Granit, and; concealing his acquisition of P-Granit.

30.   Defendant Kirill Nogotkov is a Russian citizen and the receiver appointed to oversee the estate of P-Granit Invest in 2013.   Defendant Nogotkov is a member of Delo, the self-regulated association of independent receivers.   Defendant Nogotkov has been an active participant in the conspiracy to raid P-Granit.   He has followed Defendants Zhukov and Shirin and co-conspirator Kuznetsov's instructions.   In furtherance of the Reiderstvo, Defendant Nogotkov has improperly:   a) disclosed P-Granit Invest confidential and proprietary information to co-conspirator Kuznetsov; b) filed baseless criminal charges against Mr. Poymanov; c) initiated civil proceedings in Cyprus court, and; d) adopted and approved bankruptcy plans for P-Granit Invest that were intended to benefit the conspiracy rather than the entity or its creditors. Delo is same the receivers' association whose members are involved in Mr. Poymanov's personal bankruptcy and in the ongoing attacks against William Browder and Hermitage Capital. The latter attack is part of the infamous case of Sergei Magnitsky, which was the basis for both the Russia and Moldova Jackson-Vanik Repeal and the Sergei Magnitsky Rule of Law Accountability Act of 2012, P.L. 112-208 (December 14, 2012), referred to as the "Magnitsky Act," as well as for the issuance of sanctions by the U.S. government.

31.    Defendant Alexey Bazarnov is a Russian citizen and the receiver appointed to oversee the personal bankruptcy of Mr. Poymanov.  Bazarnov, like Defendant Nogotkov, is a member of Delo, the self-regulated association of independent receivers.

32.    Defendant Zoya Galeeva is a Russian citizen and employee of Defendant Project Industry. Defendant Galeeva coordinated and implemented the Reiderstvo actions against P-Granit and the majority shareholders. Defendant Galeeva also has a close personal relationship with Kuznetsov, Shirin, and Kublitskiy and acted in close coordination with them.

33.    Defendant Sergey Kublitskiy is a Russian citizen and former law enforcement agent who is now reputed to be a member of organized crime.  Alexander Litvinenko, the former FSB/KGB officer who died in London of plutonium poisoning, reported that Defendant Kublitskiy was responsible for the killing of the mayor of Nefteyugansk (a crime Russian prosecutors now attribute to ex-political prisoner Mikhail Khodorkovsky).

d.    **U.S. Defendants**

34.    Defendant Gregory Shirin is a U.S. citizen currently residing in Moscow. Defendant Shirin is the Director of both Defendants Klever Asset Management and KII. Defendant Shirin is also a close associate of Defendant Zhukov who participated in the majority of the meetings between Defendants Zhukov, NAC, and Mr. Poymanov in 2010, prior to Defendant Sberbank Russia's refusal to restructure P-Granit's debt.  Defendant Shirin participated in and furthered the conspiracy by, *inter alia*, engaging in: a pre-determined restructuring process through phony negotiations; a manipulation of the appraisal of P-Granit shares, and; the shielding Zhukov's participation.  Defendant Shirin was, at the time of the described events, and is currently a member of the Board of NAC.

35.    Defendant Sberbank CIB USA, Inc. ("SCIB") is a company organized in 1997 under the laws of the State of Delaware with its principal place of business and headquarters

located in New York, New York.  Defendant SCIB is a registered broker-dealer pursuant to Section 15(b) of the Securities and Exchange Act of 1934.  The company is also registered as an Introducing Broker with the Commodity Futures Trading Commission and is a member of the National Futures Association.  SCIB is a wholly-owned subsidiary of Troika Dialog Group Limited, which is an indirect subsidiary of Defendant Sberbank Russia.  Upon information and belief, Defendants used Defendant SCIB to launder the instrumentalities and proceeds of the wrongs described below through U.S. banks.

### 2.   Co-conspirators

36.   Arteom Chayka is a Russian citizen, the son of the Attorney General of Russia, Yuriy Chayka, and the owner of OOO-PNK, which is currently the largest producer of granit in Russia.  Chayka has stated publicly his intent to acquire major companies in the crushed stone industry, including P-Granit, the industry leader in Russia.  Chayka furthered the conspiracy by using his family influence to manipulate both criminal justice and bankruptcy court proceedings against Mr. Poymanov, with the ultimate goal of overtaking some of P-Granit's assets.

37.   Vladimir Lelukh is the general counsel of Defendant Sberbank Capital.  Lelukh provided Chayka with confidential information concerning P-Granit and coordinated with Defendant Zhukov to render impossible the restructuring of P-Granit's debt.  Lelukh sits on the board of director of Chayka's company, First Non-Ores Company.

38.   CJSC (closed joint stock company) Project Industry ("PI") is a Russian company specializing in asset and debt recovery, business recovery, and mergers and acquisitions. Defendant Sberbank Russia is a client of PI.  Kuznetsov, an officer of PI and co-conspirator under the direction of Defendants Zhukov and Shirin, implemented the conspiracy.  Acting informally until 2011, PI entered into servicing agreements with Defendants' offshore companies Aletarro, Nisoram, and Urasay to provide legal services including, but not limited to: organizing

a general meeting of P-Granit's shareholders; electing four nominees to the Company's Board of directors from the customer's nominees; and, ultimately liquidating P-Granit. As employees of Defendant PI, Galeeva and Potolitsyn were straw men, organizers and actual coordinators and directors for multiple companies, including offshore companies involved in the scheme.

39.     Atlantic LLC is a Russian company incorporated in November 2011 by co-conspirator Mayorova, who is an officer of Defendant Klever under Defendant Zhukov's control. In December 2011, Defendant Sberbank Capital entered into an assignment agreement with co-conspirator Atlantic for its rights under the P-Granit Loan Agreement and the various security pledges. Atlantic received a loan for this purpose from Defendant Sberbank of Russia, which was approved by Defendant German Gref. The loan was based upon a resolution of Defendant Sberbank Russia's credit committee on December 21, 2012 that relied on events that had not yet taken place—e.g., auctions that were organized later with winners yet unknown—thus allowing co-conspirator Mayorova to transfer the shares in Atlantic to Mostra and pledge P-Granit shares that had not yet been acquired. After the original assignment, Atlantic re-assigned this debt to the new debtor, Defendant NAC, with the transfer of what was left of P-Granit assets, after which, having served its purpose as the straw company of the conspiracy, Atlantic was liquidated.

40.     Andrey Kuznetsov is a Russian citizen and employee of co-conspirator Project Industry. Co-conspirator Kuznetsov coordinated and implemented the Reiderstvo actions against both P-Granit and Majority Shareholders. Kuznetsov was the contact person for Defendants Zhukov and Shirin, and acted as the main coordinator of all activities.

41.     Andrey Potolitsyn is a Russian citizen and an employee of Project Industry. Co-conspirator Potolitsyn coordinated and implemented the Reiderstvo actions against P-Granit and

Majority Shareholders. Co-conspirator Potolitsyn is under Defendant Galeeva's control and, together with Kuznetsov, acted in the interests of Defendant Zhukov. In August of 2012, co-conspirator Potolitsyn became the General Director of Atlantic, acquired by Mostra, and throughout the conspiracy acted together with the Defendant Sberbank Capital managers and other co-conspirators.

### III.   JURISDICTION AND VENUE

42.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) on the grounds that the amount at issue exceeds $75,000, that Plaintiff is a citizen of the State of Delaware, and that two of the Defendants are citizens of the States of New York and California, respectively.

43.     Jurisdiction over Defendant Sberbank Russia is proper in this court on the grounds that Defendant trades Level II ADRs on the New York Stock Exchange, conducts business within the United States directly and through its subsidiary Defendant SCIB, and has purposefully availed itself of this Court's jurisdiction in previous litigation.

44.     Jurisdiction over Defendants Klever Asset Management and Klever Internet Investments is proper on the grounds that Defendants participated in both a $9,000,000 capital raise for Humanity.com Inc., a California corporation, and in the $5M investment to purchase a minority interest in CityAds Media Inc., which operates in the U.S. through its office in Alexandria, VA.

45.     Jurisdiction over Defendants PSZB, Aletarro, Nisoram, Urasay, Atlantic, Mostra Consulting, and Suintex is proper on the grounds that Defendants furthered the conspiracy at issue by conducting transactions in U.S. dollars using U.S. banks.

46.     Jurisdiction over Defendants Sberbank Capital, NEO Center LLC, Khachyatureants, Zhukov, Shirin, Nogotkov, Bazarnov, Galeeva and Kublitskiy is proper on the grounds that they are all co-conspirators who committed acts in furtherance of a conspiracy

which they knew included acts in the United States, such as investing in U.S. businesses and using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of P-Granit.

47.     Venue is proper in this Court for all Defendants pursuant to 28 U.S.C. § 1391(c)(3), which authorizes an action against an alien in any district.   Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. § 1391(b)(2) because substantial actions in furtherance of conspiracy giving rise to Plaintiff's claims, including the use of U.S. banks and businesses for the transfer of U.S. dollar payments for the assets of P-Granit, occurred in this District.   Venue is proper in this court for Defendant Sberbank CIS US pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2), as the judicial district of its principal place of business.   Venue also is proper in this court for Defendants Sberbank Russia, Sberbank CIS USA, Inc., and German Gref, pursuant to 28 U.S.C. § 1391(b), (c) and (d).

## IV.   STATEMENT OF FACTS — ALLEGATIONS RELATING TO ALL COUNTS

### 1.   P-GRANIT'S BUSINESS

48.     Before the events described below, Mr. Poymanov was the owner of P-Granit—a successful business with a substantial quarrying operation, extensive real property and various production facilities.   P-Granit was the largest employer in Pavlovsk, Russia, and a major taxpayer and corporate contributor to the local economy.   P-Granit also produced non-military explosives and was considered a strategic company under a special Anti-Monopoly and Economic regime which prevents the sale of any interest in the company to a foreign-owned corporation without prior disclosure of the beneficial owner(s) and approval by a special Government committee on foreign investments into strategic companies.

49.     In 2008, Mr. Poymanov owned approximately 90% of P-Granit directly or through other companies.   The share structure was: (i) Mr. Poymanov 24.67%; (ii) P-Granit

Invest 29.46% through PNH (a Cyprus company owned by Mr. Poymanov); (iii) Vitera LLC 36.37% (Vitera was owned 50%/50% by Mr. Poymanov and PNH), and; (iv) individual minority shareholders 9.4% (Ms. Podgornaya and Mr. Poymanov's father and brother).

## 2.   **P-GRANIT INVEST'S LOAN**

50.     In early 2008, Mr. Poymanov decided to have P-Invest acquire 100% of PNH and consolidate his interest in P-Granit.  Accordingly, on August 8, 2008, he entered into a credit facility agreement with the Central Black-Earth Region Bank ("CBERB"), a branch of Defendant Sberbank Russia (the "Loan Agreement") for RUB 5,100,000,000 ($215,000,000). The Credit and Risk Committee of CBERB reviewed the company's financial records and reports and did not report any negative information about the company or Mr. Poymanov, personally.  CBERB concluded that P-Granit was in sound financial standing and made the loan. The repayment schedule provided for monthly instalments, the last instalment being due on July 31, 2015.

51.     The Loan Agreement provided for a series of pledges: 1) business and real property valued at 11 billion 990 million rubles; 2) 99% of shares in the authorized capital of P-Granit and other assets, including Mr. Poymanov's personal assets, and also personal guarantees by Mr. Poymanov which subsequently lead to seizure of his other assets not directly related to P-Granit.  Although it was represented that Mr. Poymanov's personal guarantee was requested as a mere "formality", it was later used against him to declare him bankrupt.  The pledged P-Granit shares included those Mr. Poymanov and P-Granit-Invest acquired with the CBERB loan.

52.     As part of the loan CBERB required that P-Granit enter into various agreements providing for extrajudicial foreclosure of the pledged shares.  These agreements gave the creditor the right to make a claim under the various pledge agreements without recourse to a court, either by: (i) taking ownership of the pledged shares with the price of the pledged security being

determined in good faith by an independent appraiser; or (ii) selling the pledged security either through an auction held in compliance with the applicable Russian law or by direct sale to a third party by lawful means and on terms which ensure payment of the true value of the assets.

53.     P-Granit Invest paid a total of 730 million rubles of the principal and 1 billion rubles in interest during the time the loan was recorded on the books as a term loan asset.  The Credit Control Departments of Sberbank Russia and CBERB, respectively, audited the loan and concluded that initially there were no irregularities.

### 3.   RAIDERSTVO AND THE THEFT OF MAJORITY SHAREHOLDERS' INTEREST IN P-GRANIT BUSINESS

54.     Russian-style illegal raiding is a well-developed four-stage process: (1) preparation - constitutes the selection of a target, assessment of the related risks and benefits, and collection of information about a business, its owners, and their activities; (2) negotiation - constitutes the raiders' contacts with the targeted business owners, finance, black PR campaigns, lawsuits, blackmail or intimidation tactics; (3) execution – constituting, after a legal owner refuses to capitulate to the raiders, the use of forgery and fraud, malicious prosecution, regulatory harassment, misuse of the banking system, violence and black PR; and (4) legalization - once a takeover is completed and raiders initiate the laundering of their illegally acquired property and funds.  Defendants have followed all four steps to strip Majority Shareholders of their P-Granit shares and, and concomitantly, P-Granit's assets.  As a result of the actions taken in furtherance of the conspiracy, described below, P-Granit is now effectively part of Defendant NAC which is owned and controlled by Defendant Zhukov.

55.     The conspiracy was to a) sell all the secured assets of P-Granit, at below distressed values; b) transfer them offshore; c) avoid detection of any connection to Defendant Zhukov; d) transfer each parcel back to Defendant NAC through these offshore entities; and e)

collect them together and repatriate them into one company under the auspices of the Defendant NAC for the benefit of Defendant Zhukov.

56.   To launch the conspiracy, Defendant Sberbank Russia negotiated in bad faith, as the restructuring of the debt was never intended to offer Majority Shareholders reasonable conditions for restructuring.  During this phase, co-conspirator Lelukh was funneling P-Granit information to co-conspirator Chayka and Defendants Zhukov as they were planning and starting the implementation of the illegal takeover.

57.   Further, Defendants manipulated the valuations of P-Granit by having them prepared by the company believed to be owned by Defendant Oleg Gref. Gref was the Vice-President of Neo Center of which he owns 19.9 since February 20, 2013. The value attributed by Sberbank Capital based on the Neo-Centre Report was in stark contrast to the value attributed by Sberbank at the time of the original loan.  For example, Sberbank division with whom Mr. Poymanov organized the Loan Agreement valued the PNH/Zinica shares at approximately the loan amount of 5,100,000,000 rubles.   Yet, Neo Center valued the entire P-Granit at 3,145,969,598 rubles.  This amount was less than the outstanding debt, and less than 13+ billion rubles – the value of P-Ganit in 2008 – 2010. The Vitera shares were taken away at valuation of 1,144,189,143 rubles, when the real value was 4.5 billion rubles. Subsequent reports valued it at lower than this amount. None of the appraisers made any requests to P-Granit for information on its activities, including any financial or operational parameters.

58.   Defendant Sberbank Capital initiated the transfers of shares to companies out of Russia, and into Cyprus. Within just one day of receiving the Vitera shares,–Sberbank Capital transferred the shares into Nisoram and Aletarro, both of which are owned, controlled by or otherwise connected to Defendant Zhukov, the owner of Defendant NAC.

59. Despite the fact that the shares were transferred using three different procedures, they were all transferred ultimately to the Defendant NAC. The following acts were committed in furtherance to the conspiracy:

1. Defendants communicated during the conspiracy in order to develop tactics and share details on the progress of the conspiracy among themselves.

2. Defendants incorporated Aletarro, Urasay and Atlantic specifically for the purpose of the conspiracy. Defendant Nisoram was an off-the-shelf company.

3. Defendants auctioned Mr. Poymanov's shares at below market value to LLC Trade which re-directed the shares to Urasay, another company linked to Defendant Zhukov.

4. Defendants Sberbank Russia and German Gref included the name of the winner of an auction in one of the assignment agreements before the auction was held, and allowed in the same Credit Committee decision the sale of Atlantic to an offshore company in order to conceal Zhukov was behind the scheme.

5. Defendants obtained a low valuation by a company known as FAC and used it as a basis to justify the extra-judicial foreclosure of the PNH/Zinica shares at a price substantially below market value.

6. Defendant Sberbank Russia financed Defendant Atlantic for the purpose of illegal acquisition of the P-Granit shares and took pledges over the shares of Nisoram, Aletarro and Urasay in P-Granit.

7. Defendants opened fabricated criminal cases against Mr. Poymanov and attempted to block his efforts to seek relief in Cyprus. The Defendants

collaborated with the individuals associated with infamous raider Kluyev included in the Magnitsky list.

8. Defendants took advantage of captured courts and bankruptcy court procedures and personnel.

9. Defendants used US intermediary banks to make payments during the implementation of the conspiracy.

60. Defendants invested alleged proceeds of the conspiracy in the U.S.

**B.   Phase one - PREPARATION**

61.    In late 2008 and the first half of 2009, the global economy in general caused unfavorable market conditions in Russia and specifically resulted in a considerable decline in the demand for, and the price of, P-Granit's products.  Therefore, in July 2009, P-Granit approached CBERB to restructure the loan, seeking a 2-year extension of the loan and a principal payment deferral.

62.    In August 2009, Mr. Poymanov and CBERB discussed restructuring the loan, and CBERB proposed draft terms that Mr. Poymanov found acceptable. CBERB concluded that under the new terms of the loan, P-Granit would be in a position to timely and fully settle all of the obligations under its Loan Agreement with the bank.

63.    Although CBERB issued preliminary approval for the restructuring of the loan, the Sberbank Russia Loan and Investment Committee of Defendant had to review and approve the CBERB's opinion regarding the feasibility of the restructuring.  Thus, on November 18, 2009, the Sberbank Russia Loan and Investment Committee endorsed the proposed restructuring parameters, but added an extreme provision: the transfer of 51% of P-Granit's shares to Defendant Sberbank Capital's books within 3 months, with the right to repurchase them upon

repayment of the loan (hereinafter "Zhukov/Sberbank "deal"). In addition, Defendant Sberbank Russia demanded that control of the Board of Directors of P-Granit be transferred to Defendant Sberbank Russia's subsidiary Defendant Sberbank Capital.

64.     Defendant Sberbank Russia gave Mr. Poymanov a very short time to assess its additional demands.  The failure to accept these requirements would void the offer to restructure, and the original loan immediately would become due and payable.

65.     The aforementioned restructuring presumed major changes to the loan agreement: (i) the term was extended through July 31, 2017 with payments deferred through March 27, 2010, and (2) an interest rate of 14.75% per annum, with monthly interest payment.  If Mr. Poymanov did not consent to Sberbank's additional demands the restructuring would consist of a repayment deferment only through February 27, 2010.

66.     Between August 2009 and January 2010, CBERB staff, including the CBERB Chairman, Mr. A.K. Soloviev, who also served as the Deputy Chairman of the Board of Directors [of Sberbank Russia], conducted repeated negotiations with S.P. Poymanov regarding the implementation of Defendant Sberbank Russia's proposal.  Later, after the debt was assigned to Sberbank Capital, negotiations were held with the participation of Defendant Sberbank Capital.

67.     In essence, Defendant Sberbank Russia demanded a deal that created a situation whereby Mr. Poymanov, essentially, was handing over control of his company to the bank.  The transfer of 51% of the shares and change of management meant that Mr. Poymanov would give up all control of the business, and there were zero guarantees that the changed management would attempt to arrange for repayment of the loan rather than make sure the company stayed in default and was taken over. The condition of the transfer of 51% for the nominal amount of 1

million rubles and the buyout for 350 million rubles following successful repayment of a significant part of the loan – more than $ 10 million at the then rate – was also outrageously excessive.   Mr. Poymanov refused to accept the offer. He knew of Sberbank Capital's prior record of acquiring 51% of a company that was in distress for the purported purpose of restructuring, but ultimately bankrupting the company and selling its assets.   For example, Mosmart, the Russian mega-company owning multiple malls, defaulted on a Sberbank Russia loan in 2009 and as part of the restructuring Sberbank Capital insisted in acquiring 51% of its shares. Nonetheless, despite obvious financial restructuring opportunities, Sberbank Capital initiated bankruptcy proceedings against the company and sold its assets.

68.     Instead, Mr. Poymanov tried to save P-Granit from a Mosmart fate and offered to transfer 25% plus 1 share of P-Granit to Defendant Sberbank Capital.   Defendant Sberbank Russia refused this counter offer and retaliated by demanding that CBERB transfer the debt from its books to the books of Defendant Sberbank Capital and declare P-Granit in default. At subsequent negotiations at Sberbank Capital, of which there are voice recordings and transcripts, it was confirmed that the goal of Defendant Sberbank Capital was "to change the owners" of P-Granit.

69.     Defendant Sberbank Russia was well aware that P-Granit could not meet the shortened deadline, and on March 19, 2010, it issued a formal demand for immediate repayment of the entire outstanding amount under the Loan Agreement -- RUB 4,457,364,652.00 (equivalent to USD 152,532,985.00).

70.     Contemporaneously, between August 2009 and February 2010, Defendant Zhukov, collected confidential and proprietary information about P-Granit's business in

preparation for the illegal takeover.  Several of the sources of the information were subject to a duty to keep the information confidential.

71.     Specifically, further in 2010 Defendant Galeeva, together with co-conspirators Kuznetsov and Potolitsyn, illegally obtained confidential information on both P-Granit and Majority Shareholders, by bribing local government officials.  Specifically, Galeeva secured confidential information regarding the financial and business activities of P-Granit from the Deputy Head of Control and Audit Department of the Voronezh Region Government.

### C.     **Phase two - NEGOTIATION**

72.     Between November 2009 and February 2010, while Mr. Poymanov was negotiating in good faith to restructure P-Granit's debt, Defendants German Gref and Khachyatureants conspired with Defendant Zhukov to devise and demand conditions that compelled Mr. Poymanov to seek alternative possibilities for the restructuring of the debt. Eventually, Mr. Poymanov had no viable alternative but to accept the Zhukov/Sberbank "deal" in order to salvage a long-shot opportunity of keeping a small portion of his business and not to be declared bankrupt.

73.     In the beginning of 2010, Mr. Poymanov met Defendant Zhukov during the meetings on the creation of an Association of the Russian stone and granite producers that Defendant Zhukov feigned an interest in forming.  Defendant Shirin represented Defendant NAC at the meetings.

74.     During one of these meetings, Defendant Zhukov approached Mr. Poymanov and said that he is aware of Poymanov's difficulties regarding restructuring Sberbank's loan. Defendant Zhukov made the unsolicited aggressive proposal that Mr. Poymanov should merge P-Granit with his company, Defendant NAC.  Defendant Zhukov's promised to fix all the challenges faced by P-Granit, specifically including that he guaranteed that he could persuade

Defendant Sberbank Russia to restructure its debt on favorable terms. Defendant Zhukov boasted that he was on friendly relations with Defendants Gref and Khachyatureants.

75. In February 2010, a couple of days prior the expiration of the one month extension granted by Defendant Sberbank Russia, Defendant Zhukov presented Mr. Poymanov with a an "offer" to form a "NewCo." The terms included the establishment of a new business entity with an ownership interest distribution of 70 % to Defendants NAC and 30 % to P-Granit. Defendant Zhukov told Mr. Poymanov that the new company would apply for a loan to Defendant PSZB to fully repay P-Granit's Sberbank loan.

76. In February 2010, Defendant Shirin and other NAC employees had multiple meetings with Mr. Poymanov to discuss a merger.

77. In summer of 2010 Zhukov offered to Poymanov to use PSZB to restructure the debt, for which purposes introduced him to Mr. Ananyev. In December 2010, Mr. Ananyev offered Mr. Poymanov to apply separately for a loan to repay Defendant Sberbank Russia's loan. The Director of Defendant PSZB, Dmitry Ananiev, confirmed the bank's availability to provide the refinancing needed to extinguish the Sberbank debt.

78. P-Granit, based solely on the premise that it was negotiating a re-financing solely on its own behalf, provided all the documents, including confidential and proprietary data, requested by Defendant PSZB to review the issue of re-financing. In violation of Russian banking secrecy law and breaching the fiduciary duty to P-Granit, Defendant PSZB conspired with and Defendants Khachyatureants, Zhukov, Shirin and co-conspirator Lelukh and Chayka disclosed all P-Granit confidential and proprietary information.

79. In early March 2011, shortly before the PSZB Credit Committee was to meet on the P-Granit loan, Mr. Ananyev called Mr. Poymanov on his cell phone and told him that,

despite the necessary economics and financial information for a positive decision, PSZB would not be moving forward with P-Granit. Mr. Ananyev stated that he was instructed by Defendant Khachyatureants to deny P-Granit the loan. Mr. Ananyev said that the stakes were too high for his bank to be on bad terms with Defendants Sberbank Russia and Sberbank Capital, plus he could not afford to jeopardize his relationship with Defendants Gref and Khachyatureants. Mr. Anayev said that if Mr. Poymanov convinces Defendant Khachyatureants not to object, Defendant PSZB would come back and issue the refinancing loan.

80.     As it became known later, during the time Mr. Poymanov was negotiating with Defendant PSZB and co-conspirator Ananyev, Defendants Aletarro (in March 2011), Nisoram (in September 2010) and Urasay (in July 2011) were opening bank accounts with Defendant PSZB's Cyprus branch to receive funds in US dollars from offshore companies associated with Defendants Zhukov and Klever Group, such as Maritrade Investment Limited, Monbee Trading Limited and to transfer money to Defendant Sberbank Capital as alleged consideration for the P-Granit shares assignment.

81.     Throughout the conspiracy, Defendant Zhukov was informing Defendant German Gref on the progress of his securing ownership of P-Granit. For example, on May 25, 2013, Defendant Zhukov in a phone conversation with Defendant Shirin told him that he had discussed P-Granit related issues with Defendant Gref earlier in the day.

82.     During the meetings with Mr. Poymanov in August 2010, Defendant Zhukov threatened Mr. Poymanov that, if he declined the merger offer, the P-Granit group would face major difficulties in its relationship with Defendants Sberbank Russia and Sberbank Capital. Mr. Poymanov rejected Defendant Zhukov's "offer." Immediately thereafter, Defendants co-

conspirators took a series of actions aimed at essentially stealing P-Granit's shares for the benefit of Defendant Zhukov and the co-defendants.

### D.   EXECUTION OF THE SCHEME

#### 1.   Transfer of P-Granit Debt to Defendant Sberbank Capital & Criminal Investigation against Mr. Poymanov

83.   While P-Granit thought it was independently negotiating with Defendant Sberbank Russia to restructure its loan and with Defendant PSZB to apply for and receive a new loan to repay Sberbank Russia, Defendant co-conspirators already were readying to steal P-Granit if Mr. Poymanov did not accept Defendants Zhukov and NAC's sweetheart deal. Between March 2010 and June 2013, Defendants planned and implemented a series of assignments under the Loan Agreement to multiple companies that owned by or for the benefit of Defendants Zhukov and other unknown beneficiaries.

84.   On May 20, 2010 Defendant Sberbank Russia assigned all its interests under the Loan Agreement to Defendant Sberbank Capital LLC by entering into an Assignment Agreement of Rights with Sberbank Capital ("Assignment Agreement").

85.   Immediately thereafter, P-Granit realized that Defendants had manipulated the situation as to all of them so as to shield themselves from the Courts and the public disclosure of Zhukov's interests by invoking the out-of-court settlement clause they had forced P-Granit/Poymanov to accept in the Loan Agreement. P-Granit/Poymanov filed a claim with the local court in Voronezh to nullify the clause. That claim, along with the other 60 claims filed by P-Granit between May 2010 and August 2016 in courts of different jurisdictions, predictably was rejected by the Russian Courts. The court proceedings were tainted with multiple procedural rights violations, for example: (i) failing to provide Mr. Poymanov's counsel sufficient time to study the court filing; (ii) appointing an appraiser who had a conflict of interests and who had

been accredited professionally by Defendants German Gref; (iii) failing to admit into evidence properly authenticated documents favourable to Mr. Poymanov's position; and (iv) approving auctions conducted without proper notice to Mr. Poymanov.  Defendant Chayka was involved in court proceedings against P-Granit through Elizaveta Berezina and her law firm "Zvezda Resource" that acted as the outside counsel of Defendant Sberbank Capital in the litigations with Mr. Poymanov over the shares and assets of P-Granit.

86.    On July 6, 2010, Defendant Sberbank Capital filed a claim in the Arbitrazh Court of Voronezh District for the recovery of RUB 4,649,293,410 under the pledge agreements.  The court granted Defendant Sberbank Capital's claim on July 3, 2011.

87.    Thus, Defendant Sberbank Capital sought a court order against all P-Granit's property mortgaged as a guarantee for loan payment and valued as at 11 billion 990 million rubles and 99% of shares in the authorized capital of P-Granit.  Pursuant to the Loan and Assignment Agreements, Defendant Sberbank Capital could enforce the court order either by: (i) taking ownership of the pledged shares with the price of the pledged security being determined in good faith by an independent appraiser; or (ii) selling the pledged security either through an auction held in compliance with the applicable Russian law or by direct sale to a third party by lawful means and on terms which ensure payment of the true value of the assets.

88.    Defendants conspired to falsify the fair market value of the assets by engaging captured appraisers who joined the conspiracy and helped rig the auctions.  Defendants Sberbank Russia and German Gref included the name of the winner of an auction in one of the assignment agreements before the auction was held.

89.    Between July 2010 and fall 2010, P-Granit unsuccessfully filed counterclaims to nullify the assignment agreement between Sberbank and Sberbank Capital.  While using all

available legal actions in local courts, Mr. Poymanov brought Defendants' conspiracy into the public limelight. He published open letters addressed to Defendant German Gref, and then wrote letters to the then Prime Minister of Russia, now President V.V. Putin.

90.    In response to his persistence and resilience, Defendant Chayka had used his family connection, as the son of the attorney General of the Russian Federation, to commence and continue criminal investigation against Mr. Poymanov to pressure him to relinquish his rights and claims regarding illegal takeover of P-Granit. Defendant Sberbank Capital in the person of Defendant Khachyatureants filed a criminal complaint with the law enforcement in Voronezh claiming that Mr. Poymanov was attempting to bankrupt P-Granit.

91.    Later, in 2011 Defendant Sberbank Capital filed a bankruptcy petition itself to the Voronezh oblast Arbitrazh court. Later in the spring of 2011, the investigative department of Voronezh police indicted Mr. Poymanov on these charges. These criminal cases against Mr. Poymanov have been closed. Further on, Defendant Sberbank Capital filed a bankruptcy petition against P-Invest.

92.    In 2014, the receiver of P-Invest, Defendant Nogotkov filed another criminal complaint claiming that Mr. Poymanov, as a shareholder of one of his smaller companies, P-Beton, attempted to cause damage to the company. The complaint was prepared by employees of NAC. P-Beton was 50% owned by P-Invest, and 50% by Mr. Poymanov.

93.    The bankruptcy of P-Beton was initiated by another company of Mr. Poymanov's group, P-Zhilstroy. Its bankruptcy was initiated by P-Nerud, the company which acquired assets of P-Granit. The charges are baseless since Mr. Poymanov was not an officer or a director of the company, a threshold requirement necessary for the crime. The co-conspirators used the

bankruptcy procedures to destroy Mr. Poymanov's businesses, undercutting his ability to fight the Reiderstvo.

94.     The supervisor in Moscow for the criminal investigation against Mr. Poymanov was reporting to Mr. Glukhov, who is well known for his involvement in corrupt schemes and Reiderstvo.  He is included on various international sanctions lists and has difficulty traveling outside of Russia.

95.     While Mr. Poymanov initially was defending the fabricated criminal charges against him and litigated in local and regional courts, the Defendants were transferring money from one offshore account to another in order to acquire Granit's shares and assets while hiding Defendant Zhukov's role in the scheme.   For example, on September 25, 2010, Defendant Nisoram, whose end beneficial owners are unknown received $30 million US dollars from Marbello Holdings limited, which is owned by Defendant Zhukov.  Nisoram made payments to Sberbank Capital for the shares in P-Granit. Similarly, on December 24, 2011 Urasay, which is believed to be owned by Defendant Zhukov, received in its US Dollars account with the Promsvyazbank Cyprus branch, a loan of US $ 18 million from Monbee Trading Ltd. – the same company which provided loans to Atlantic and which is mentioned in the Atlantic/Sberbank loan agreement as a member company of the NAC group.

96.     At the same time, in November 2010, co-conspirator Galeeva communicated via co-conspirator Kuznetsov with other co-conspirators and sent P-Granit's confidential financial information received from public officials and other P-Granit proprietary information to other co-conspirators. By email, she instructed them to construct a harassment and intimidation campaign against Mr. Poymanov.  In particular, Galeeva in the email instructions to the infamous Defendant Kublitskiy demanded that he coordinate the involvement of law

enforcement agencies to put pressure on Mr. Poymanov. She specifically stated that "[i]n order to reach the objective, namely to gain control over the authorized capital and the operating activities of P-Granit in addition to the list of corporate measures [ ...the following ... ] need to be arranged: wiretapping of S.P. Poymanov; field surveillance of the opponent with a view of revealing the persons, assisting S.P. Poymanov in terms of the conflict; search of premises; pre-trial restrictions (arrest, custody, overseas travel ban)." Defendant Kublitskiy remained in constant communication with Defendants Shirin, Zhukov and co-conspirator Kuznetsov and his involvement has been instrumental in the current persecution against Mr. Poymanov. Also, Defendant Kublitskiy is an associate of, and communicates often with, the infamous raider Kluyev.

### 2.    False Appraisal and Auction of P-Granit's Shares

97.    To further implement their fraudulent scheme, and prior to the Court's decision issued on July 3, 2011 granting Defendant Sberbank Capital's claims to enforce the pledge agreements, Defendant co-conspirators secured artificially deflated valuation reports wherein far below market or distress values were attributed to P-Granit's shares and assets. Defendants relied upon this value in order to justify transfers of the shares at deflated prices to companies connected to Defendants Zhukov and Oleg Gref.

98.    Although these valuation reports were used as supposed benchmarks for the sale price of the shares, at the time of the appraisals, none of the appraisers made any requests to P-Granit for information on its activities, including any financial or operational parameters.

99.    Thus, on or about April 6, 2011, Defendant co-conspirators Sberbank Capital, Khachyatureants, German Gref and Zhukov co-ordinated with Defendants Neo Centre and Oleg Gref to obtain an artificially deflated appraisal report for P-Granit's shares and assets. Defendant Oleg Gref, the son of Defendant German Gref, and a close associate with Defendant Zhukov,

quickly performed his role, and, only two weeks later, issued the appraisal report of P-Granit valuing its shares at a fraction of the real market value.

        a.     **The Vitera Shares**

    100.   On 8 April 2011, for the purpose of enforcing the Sberbank Russia debt, Defendant Neo Center issued its appraisal for the P-Granit shares. It valued the shares at RUB 3,035,319,747. Defendant NEO Center estimated P-Granit at a value five times lower compared to the value determined for the purpose of the original CBERB loan. Between June 3 and June 14, 2011 Defendants Sberbank Capital, through co-conspirators Lelukh and Kuznetsov communicated with notary Kharnaukhova causing the latter to purposefully and knowingly send Vitera LLC a notice of the enforcement of the pledge against Vitera shares in P-Granit to an incorrect address. The co-conspirators were well-aware of that Vitera LLC was not located at the address 12 Ostapovskiy projezd, b. 3, Moscow, because on the enforcement application by Defendant Sberbank Capital dated 31 May 2011 it states that "Vitera LLC office is not located at the legal address 12 Ostapovskiy projezd, b. 3, Moscow, there are no Vitera LLC representatives at the stated address". This was done despite the fact that Sberbank Capital was notified in writing about the actual correct address for Vitera. Khnaraukova's sister, Lobakh also a notary, later issued the final enforcement notice of the pledge against Vitera shares after the 1year statute of limitation for challenging the enforcement order had passed.

    101.   Having issued its final enforcement notice against Vitera shares, Defendants Sberbank Capital, PI and Zhukov contacted bailiff Burmistrov to initiate enforcement proceeding against Vitera.

    102.   On June 22, 2011, Burmistrov, having avoided a challenge to the order, arranged the withdrawal of Vitera LLC's shares of P-Granit, and their transfer to Defendant Sberbank

Capital. Thus, on June 22, 2011 the Vitera shares at the deflated value set forth in the Defendant Neo Centre's Report passed under the control of Defendant Sberbank Capital.

103.   On the same day, on June 22, 2011, Defendant Aletarro received in its account at Defendant PSZB's branch in Cyprus a $10 million US dollars loan from Zasteni Investment Ltd., a BVI company owned by Defendant Zhukov.  On the same day, Defendant Aletarro transferred the $10 million US dollars in two payments of $3 million and $7 million to its bank account with Bordier & CIE, Geneva Switzerland, a correspondent (intermediary bank) of UBS.

104.   On 23 June 2011, Defendant Sberbank Capital transferred the Vitera shares [36.37%. of P-Granit] to Defendants Nisoram – 25%, and Aletarro – 11.37%.  Aletarro paid Sberbank Capital $10 million US dollars from its account with Bordier & CIE bank in Switzerland.  Because the transfer was in US dollars the Swiss banks had to use a US correspondent bank.

105.   Defendants Sberbank Capital and Zhukov intentionally split the Vitera shares in order to circumvent general anti-monopoly restrictions and the restrictions imposed under Russian law on the acquisition of shares in strategically important companies by foreign subjects. P-Granit is a strategically important company and acquisition by a foreign entity of more than 51% shares would require the permission of a special committee under the Federal Government of the Russian Federation.  One of these proceedings would have exposed Defendant Co-conspirators Zhukov's, Gref's, Khachaturyants's and the other co-conspirators' roles in the scheme.

106.   Vitera challenged the administrative act/transfer of its shares to Defendants Nisoram and Aletarro directly in the Arbitrazh courts in Russia.  Predictably, the court rejected their claims.

107.   While the case was still pending, on 19 April 2012, and before Court issued its appeal decision on the validity of the transfer of Vitera shares, a bankruptcy manager was appointed over Vitera.  Defendant Atlantic LLC was the only Vitera creditor at that stage and the bankruptcy manager that was appointed was nominated by Defendant Atlantic LLC.  Thus, the sole creditor controlled the entire process.  The bankruptcy manager did not support the claim on appeal and left it to the court to decide as it saw fit.  The 19th Arbitrazh Appellate Court predictably allowed the appeal against Vitera, without objection by its receiver, in relation to Defendant Nisoram on May 15, 2012 and in relation to Defendant Aletarro on July 20, 2012.  Contrary to the professional rules, the receiver acted in the interests of the co-conspirators, rather than defending the interest of Vitera.

108.   Once the Vitera Bankruptcy Trustee withdrew support for Vitera's claim for recovery of the Vitera shares from Nisoram and Aletarro, PNH issued petitions with the Central District Federal Arbitrazh court and Supreme Arbitrazh court for their supervisory review of the decisions of the 19th Arbitrazh Appellate court.  However, it was held that PNH, as a third party, did not have the right to appeal the decisions of the 19th Arbitrazh Appellate court in relation to Vitera's claim, despite the obvious fact that the judgments, effectively refusing to return the shares to Vitera and keeping the enforcement of the pledge over Vitera shares at the deflated value determined by NEO Centre, affected PNH as the provider of pledge of its shares in P-Granit.  Effectively the Trustee and the Court insulated the distribution of Vitera shares from independent review.

### b.   Mr. Poymanov's Shares

109.   After the Vitera shares, Defendant Sberbank Capital moved to enforce the pledges against Mr. Poymanov's 24.67% shares in P-Granit.  Thus, on July 8, 2011, for the purpose of obtaining a bailiff order in the enforcement proceedings, the bailiffs in co-ordination with PI co-

conspirators retained Sokolov of appraiser Primula LLC to issue an artificially deflated valuation report for Mr. Poymanov's shares. Sokolov is an acquaintance of Ms. Galeeva, and his wife is an employee of Promsvyazbank.

110.   The Primula LLC Report valued Mr. Poymanov's shares at approximately RUB 496,174,826. This value was lower than that attributed to comparable shares appraised by Defendant Neo Centre, which was RUB 733 million.

111.   On December 30, 2011, the Task Quadro Securities LLC organized an auction of Mr. Poymanov's shares. The auction of Mr. Poymanov's shares was designed and conducted in a manner that minimized participation by potential bidders. A temporary decision of the Supreme Court of Russia suspended the auction date. When the temporary decision was lifted, the auction was held on only one day's notice. There were only two participants at the auction: LLC Trade and Defendant Sberbank Capital. The winner of the action was declared LLC Trade that paid RUB 516,174,826 for the share.

112.   Later, believed to be in or around February 2012, LLC Trade transferred Mr. Poymanov's P-Granit shares to Defendant Urasay. On December 24, 2011 Urasay received in its US Dollar account with the Promsvyazbank Cyprus branch a loan of US $ 18 million from Monbee Trading Ltd. – the same company which provided loans to Atlantic and which is mentioned in the Atlantic – Sberbank loan agreement as a company of the NAC group. On January 25 and 31, 2012 Urasay transferred 12,953,367.87 US Dollars and 4,281,949.93 US Dollars under the Contract of Purchase and Sale of Securities dated 23.01.2012. The amount corresponds to the price of the shares purchased by OOO Trade at the auction. OOO Trade is mentioned in the Sberbank credit committee decision approving the loan to Atlantic as the winner-to-be of the auction. These movements clearly establish the additional financial flows in

US dollars by the NAC. Upon information and belief, Defendant Zhukov owns Defendant Urasay.

     c.    **The PNH/Zinika Shares**

113.    Disposing of PNH/Zinika shares took place after Defendant Sberbank of Russia assigned its debt to Defendant Atlantic. Before that assignment, Sberbank Capital worked on the enforcement of pledges on the shares in P-Granit in the interests of Zhukov and other co-conspirators.

114.    On November 9, 2011, co-conspirator Nataliya Maiorova, the Chief Accountant (as co-defendant Shirin informed the criminal investigator in the course of interrogation) of Defendant Klever Asset Management and acting under Defendant Zhukov's control, incorporated Defendant Atlantic LLC.

115.    On 20 December 2011, Defendant Sberbank Capital entered into an assignment agreement with Defendant Atlantic LLC transferring all of its rights under the Loan Agreement and the various security pledges to Defendant Atlantic LLC for a consideration of 4,140,550,564 (the "Assignment Agreement"). Department of the Economy and Finance of the Government of the Russian Federation, in a letter dated 30 December 2011, described the party receiving assignment from Defendant Sberbank Capital in its report to then Prime Minister, now President of Russia Mr. Putin, signed by Mr. Belousov as "'structures owned by' Zhukov."

116.    The Assignment Agreement listed a series of pledge agreements also assigned by Sberbank Capital to Atlantic LLC. Further, it provided that Defendant Atlantic LLC had to pay within 20 business days of the date of the Assignment Agreement. The Assignment Agreement links the failure to perform to the termination of the option agreement between Defendants Sberbank Capital, Atlantic LLC, Aletarro and Nisoram (the "Option Agreement").

117.   On December 21, 2011, one day after the Assignment and the Option Agreements were signed, the Defendant Sberbank Russia's Credit Committee ("Credit Committee"), chaired by Defendant German Gref, approved the issuance of a loan to Defendant Atlantic LLC. The amount of the loan was, surely not by coincidence, equivalent to the amount payable by Atlantic to Sberbank Capital for the assignment of the debt less the amount which was subsequently paid by the winner-to-be of the auction LLC Trade for the 24.67% block of shares owned by Mr. Poymanov in P-Granit.

118.   As a loan condition, the Credit Committee listed multiple events that had not taken place yet, but happened within several weeks after the date of the Credit Committee decision and the date when the loan agreement was signed.  In particular, the agreement listed Trade LLC as the winner of the auction for P-Granit shares organized by the State Agency for Russian Property before the auction was conducted and approved the sale of the yet to be acquired shares to Defendant Urasay.

119.   Furthermore, the Credit Committee minutes of the meeting on the loan to Defendant Atlantic described how the founder of Atlantic, co-conspirator Mayorova would be allowed to sell P-Granit debt to Defendant Mostra Consulting which is allegedly owned by Defendant Zhukov.   The minutes omitted that the Credit Committee was retroactively authorizing the transaction and made no reference to failure to secure proper authorization in the future.

120.   On 27 January 2012, Defendant Atlantic entered into a loan agreement with Defendant Sberbank of Russia to finance its obligations to Defendant Sberbank Capital under the Assignment Agreement.  ("Sberbank's Loan Agreement to Atlantic").

121. Defendant Sberbank's Loan Agreement to Defendant Atlantic identifies that Defendant Sberbank of Russia would provide a credit line to Atlantic with a limit of RU 3,624,400,000 to finance the transaction to buy the debt under the various agreements including the Loan Agreement. The credit line balance had to be completely repaid by 25 December 2018.

122. Further, the agreement provided that the credit would be issued on execution of certain guarantees, including a guarantee by Defendant Atlantic in favor of Defendant NAC.

123. As security, Defendant Atlantic guaranteed to provide to Defendant Sberbank the following pledges: a pledge of the ordinary shares in Defendant Aletarro; a pledge of the ordinary shares in Defendant Urasay; a pledge of the ordinary shares in Defendant Nisoram; a pledge of an 11.37% shares in P-Granit; a pledge of a 25% shares in P-Granit; a pledge of a 24% shares in P-Granit; and a pledge of a 38.63% shares in P-Granit.

124. These pledges had to be signed within 30 days of the transfer of the shares in P-Granit to Defendant Atlantic or affiliates of the Defendant NAC controlled by Defendant Zhukov.

125. Defendant Sberbank of Russia also required Defendant Atlantic to ensure that the Defendant NAC maintained a particular Debt/EBITDA ratio as specified in the agreement and that the debts owed by three companies associated with Defendant Zhukov are not to be taken into account when assessing the overall exposure of his companies to Defendant Sberbank of Russia. The companies noted in the agreement are: *"Tankard Trading & Investments Limited; Monbee Trading Limited; and IBG Development Group Inc."* The exemption amounts to a total not exceeding $80,000,000 (eighty million US dollars).

126. Under Defendant Sberbank Russia's Loan Agreement to Defendant Atlantic, Defendant Sberbank Russia can demand an early repayment of the credit funds given to Atlantic

and provides Defendant Sberbank of Russia's irrevocable and unconditional consent to the sale of shares in Atlantic to Mostra by the founder and General Director of Atlantic, Natalia Mayorova by 1 March 2012.

127.   The agreement also contemplates and records the eventual transfer of shares in P-Granit to Defendant Atlantic and or affiliates of the Defendant NAC controlled by Defendant Zhukov.

128.   Thus, Defendant Sberbank Russia financed Defendant Atlantic LLC's acquisition of the Pavlovskgranit shares and took pledges for the shares of Defendant Nisoram, Aletarro and Urasay in P-Granit, at more favourable terms than it was willing to give P-Granit/Poymanov to re-finance the original debt.  If the P-Granit restructuring negotiated by Mr. Poymanov had been accepted, Sberbank Russia would have recovered, before July 31, 2017, the entire loan amount plus 3.635 billion rubles interest just on the main loan, not counting interest on other smaller loans.  Under the Atlantic loan agreement, Sberbank Russia would recover the loan amount, but only 2.047 billion rubles interest, *i.e.*, 1.588 billion rubles less.  On the date Sberbank Russia signed the loan agreement with Atlantic, the ruble rate was 30.3600 rubles for 1 US dollar, *i.e.*, the difference amounted to a lesser interest return of US $ 52.3 million.

129.   On February 17, 2012, Mayorova entered into a sale agreement with Defendant Mostra Consulting, under direct control of Defendant Zhukov, for the purchase of 100% of participatory interest in the authorized capital of Defendant Atlantic.

130.   On March 28, 2012, Defendant Aletarro and Sberbank Russia entered into a share pledge agreement for the pledge of shares owned by Aletarro in P-Granit to Sherbank, whereby Defendant Zhukov is the direct beneficiary of Defendant Aletarro for the purpose of Defendant Atlantic enforcement proceedings under the Sberbank Loan Agreement to Atlantic.

131.    On September 6, 2012, by resolution of the sole member of Defendant Atlantic - Mostra Consulting - drafted by attorney Kozyr, under the direct control of Defendant PI. Defendant Atlantic changed its address to 21 Bolshoy Sukharevskiy pereulok, b. 2, Moscow, 127051.   This is the same address as VEB Upravlenie Projektami, another of Defendant Zhukov's registered companies.

132.    During this entire process, as mentioned above, the Majority Shareholders used all available legal means to protect their interest, including filing criminal complaints for the theft of the company.  It is no surprise that the Russian authorities only pretended to investigate the facts.  Moreover, the investigation was delayed and ultimately thwarted when Russian law enforcement attempted to secure a response to a Mutual Legal Assistance Request seeking the identity of the beneficial owners of the offshore Defendant companies named herein. Despite the fact that the Russian court in due order authorized such request for legal assistance, the request of the court was never even sent to the Office of Attorney General of Russia, whose Department of International Co-Operation is sending such requests to foreign authorities in the normal procedure of international assistance on legal and judicial matters.

133.    Nonetheless, as part of its investigation on the theft of Vitera shares, the Moscow Tver Interdistrict Prosecutor sent official letters to Defendant Neo Center regarding its appraisal of Vitera shares.

134.    On September 25, 2012, receiving this letter, Defendant Oleg Gref emailed Defendant Zhukov (from e-mail o.gref@neoconsult.ru) forwarding the aforementioned letters to Yuri Zhukov (e-mail yz@klever.com), with the following accompanying letter: "Hello Yura. For your information: the show goes on". On 25 September 2012 at 12:40 Yuri Zhukov (from e-mail yz@klever.com) responded to Gref Oleg (to e-mail o.gref@neoconsult.ru): "I think the

show will not be long, neither will it be interesting, but it's worth being attended. Need a contact person for my legal advisors to arrive at a certain decision".

135. On 28 September 2012, Defendant Atlantic ordered a valuation report from Financial Appraisal Consulting LLC ("FAC") for the purpose of enforcement proceedings against PNH/Zinica shares (the "FAC Report"). According to the agreement Defendant Atlantic had to fulfil the requirement of obtaining a supposed independent valuation under the assignment and loan agreements on extrajudicial foreclosure of the pledged shares. The FAC Report valued the PNH/Zinica shares at RUB 760 million a value even lower than the value for the PNH/Zinica shares given by Neo Centre, which was RUB 926 million. The appraisal specialist doing that report was member of SMAO – the same guild of appraisers to which the NEO Centre appraiser was a member.

136. On 2 October 2012, Defendant Atlantic served notice on PNH under the agreement on extrajudicial foreclosure of the PNH/Zinica shares, which was assigned to it pursuant to the Assignment Agreement. Defendant Atlantic notified PNH of its intention to take over the PNH/Zinica shares at the value assigned to it by the FAC Report, i.e. RUB 760,000,000.

137. On October 26, 2012, Defendant Atlantic LLC acquired the PNH/Zinica shares through an out-of-court foreclosure of these shares.

E.   **LEGALIZATION**

a.   **Illegal bankruptcies**

138. In April 2012, Defendants started implementing their plan to bankrupt P-Granit and funnelling its assets to Defendant NAC.

139. Thus, in December 2012, Defendants Atlantic, NAC, Zhukov, Shirin, and PI conspired to initiate the extrajudicial bankruptcy proceedings against P-Granit.

140.    Contrary to the receiver's obligation to act independently and his fiduciary duty to the company's creditors, correspondence of December  2012 between Defendants Sberbank of Russia, NAC, Zhukov, and Galeeva and co-conspirators PI, Kuznetsov, and Potolitsyn demonstrates that they controlled the bankruptcy receivers, including Defendants Nogotkov and Bazarnov.  They were instructing Defendant Nogotkov, who were in turn was reporting back on all actions taken during the proceedings.   For example, in December 2012 co-conspirator Kuznetsov and the receiver Zaytsev and receiver Defendant Nogotkov exchanged emails sharing: 1) reconciliation statement between Vitera LLC, Evrogranitinvest LLC and Pavlovskgranit-INVEST CJSC; 2) Evrogranitinvest LLC progress report for November 2012; 3) Vitera LLC progress report for November 2012.  Defendant Nogotkov sent to co-conspirator Kuznetsov (from his e-mail knogotkov@gmail.com to  the e-mail K.andrey@bk.ru)  the aforementioned reconciliation statements and progress reports with the following comments: "Hello! Please find attached the reports on two bankruptcies (same like we do it for Slava in Samara) and financial expenses report. Is it ok for you? If yes, will discuss everything in detail on Friday. Kirill." The same receiver, Zaytsev, although appointed receiver to protect its interests, did not oppose Aletarro and Nisoram's appeal of the  initial court judgment ordering them to return P-Granit shares to Vitera.

b.      **Transfer of P-Granit Assets to Defendants NAC and Zhukov**

141.    On January 29, 2013, Defendant NAC, emailed Defendant Sberbank Russia, a comprehensive plan for the future steps to be taken by Defendants to accomplish the takeover of P-Granit's assets for the benefit of Defendants NAC and Zhukov.   The plan detailed the following actions that ultimately were implemented by Defendants: (1) Defendant Atlantic assigned the debt of Defendant Sberbank Russia to Defendant NAC as a payment for obligation assumed and Defendant NAC acquired receivables as to P-Granit and 20.86 % block of shares;

42

(2) P-Granit established an associated company (JSC) and funneled almost all the assets into it; (3) P-Granit and Defendant NAC made an amicable settlement agreement, whereby Defendant NAC changed receivables as to P-Granit; and (4) Defendant NAC owns a new JSC.  Defendants Shirin, Zhukov and Khachyatureants signed off this plan.

142.    Thus, on June 27, 2013, Defendant Atlantic applied to the Russian Federal Anti-Monopoly Service (the "FAS") for permission to acquire two entities Pavlovskgranit-Promvzryv ("P-Prom") and Pavlovskgranit-Nerud ("P-Nerud") created by new shareholders of P-Granit, to which most of the assets of P-Granit were to be moved.  On 23 July 2013, Defendant Atlantic obtained such approval.

143.    On July 17, 2013, Defendant Atlantic and P-Granit entered in to a comprehensive settlement in the process of the P-Granit bankruptcy case in court, whereby the assets of P-Granit were transferred to P-Prom and P-Nerud.  The settlement was also approved by the Russian Court on the basis that the other creditors of P-Granit (very minor) would be paid in full ("the Settlement").

144.    On August 15, 2013, subsequent to Defendant Atlantic's application, Defendant NAC applied to the FAS for permission to acquire 100% shares in P-Prom and P-Nerud and implement the Settlement.  On September 2, 2013, Defendant NAC obtained such approval for P-Prom and on  September 5, 2013, it got similar permission for P–Nerud.

145.    On September 23, 2013, Defendant Atlantic and co-conspirator Vetrolin, a BVI company, entered into a sale and purchase agreement of P-Nerud 100% shares for the amount of 2 billion rubles.  The deposit for the transaction in the amount of almost 1 billion RUB was transferred from Vetrolin's bank account in the Defendant Promsvyazbank Cyprus branch in US dollars.

146.    In accordance with the Settlement, on November 1, 2013 P-Granit paid Defendant Atlantic two amounts totalling 1,009,665,613 rubles.  Subsequently, on November 14, 2013, P-Granit transferred to Defendant Atlantic its shares in P-Nerud and in P-Prom, and unilaterally cancelled the agreement with Vetrolin, allegedly due to a more favourable offer.

147.    The agreement between Defendant Atlantic and Vetrolin had an arbitration clause and the forum was the Arbitration court of non-profit organization fund "Pravo and Ekonomika TEK".  Shortly after the alleged breach, co-conspirators Gorbunov and Kuznetsov, pursuant to Zhukov's instruction, filed a claim in the Moscow City Arbitrazh Court to enforce the arbitration clause and seek compensation from Defendant Atlantic. Right before canceling the agreement, Defendant Atlantic was renamed into AlfaMarket LLC.  This was done to prevent the public, including the Majority Shareholders, from finding the pending case between Atlantic and Vetrolin on the docket. Under Russian law, if the contract requires an "earnest payment" by buyers to secure the transactions, and the seller cancels the deal, then the seller has to return double the "earnest payment".  Earnest payments are routinely set between 1% and 5% of the purchase price.  In this case, the "earnest payment" was 75% of the 2 billion rubles purchase price.  The reasonable explanation for this extraordinary "earnest payment" is to launder the funds.  By getting a court order for the distribution of the "earnest payment," Defendants legalized that outflow of funds.

148.    As   a   result   of   the   Settlement   between   P-Granit   and   Defendant Atlantic/AlfaMarket, in exchange for payments in cash and in shares of P-Nerud and P-Promvzryv described above, P-Granit acquired the rights of Defendant Atlantic/AlfaMarket under the Loan Agreement, which were valued at 3,326,210,254 RUR.  This amount is the

equivalent of US $ 92,578,498 at an exchange rate of 1 RUR = 0.278 USD (as of March 19, 2014).

149.    On November 29, 2013 P-Granit entered into an agreement with Suintex Ltd, a BVI company, whereby P-Granit (the Assignor) assigned to Suintex Ltd. (the Assignee) the creditor's rights under the Loan Agreement for only 137,000,000 RUR, which is the equivalent of US $ 4,301,953, as per the exchange rate on October 29, 2014, and today of US $2,194,830. The agreement to sell the rights to bring the claim to Suintex Ltd was a transaction which required approval by the P-Granit shareholders.  Defendant Atlantic put forward the proposal to sell the claim to Suintex Ltd for 137 million rubles at the shareholders' meeting.

150.    On December 3, 2013, the new General Director of Defendant Atlantic/AlfaMarket, co-conspirator Potolitsyn distributed to P-Granit's new shareholders a draft "Resolution of P-Granit General meeting of shareholders, to be held on 27 December 2013". The first item on the agenda was approval of the major transaction, formulated as follows: "To approve the Company's major transaction, namely Receivables assignment contract (cession) between P-Granit and the company Suintex Ltd."

151.    On December 23, 2013, Defendant Atlantic/AlfaMarket, acting as the borrower under the non-revolving loan facility agreement dated January 27, 2012 with Defendant Sberbank of Russia and concluding a tri-party agreement between Atlantic, Sberbank and NAC, assigned the 3 billion 636 million 257 thousand 963 rubbles debt to the new debtor – Defendant NAC. The consideration was the transfer to NAC of 100% of shares in P-Prom and P-Nerud, the latter holding most of the assets of the former P-Granit. As a result, NAC formally held the assets and the business of P-Granit, which was at the final stage of being raided.

152.   At the shareholders meeting on December 27, 2013 shareholders Defendants Aletarro, Nisoram, Urasay and Atlantic/AlfaMarket voted in favor of the Suitnex proposal. Thus, Suintex, together with the right to the debts, accepted the corresponding receivables on the guarantees for the debt as to:

    a.  primary debtor – P-Granit-INVEST; and

    b.  guarantors and pledgers: I.Y. Podgornaya, O.P. Poymanov, P.A. Poymanov, S.P. Poymanov, VISKOM LLC, Evrogranit LLC, Evrogranit-Invest LLC, Vitera LLC, and Dorspetsstroy LLC.

The latter arose from the agreement on the non-revolving loan facility dated August 4, 2008, with supplementary agreements between Defendant Sberbank of Russia and P-Granit-INVEST and the security interest agreements. The decisions adopted at this shareholders meeting violated the law as related parties voted on matters in which they had a self-interest.

153.   Also during the December 27, 2013 shareholders meeting, Defendants Aletarro, Nisoram, Urasay and Atlantic/AlfaMarket voted to liquidate P-Granit. Subsequently, in furtherance of the conspiracy and to cover it up, on June 17, 2014, Defendant Atlantic/AlfaMarket was dissolved. Thus, Defendants liquidated the corporate entities which could be parties to court proceedings challenging the validity of the performed transactions and restitution of assets.

154.   Mr. Poymanov continued to fight for his company in actions pending in Russian court. During this period, he was threatened multiple times with physical violence by an unknown person who demanded that he drop his claims. Although Mr. Poymanov filed a complaint with the local police, the criminal case was closed due to a supposed dead-end in the investigation.

155.   In a further attempt to intimidate Mr. Poymanov, on July 15, 2014, the Investigative Committee for Voronezhkaya Oblast initiated a new criminal case against him based on the complaint of the P-Invest receiver.  The receiver Defendant Nogotkov alleged that Mr. Poymanov, as the shareholder of a OOO Pavlovskgranit-Beton through P-Granit Invest abused his authority and sold  certain assets to a third party, avoiding payment to the existing creditors and the tax authority. The case against Mr. Poymanov was baseless as a matter of Russian law, because a derivative action only can be brought against an officer of the company, while Mr. Poymanov was a shareholder. Contrary to the allegation, on December 14, 2008, Mr. Poymanov personally loaned 3.4 million rubles to the company, the balance of which is outstanding.  He never took measures to recover this debt.

156.   On August 13, 2015, the Defendants' accomplished the next step in the conspiracy -- the takeover of P-Granit -- when the Voronezh Regional Arbitrazh Court recognized the liquidation of P-Granit.   P-Granit ceased to exist and was erased from the National Registry of companies.

157.   Thus, Defendants successfully transferred the assets of P-Granit from the Majority Shareholders to the Defendants NAC Group and Zhukov.  Defendant Atlantic LLC was re-named and ultimately liquidated.  P-Granit also has been liquidated.

158.   The personal bankruptcy of Mr. Poymanov that followed the bankruptcy and liquidation of P-Granit is part of the conspiracy to raid his company and eliminate his ability to enforce his rights.  In furtherance of this segment of the conspiracy, Defendant Suintex acquired P-Granit's alleged claims for a nominal value and then initiated the bankruptcy proceedings purportedly to enforce those claims.

159.   On October 2, 2015, Defendant Suintex filed for Mr. Poymanov to be put into personal bankruptcy.  On February 8, 2016, the Moscow Oblast Arbitrazh Court approved the restructuring of the debt and, at the request of Defendant Suintex, approved Defendant Bazarnov as the receiver.  Shortly after his appointment, Defendant Bazarnov requested the Court freeze Mr. Poymanov's bank accounts and real estate.  Although acting as the receiver for Mr. Poymanov's bankruptcy estate, Defendant Bazarnov refused to seek the re-evaluation of the P-Granit shares and to contest the previous artificially deflated transactions which led to Mr. Poymanov's bankruptcy.

160.   On July 21, 2016 the Moscow Oblast Arbitrazh Court declared Mr. Poymanov bankrupt and initiated the sale of his assets.  On July 29, 2016, co-conspirator Arismet, an entity controlled by Defendant Zhukov, joined Suintex as one Mr. Poymanov's creditors.  The personal bankruptcy of Mr. Poymanov is part of the conspiracy to raid his company and eliminate his ability to enforce his rights.  In furtherance of this segment of the conspiracy, Defendant Suintex acquired P-Granit's alleged claims for a nominal value and then initiated the bankruptcy proceedings purportedly to enforce those claims.  Although the alleged claims against Mr. Poymanov were valued at the deflated price by Defendant Neo Centre at 1.144.189.143,00 rubles, Arismet purchased them for 2.656.800,00 rubles. On November 11 2016, P-Nerud, controlled by Defendants NAC and Zhukov joined Suintex and Arismet as creditors in Mr. Poymanov's personal bankruptcy.

161.   Although the original debt of P-Granit to Defendant Sberbank Russia was 4.5 billion rubles, Defendants became owners of shares and/or received cash in excess of 7 billion rubles despite the intentional low-ball appraisal of the shares and assets.  Yet, in Mr. Poymanov's personal bankruptcy, Defendants are claiming an additional 4 billion rubles.

### 4. LITIGATIONS IN CYPRUS

162.    Right after Defendant Atlantic executed the Settlement agreement with P-Granit's new shareholders, on August 7, 2013, Mr. Poymanov filed a request for preliminary injunction in the Limassol District Court in Cyprus, requesting the Court enjoin them from disposing of P-Granit shares and an order for the return of the shares to Mr. Poymanov or monetary compensation and the disclosure of the beneficial owners of the offshore companies ("Limassol Litigation").

163.    Although the Court originally granted the preliminary injunction, the decision was reversed on the appeal.  The matter of the preliminary injunction is currently pending at the Supreme Court.  The District Court postponed the disclosure of the beneficial owners until the case is adjudicated on the merits, it is being further heard.  The claims alleged in the Limassol Litigation are conspiracy to defraud Mr. Poymanov and other shareholders of their shares in P-Granit.

164.    On September 12, 2016, the court appointed receiver in Mr. Poymanov's personal bankruptcy case, defendant Bazarnov, submitted a letter to Mr. Poymanov's Cyprus counsel revoking any power of attorney (including retainers) issued by Mr. Poymanov for the Limassol Litigation and demanded that counsel "stop with immediate effect any legal work and/or proceedings and/or services rendered, as regards any property movable or immovable, in which Mr. Poymanov is directly or indirectly involved or interested in and/or any representation on behalf of Mr. Poymanov in court or elsewhere." Mr. Poymanov challenged the authority of the receiver in Russian Court and the hearing has been scheduled for late November.  Obviously, this latest move by the co-conspirators demonstrates that there is no available forum for the Majority Shareholders to seek redress for the expropriation of their assets in P-Granit.

165.   Mr. Poymanov filed a complaint against Defendant Bazarnov's actions canceling the powers of attorney, but the Court, again, denied Mr. Poyamnov's request.  On November 7, 2016, alleged creditors – Suintex and Arismet – approved the hiring of the law firm, Panagos and Panagos, to purportedly represent Mr. Poymanov in the court cases in Cyprus. The same alleged creditors also decided that co-conspirator Arismet would finance Panagos and Panagos.  Thus, the receiver is represented in court by counsel that is paid by Defendant Zhukov.

166.   To exert additional pressure on Mr. Poymanov, Defendants, through Defendant Nogotkov, brought additional proceedings in Cyprus in March 2013 against PNH, Mr Poymanov, Belim Enterprises Limited and Abacus (Cyprus) Limited. The case is currently pending in the District Court of Nicosia, with action number 1901/2013 (the "Nicosia Proceedings").

167.   In the Nicosia Proceedings Defendant Nogotkov claims that Mr. Poymanov and others conspired to cause damage to P-Invest by unlawfully diluting P-Invest's interest in PNH. In particular, Defendant Nogotkov alleges that because the shares in P-Granit owned by PNH were pledged as security for the Loan Agreement, Mr. Poymanov and others fraudulently took steps to dilute the interest of P-Invest in PNH to protect themselves from the consequences of the breach of the Loan Agreement. This is a completely unsound allegation, as this has not affected the pledge of shares owned in P-Granit by PNH in favor of Sberbank, taken over by Atlantic. The Nicosia District Court granted Defendant Nogotkov freezing orders *ex parte*. For now the case is pending and  a hearing date has not been scheduled.

168.   While the Nicosia Proceedings arise from the same story as the Limassol claim, they relate to only part of it, in particular P-Invest's shares in PNH and the related pledge

agreement. By contrast, the Limassol Litigation relates to the shares in Pavlovskgranit, one level up from PNH.

## COUNT I

### Fraud

### (Against Defendants Sberbank Russia and Sberbank Capital)

169.    Paragraphs 1 through 168 are incorporated by referenced as if fully set forth herein.

170.    Defendants Sberbank Russia and Sberbank Capital intentionally and knowingly failed to disclose to Majority Shareholders that their purported negotiation over restructuring of the debt was for the benefit of Defendant Zhukov.  Defendants kept Zhukov as the ultimate beneficiary of the scheme a secret until the end and circulated and disclosed proprietary and confidential information of P-Granit.

171.    Defendants (a) made proposals to the Majority Shareholders regarding the restructuring, (b) told the Majority Shareholders that the negotiated terms would result in a plan that would allow Majority Shareholders to keep P-Granit, while (c) in fact Defendants intended only to make an offer in terms that could not work and would allow for the seizure of shares and non-judicial sale of assets, (d) caused issuance of deflated appraisals what justified throwing P-Granit into control by them, foreclosure and ultimately dissolution. Defendants intended for both the Majority Shareholders and P-Granit to rely on the misrepresentations.

172.    Majority Shareholders reasonably relied on Defendants' misrepresentations by commission and omission.  In detrimental reliance on Defendants' malicious, intentional and willful misrepresentations of material facts and malicious, intentional and willful failure to disclose material facts, Majority Shareholders did not seek alternative financing to restructure Sberbank debts.

173. Moreover, Defendants' fraudulent interference with the appraisal process, the bankruptcy proceedings, the auctioning of P-Granit assets and the judicial process made it impossible for Majority Shareholders to stop the destructive actions Defendant undertook against their shares in P-Granit.

174. As a direct and proximate result of Defendants' fraud, Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count 1 for the following relief:

A. Compensatory damages of no less than $500,000,000.00;

B. Punitive damages of no less than $250,000,000.00;

C. Costs, attorney's fees, and post-judgment interest; and

D. Such other and further relief as the Court deems proper.


## COUNT II

### Conspiracy to Commit Fraud

### (Against all Defendants)

175. Paragraphs 1 through 174 are incorporated by referenced as if fully set forth herein.

176. Pursuant to an agreement and understanding, Defendants conspired to commit and did commit the unlawful acts of illegal takeover campaign against the Majority Shareholders' assets in P-Granit.

177. Defendants maliciously, intentionally and willfully misrepresented to the Majority Shareholders that they intend to negotiate the restructuring of the original Sberbank debt when in

facts they never intended to restructure the debt but intended to steal Majority Shareholders' P-Granit shares and P-Granit's assets and transfer them to companies owned or controlled by Defendant Zhukov. The purposes of this conspiracy and common schemes were to steal P-Granit from the Majority Shareholders for the benefit of Defendants.

178. In furtherance of the conspiracy Defendant German Gref directed Defendant Sberbank Russia to interfere with any attempts by Majority Shareholders to restructure their debt or to secure alternative financing to repay the loan and to file a criminal complaint against Mr. Poymanov to entangle him in criminal proceedings while his company was being stolen. Defendant German Gref retained his son Defendant Oleg Gref and his company Defendant NEO Centre, to appraise P-Granit group's shares. Defendant Oleg Gref and NEO Center appraised P-Granit without visiting the P-Granit. Defendant Oleg Gref regularly communicated with Defendant Zhukov as to the action plan. The appraisal of P-Granit shares was low.

179. Thereafter, Defendants involved co-conspirators unnamed defendants such as notaries and bailiffs who sold P-Granit shares to Defendants through the following layering:

a. the 36.37% of Vitera shares in P-Granit to two offshore companies Defendants Nisoram and Aletarro whose end-beneficiary is allegedly Defendant Zhukov;

b. 24.67% of Mr. Poymanov's shares to Defendants Urasay and Trade LLC, whose end-beneficiary is allegedly Defendant Zhukov.

c. 29.64% of PNH/Zinica shares to Defendant Atlantic LLC whose end-beneficiary is allegedly Defendant Zhukov. Just a month prior Defendant Atlantic LLC's acquisition of the shares and for this purpose, Defendant Sberbank Capital provided a loan, while still negotiating potential restructuring with P-Granit.

d. 1,85% and 8% shares of the people affiliated with Mr. Poymanov were diluted during the manufactured bankruptcy.

180. On December, 20, 2011, Defendants Sberbank Russia and German Gref were so prescient that they included Trade LLC as the winner of an auction in one of the assignment

agreements before conducting the actual auction. In September 2012, Defendant Zhukov assured Defendant Oleg Gref that the scheme would not take long and it would be worth the effort.

181.    Defendants kept Defendant Zhukov as the ultimate beneficiary of the scheme a secret until the end and circulated and disclosed proprietary and confidential information of P-Granit. The offshore companies that acquired the undervalued shares ultimately sold them back to Defendant Zhukov and Defendant NAC. This way, Defendant Zhukov's original plan of taking over control over P-Granit had been accomplished.

182.    Defendants Sberbank Russia and Sberbank Capital intentionally and knowingly failed to disclose to Majority Shareholders that their purported negotiation over restructuring of the debt was for the benefit of Defendant Zhukov.

183.    In furtherance of the conspiracy, Defendants, as described in paragraph 95:

1.    Manipulated the filing of fabricated criminal charges against Mr. Poymanov. Defendant Galeeva instructed Defendant Kublitsky regarding the objective of the conspiracy "…to gain control over the authorized capital and the operating activities of P-Granit" and the law enforcement actions necessary to implement the plan, including wiretapping, field surveillance, searches, and pre-trial restrictions – all applicable to Mr. Poymanov;

2.    Communicated during conspiracy in order to developed tactics and share details on the progress of the conspiracy among themselves;

3.    Incorporated offshore companies for sole purpose of the conspiracy and used off-the-shelf company;

4.    Collaborated with criminal investigators including those known to work with infamous raider Kluyev;

5.    Took advantage of captured courts and bankruptcy court procedures and personnel;

6.    Used US intermediary banks to make payments during the implementation of the conspiracy; and

7.    Invested alleged proceeds of the conspiracy in the U.S.

184.    The Majority Shareholders reasonably relied on Defendants' misrepresentations by commission and omission.  In detrimental reliance on Defendants' malicious, intentional and willful misrepresentations of material facts and malicious, intentional and willful failure to disclose material facts, Majority Shareholders did not seek alternative financing to restructure Sberbank debts.  Moreover, Defendants' fraudulent interference with the appraisal process, the bankruptcy proceedings, the auctioning of P-Granit assets and the judicial process made it impossible for Majority Shareholders to stop the destructive, actions Defendants undertook against their shares in P-Granit.

185.    As a direct and proximate result of this conspiracy, the Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count II for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.    Costs, attorney's fees, and post-judgment interest; and

D.    Such other and further relief as the Court deems proper.

## COUNT III

### Negligent Supervision

### (Against Defendants German Gref and Sberbank Russia)

186.    Paragraphs 1 through 185 are incorporated by referenced as if fully set forth herein.

56

187.    Defendant German Gref, as the CEO of Defendant Sberbank Russia had a duty to properly supervise Defendant Khachyatureants, the CEO of Sberbank Russia's subsidiary Defendant Sberbank Capital and Defendant German Gref breached that duty. Defendant Sberbank Russia had a duty to supervise Defendant German Gref and Defendant Sberbank Russia breached that duty.

188.    As a result of Defendants Gref and Sberbank Russia's failure to properly exercise this duty, Defendants conspired with Defendant Zhukov to develop and implement the scheme to defraud Majority Shareholders of their shares in P-Granit, dismantle P-Granit's assets and transfer them into Defendant Zhukov's company, Defendant NAC.  Defendants German Gref and Sberbank Russia knew or should have known Defendants' propensity for the illegal conduct that caused Majority Shareholders' injury.

189.    As a direct and proximate result of Defendants German Gref and Sberbank Russia's failure to supervise Defendants Khachyatureants and German Gref, the Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count III for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.    Costs, attorney's fees, and post-judgment interest; and

D.    Such other and further relief as the Court deems proper.

## COUNT IV

### Breach of Fiduciary Duty

### (Defendant Sberbank Russia)

190.    Paragraphs 1 through 189 are incorporated by referenced as if fully set forth herein.

191.    Defendant Sberbank Russia owed a duty to Majority Shareholders to treat them fairly in the restructuring process and to avoid self-dealing.

192.    Defendant Sberbank Russia breached that duty by purposefully interfering with Majority Shareholders' attempt to restructure their debt and assigning P-Granit's debt to Defendant Sberbank Capital that in turn implemented together with Defendant Zhukov and other co-conspirators the illegal scheme to expropriate ownership of the P-Granit shares and dismantle the company by distributing its assets at below market value to Defendant NAC, and ultimately liquidating P-Granit.

193.    Defendant Sberbank Russia disclosed proprietary and confidential P-Granit information.

194.    As a direct and proximate result of Defendant Sberbank Russia's breach of its fiduciary duty, the Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count IV for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.    Costs, attorney's fees, and post-judgment interest; and

D.   Such other and further relief as the Court deems proper.

## COUNT V

### Tortious Interference with Business Relations

### (Defendants German Gref, Zhukov, and Khachyatureants)

195.   Paragraphs 1 through 194 are incorporated by referenced as if fully set forth herein.

196.   The Majority Shareholders attempted to restructure P-Granit's debt to Defendant Sberbank Russia. As part of this process, Majority Shareholders disclosed P-Granit confidential and proprietary information, requested by Defendant PSZB to assess the potential re-financing. Defendants German Gref, Zhukov and Khachyatureants were aware of Majority Shareholders' negotiation with PSZB Credit Committee, and interfered with the process. Defendants told the CEO of Defendant PSZB to not move forward with the P-Granit refinancing. Mr. Ananyev stated that he was instructed by Defendant Khachyatureants to deny P-Granit the loan. He also said that should Mr. Poymanov convince Defendant Khachyatureants not to object, Defendant PSZB would issue the refinancing loan.

197.   Defendants conduct was malicious and wanton. As a direct and proximate result of Defendants' conduct, the Majority Shareholders have been damaged and are entitled to relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count V for the following relief:

A.   Compensatory damages of no less than $500,000,000.00;

B.   Punitive damages of no less than $250,000,000.00;

C.   Costs, attorney's fees, and post-judgment interest; and

D.   Such other and further relief as the Court deems proper.

## COUNT VI

### Abuse of Process

### (Against Defendants German Gref, Zhukov, Khachyatureants, Nogotkov and Bazarnov)

198.    Paragraphs 1 through 197 are incorporated by referenced as if fully set forth herein.

199.    Defendants Gref, Zhukov, Khachyatureants and Nogotkov filed criminal complaints against Mr. Poymanov that resulted in criminal charges. Defendants maliciously and intentionally misused the Russian criminal legal process and manufactured charges against Mr. Poymanov. Defendants used their reputation and power to control the criminal cases in order to force Mr. Poymanov to cease his fight over the stolen P-Granit shares and assets. Defendants Nogotkov and Bazarnov impeded Mr. Poymanov's ability to defend himself outside Russia as he cannot travel during the investigation.

200.    Co-conspirator Galeeva went so far as to instruct a law enforcement agent regarding the objective of the conspiracy "…to gain control over the authorized capital and the operating activities of P-Granit" and the law enforcement actions necessary to implement the plan, including wiretapping, field surveillance, searches, and pre-trial restrictions – all applicable to Mr. Poymanov.

201.    As a direct and proximate result of Defendants' conduct, the Majority Shareholders have been damaged and are entitled to relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count VI for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.      Costs, attorney's fees, and post-judgment interest; and

D.      Such other and further relief as the Court deems proper.

## COUNT VII

### Unjust Enrichment

### (Against All Defendants)

202.    Paragraphs 1 through 201 are incorporated by referenced as if fully set forth herein.

203.    Through their wrongful actions described above, Defendants stole the assets of P-Granit and diverted them into Defendant NAC for the benefit of Defendant Zhukov. By reasons of the foregoing, Defendants have been unjustly enriched at the Majority Shareholders' expense.

204.    As a direct and proximate result of Defendants' conduct, the Majority Shareholders have been damaged and are entitled to relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count VII for the following relief:

A.      Compensatory damages of no less than $500,000,000.00;

B.      Punitive damages of no less than $250,000,000.00;

C.      Costs, attorney's fees, and post-judgment interest; and

D.      Such other and further relief as the Court deems proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court award a judgment on all claims and award it such damages and compensation, interest, attorneys' fees, costs and such other relief as this Court may deem just.

61

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

**Dated:** November 22, 2016

Respectfully Submitted,

Caroline Heller
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
202-801-9200
hellerc@gtlaw.com

Sanford M. Saunders, Jr. (***pro hac vice***
***application forthcoming***)
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, D.C. 20037
202-331-3130
saunderss@gtlaw.com

Nicoleta Timofti
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, D.C. 20037
202-530-8536
timoftin@gtlaw.com

Counsel for PPF Management LLC