WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Owen C. Pell

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (*pro hac vice* pending)
Matthew A. Goldberger

*Attorneys for Aleksey Vladimirovich Bazarnov*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| SERGEY PETROVICH POYMANOV | ) Case No. 17-10516 |
| | ) |
| Debtor in a Foreign Proceeding.[1] | ) Chapter 15 |
| | ) |

**VERIFIED PETITION FOR RECOGNITION**
**OF FOREIGN MAIN PROCEEDING AND MOTION FOR ORDER GRANTING**
**RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1515, 1517 AND 1520**

Aleksey Vladimirovich Bazarnov ("**Bazarnov**" or, the "**Petitioner**"), the duly-authorized

receiver and foreign representative of Sergey Petrovich Poymanov ("**Poymanov**" or "**Debtor**")

with respect to Poymanov's pending Russian insolvency proceeding (the "**Russian Insolvency**

**Proceeding**") before the Commercial (Arbitrazh) Court of the Moscow Region (the "**Russian**

**Bankruptcy Court**"), pursuant to Russian Federal Law № 127-FZ "On Insolvency

(Bankruptcy)" (the "**Russian Bankruptcy Law**")[2] by and through his U.S. counsel, White &

Case LLP, respectfully submits this *Verified Petition for Recognition of Foreign Main*

---

[1]    The last four identifying digits of the Debtor's tax number in Russia are 6753.

[2]    As explained in the *Declaration of Pavel Boulatov in Support of the Petition for Recognition* (the "**Russian Counsel Declaration**"), the Russian Bankruptcy Law describes a receiver in bankruptcy proceedings for individuals as, literally, a "financial administrator".

1

*Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517 and 1520* (the "**Verified Petition**"). The Verified Petition is filed in furtherance of the official form of voluntary petition (the "**Form of Voluntary Petition**") filed concurrently herewith (this Verified Petition, together with the Form of Voluntary Petition, the "**Petition**"). The Petitioner hereby requests that the Court enter an order substantially in the form annexed hereto as Exhibit A (the "**Proposed Order**") pursuant to sections 1515, 1517 and 1520 of title 11 of the United States Code (the "**Bankruptcy Code**"):

    a) granting recognition, pursuant to section 1517, of Poymanov's Russian Insolvency Proceeding as the "Foreign Main Proceeding", as defined in section 1502(4), for the Debtor;

    b) recognizing the Petitioner is the "Foreign Representative", as defined in section 101(24), of the Debtor with respect to Poymanov's Russian Insolvency Proceeding; and

    c) granting such other and further relief as the Court deems just and proper.

In support of this request, the Petitioner refers the Court to the statements contained in the Russian Counsel Declaration, which is submitted concurrently herewith and incorporated herein by reference. In further support of the relief requested, the Petitioner declares under penalty of perjury under the laws of the United States of America that the statements contained herein are true and correct, and respectfully represents as follows:

**I.**

**PRELIMINARY STATEMENT**

1.    By this Petition, the Petitioner respectfully requests this Court to recognize the Russian Insolvency Proceeding in the United States to ensure that the Petitioner, as the sole receiver, can continue to conduct and administer the Russian Insolvency Proceeding in an orderly manner. Although the Debtor and nearly all of his stated assets are located in Russia, the assistance of this Court has become necessary as Poymanov, having exhausted his judicial

2

remedies in Russia and Cyprus, has now apparently identified the United States as a new front to continue his persistent and vociferous pattern of litigation.

2.      As more fully described herein, during the last five years, Poymanov has doggedly initiated litigation proceedings to prevent his creditors from exercising their lawful rights. Despite repeated losses in Russia (and then Cyprus), Poymanov's latest maneuver involves assigning purported claims that, under Russian law, are part of his bankruptcy estate and subject to the control of the Petitioner, his financial administrator, to a newly formed Delaware LLC (created by his U.S. counsel), which recently commenced a lawsuit in the United States District Court for the Southern District of New York. This latest attempt to relitigate issues previously decided in yet another jurisdiction threatens to interfere with Poymanov's Russian Insolvency Proceeding and further hinder Poymanov's creditors.

3.      With a petition to declare Poymanov bankrupt having been filed in 2015, his actions have a direct impact on his bankruptcy estate and on the ability of the Petitioner to perform his duties as the duly-appointed insolvency receiver, who under Russian law is the sole party empowered to administer Poymanov's assets in the Russian Insolvency Proceeding for the benefit of Poymanov's creditors. Therefore, the Petitioner respectfully requests that this Court enter the Proposed Order recognizing the Russian Insolvency Proceeding so that any assets of Poymanov located in the United States (including any potential claims of Poymanov's bankruptcy estate purportedly assigned by the Debtor) may be brought back under the control of the Petitioner.

## II.

## BACKGROUND

### A.      History and Operations

3

4.      Poymanov is an individual citizen and resident of the Russian Federation ("**Russia**").  He was born on February 15, 1972, in Pavlovsk, a town in the Voronezh Region of Russia.  In July 2000, Poymanov became the Director General of Open Joint Stock Company "Pavlovskgranit" ("**Pavlovskgranit**").  At the time, Pavlovskgranit was one of the largest producers of granite and fieldstone construction materials in Europe.  Until 2008, Poymanov, through companies and persons controlled by or related to him (collectively, his "**Affiliates**"), owned approximately 51 percent of the shares of Pavlovskgranit.  His partner, Sergey Mamedov ("**Mamedov**") indirectly owned the remaining shares of Pavlovskgranit, except for approximately 1 percent of the shares owned by other minority shareholders.

5.      In 2008, Poymanov decided to acquire Mamedov's shares of Pavlovskgranit through CJSC "Pavlovskgranit – Invest" ("**P-Invest**").  To finance the purchase, on August 4, 2008, P-Invest entered into a loan agreement (the "**P-Invest Credit Agreement**") with Sberbank of Russia ("**Sberbank**") to borrow up to RUB 5.1 billion (approximately US $217 million at that time).  Poymanov used the proceeds from the P-Invest Credit Agreement to acquire Zinica Limited ("**Zinica**")[3], a Cypriot company indirectly owned by Mamedov, which owned (a) 29.46% of shares of Pavloskgranit and (b) 50% of the shares of LLC Vitera ("**Vitera**"), a Russian company jointly owned by Mamedov and Poymanov, which owned 36.37% of the shares of Pavlovskgranit.  Following P-Invest's acquisition of Zinica, Poymanov became the beneficial owner, through his Affiliates, of approximately 99 percent of the shares of Pavlovskgranit.

6.      After entering into the P-Invest Credit Agreement and acquiring Mamedov's shares in Pavlovskgranit, Poymanov arranged for Pavlovskgranit to borrow RUB 1.39 billion (approximately US $43.5 million at that time) of working capital from Sberbank.  To obtain this

---

[3]      Zinica Limited was subsequently renamed PNH Limited ("**PNH**").

4

new financing, Pavlovskgranit entered into three credit agreements with Sberbank, the first two
signed on March 31, 2009, and the third on June 15, 2009 (the "**Pavlovskgranit Credit
Agreements**" and together with the P-Invest Credit Agreement, the "**Credit Agreements**").

7.     To secure and guarantee the obligations arising under the Credit Agreements,
Poymanov and his Affiliates entered into a series of surety and pledge agreements (supplemented
by agreements on out-of-court foreclosure procedures for pledged property in the event of
default) (the "**Surety and Pledge Agreements**").   Under the Surety and Pledge Agreements,
Poymanov and his Affiliates pledged 99% of the issued shares of Pavlovskgranit (including the
Vitera and Zinica shares), 100% of the issued shares of P-Invest and 100% of the participatory
interests of Vitera to Sberbank as collateral for the Credit Agreements.   Thus, initially,
Poymanov's Affiliates pledged their shares to secure the loan repayment by P-Invest, which was
wholly owned by Poymanov.   Poymanov signed the pledge agreement, two additional
agreements thereto and the agreement on out-of-court foreclosure on behalf of his wife, Irina
Podgornaya ("**Podgornaya**") pursuant to Powers of Attorney.   The Credit Agreements were
payable in Rubles in Russia and both the Credit Agreements and the related Surety and Pledge
Agreements provided for the exclusive jurisdiction of Russian courts over any disputes.

**B.     P-Invest Defaults on the P-Invest Credit Agreement**

8.     From the outset, P-Invest and Pavloskgranit struggled to meet their loan
obligations to Sberbank.   P-Invest and Pavlovskgranit never repaid these loans, and indeed, in
2009, after receiving the final tranche from the Pavlovskgranit Credit Agreements, Poymanov
approached Sberbank about a need to restructure the loans. As a result, in November 2009,
Sberbank presented Poymanov with an official restructuring proposal that would extend the
maturities and reduce the interest rates on the Credit Agreements in exchange for additional
collateral.   Those negotiations did not result in a mutually agreeable debt restructuring

5

agreement.  On February 24, 2010, P-Invest and Pavlovskgranit defaulted on their respective obligations by failing to make payments required under the Credit Agreements.   On March 19, 2010, Sberbank accelerated the full amount of the outstanding debt under the P-Invest Credit Agreement.

9.   In light of P-Invest's ongoing default, on May 20, 2010, consistent with its standard practices, Sberbank assigned its rights under the Credit Agreements to Sberbank Capital LLC ("**Sberbank Capital**"), a wholly owned subsidiary of Sberbank, which deals exclusively with problematic indebtedness (loans in "workout").   Following further negotiations with Poymanov, on June 25, 2010, Sberbank Capital declared the full amounts outstanding under the Pavlovskgranit Credit Agreements immediately due and payable.

10.   In July, 2010, after more than 15 months of unsuccessful negotiations with Poymanov, Sberbank Capital commenced Russian court proceedings on the P-Invest Credit Agreement and against Poymanov as guarantor.[4]   On January 18, 2011, the court found that Poymanov was obligated to pay RUB 4,620,228,024.75, the full amount due under the P-Invest Credit Agreement.[5]  On April 14, 2011, that decision was upheld.[6]

11.   Sberbank Capital also initiated recovery proceedings against Pavlovskgranit and P-Invest.  As part of these enforcement efforts, on September 29, 2011, Sberbank Capital initiated a case in the Commercial (Arbitrazh) Court of the Voronezh Region to recognize Pavlovskgranit as insolvent.  On September 30, 2011, Sberbank Capital initiated a case in the Commercial (Arbitrazh) Court of the city of Moscow to recognize P-Invest as insolvent.  Both companies were found to be insolvent by the Russian courts, and the insolvency proceedings were permitted to proceed.

---

[4]   Case No. 2-93/2011 in Odintsovsky City Court of the Moscow Region.
[5]   Decision of Odintsovsky City Court of the Moscow Region dated January 18, 2011, in case No. 2-93/2011.
[6]   Appellate ruling of the Court of the Moscow Region dated April 14, 2011, in case No. 2-93/2011.

**C.      Poymanov Attempts to Escape His Obligations Under the P-Invest Credit
Agreement and the Surety and Pledge Agreements**

12.      In August 2010, just months after P-Invest and Pavloskgranit defaulted on their

respective obligations under the Credit Agreements, Poymanov commenced a persistent and

vociferous strategy of litigation to escape his obligations under the Credit Agreements and the

Surety and Pledge Agreements.  In total, Poymanov initiated over 35 separate proceedings in

Russia in an effort to prevent his creditors and their assignees from exercising their contractual

rights.  The following is a summary of just some of the litigation commenced by Poymanov to

avoid his creditors.

*i.      Poymanov's Attempts to Invalidate Assignment of Credit Agreements*

13.      On August 3, 2010, Pavloskgranit (controlled by Poymanov) filed a counterclaim

in a debt collection proceeding pending against P-Invest in the Russian courts, seeking to

invalidate the assignment of the Credit Agreements from Sberbank to Sberbank Capital as

violative of applicable laws.  At that stage, Poymanov did not contest the validity of the

underlying debt – his only apparent objective was to hinder Sberbank Capital's collection efforts.

On June 3, 2011, the Russian court denied Pavloskgranit's counterclaim, finding that the

assignment of rights under the Credit Agreements from Sberbank to Sberbank Capital were legal,

enforceable and not in violation of Russian laws.  On October 7, 2011, that decision was upheld

by a Russian appellate court.  In a separate proceeding, P-Invest also unsuccessfully challenged

the assignment to Sberbank Capital.

*ii.      Poymanov's Attempt to Amend the P-Invest Credit Agreement*

14.      On September 17, 2010, P-Invest (still controlled by Poymanov) commenced a

case in a Russian court seeking an order extending the maturity dates and payment terms of the

P-Invest Credit Agreement on the grounds of a change in economic conditions.  On May 6, 2011,

7

the court denied P-Invest's request, concluding there were no legal grounds to amend the P-Invest Credit Agreement.

    *iii.*    *Poymanov's Attempts to Invalidate Surety and Pledge Agreements*

15.    On November 8, 2010, Poymanov commenced an action in another Russian court arguing that his personal guarantee of the obligations arising under the P-Invest Credit Agreement had been terminated. On February 8, 2011, the court concluded that the guarantee did not terminate and was still effective under Russian law.[7]

16.    On May 25, 2010, Zinica and Vitera (both controlled by Poymanov) commenced similar cases in the Commercial (Arbitrazh) Court of the Voronezh Region, seeking to invalidate the agreements regarding out-of-court foreclosure of pledged property that provided Sberbank Capital the right to foreclose on (i) the 29.64% stake in Pavlovskgranit pledged by Zinica and (ii) the 36.37% stake in Pavlovskgranit pledged by Vitera, respectively. On November 26, 2010, and on December 29, 2010, the Russian court refused to invalidate the agreements on out-of-court foreclosure and found that Sberbank Capital could foreclose on the Pavlovskgranit shares owned by Zinica and Vitera, respectively. On Zinica's and Vitera's appeals, the decisions of the lower courts were upheld, on October 5, 2011 and April 22, 2011, respectively.

    *iv.*    *Poymanov Files for Divorce in Russia to Attempt to Shield Assets*

17.    On March 4, 2005, Poymanov married Podgornaya. As described in the Russian Counsel Declaration, by default, all property acquired by either spouse during the marriage is considered joint property under Russian law, including any Pavlovskgranit shares potentially held by Podgornaya.

18.    On September 19, 2011, Poymanov filed for divorce from his wife. Upon information and belief, Poymanov continued to live with his wife and children after filing for

---

[7]    Decision of the Leninsky District Court of Voronezh dated February 8, 2011, in case No. 2 248/2011.

divorce.  On December 15, 2012, Poymanov and Podgornaya entered into an alimony agreement (the "**Alimony Agreement**").  Pursuant to the Alimony Agreement, Poymanov was obligated to pay 90 percent of his monthly income to Podgornaya, but in any event not less than RUB 700,000 (approximately US $22,800 at that time).

19.     Suintex Limited ("**Suintex**"), the subsequent legal successor to Sberbank Capital with respect to certain claims against Poymanov, filed a claim with the Russian court overseeing the divorce to invalidate the Alimony Agreement.  On October 9, 2015, the court invalidated the Alimony Agreement based on Article 10 of the Russian Civil Code, which prohibits conduct that abuses creditors' rights.[8]  This decision was upheld on appeal.[9]

**D.     Poymanov Attempts to Challenge the Levy of Execution and Foreclosure of Collateral Securing Credit Agreements**

20.     During 2011 and 2012, Sberbank Capital, and entities to which it assigned its rights, enforced the Poymanov guarantee by levying execution on his shares and foreclosed on the Pavlovskgranit shares pledged by his wife, his family and companies controlled by him, pursuant to the Surety and Pledge Agreements.  Poymanov attempted to halt the levy of execution on and foreclosure of the pledged Pavlovskgranit shares in several ways, including by challenging the valuations prepared in connection with the auctions for these shares.

21.     Multiple times during the levy of execution and foreclosure proceedings, Poymanov and the enforcing parties offered competing valuations prepared by third-party appraisers for the Pavlovskgranit shares to be auctioned.  The issues concerning the valuation of the auctioned shares were fully and extensively litigated on several occasions.  A Russian court rejected the valuation introduced by Poymanov, noting that the valuation "contains contradictory information, the source data used in the calculations is not supported by reliable sources,

---

[8]     Decision of the Odintsovsky Court of the Moscow Region dated October 9, 2015, in case No. 2-8804/15.
[9]     Appellate Ruling of the Court of the Moscow Region dated February 10, 2016, in case No. 33-3660/2016

calculations and reasons are not presented in full".[10]   Other Russian courts, including the Commercial (Arbitrazh) Court of the Voronezh Region and the Commercial (Arbitrazh) Court of the Moscow Region, considered valuations prepared both by appraisers used by creditors and by appraisers appointed by the Russian courts or the bailiffs who would arrange any auctions for levying execution, and found them to be fair.   In at least one Russian proceeding, one of Poymanov's companies challenged one of the creditors' valuations, but then withdrew that challenge.

22.   Ultimately, all of the Pavlovskgranit shares pledged by Poymanov, his wife and other Affiliates, pursuant to the Surety and Pledge Agreements, either were subject to levy of execution (shares owned by Poymanov) or were foreclosed upon.   Poymanov's 100 percent shareholding interest in P-Invest (whose principal asset was its Pavlovskgranit shares) was also subject to a levy of execution.

**E.**   **Poymanov Commences Litigation in Cyprus**

23.   Upon information and belief, on August 7, 2013, after years of Russian litigation, Poymanov initiated proceedings before courts in the Republic of Cyprus (the "**Cyprus Court**"), this time alleging that various of his creditors and their assignees had engaged in a conspiracy to defraud Poymanov and P-Invest of their respective interests in Pavlovskgranit (the "**Cyprus Litigation**").   After years of Russian litigation, the Cyprus Litigation was the first time that Poymanov alleged in a court proceeding that he was a victim of fraud and conspiracy.

24.   Upon information and belief, the Cyprus Court ultimately denied Poymanov's efforts to sustain *ex parte* interim measures against the defendants to the Cyprus Litigation.   On December 3, 2013, the Cyprus Court ruled that Poymanov had no legal interest (i.e., standing) in

---

[10]      Decision of Krasnogorsky City Court of the Moscow Region dated November 7, 2011, in case No. 2-4672/11.

the claims brought on behalf of two of his companies (PNH and Vitera).  The Cyprus Court also found that Poymanov had failed to present any qualified evidence to support his allegations of fraud as to any Russian legal proceedings.  Specifically, the Cyprus Court rejected an expert report offered by Poymanov, and ruled that the prior rulings by the Russian courts conclusively established that no fraud had been perpetrated against Poymanov.  As such, the Cyprus Court ruled that Poymanov had no reasonable prospect of proving that the appraisal reports used in Russia were false and fraudulent so as to substantiate his claims.  The Petitioner has, in the meantime, appeared in the Cyprus Court through counsel and will be moving to take control of the Cyprus Litigation because Poymanov no longer has capacity to pursue these claims given his Russian bankruptcy proceeding.

25.     Upon information and belief, in a separate 2013 Cyprus proceeding, the Russian receiver of P-Invest sued Poymanov for defrauding his creditors, including by ignoring Russian court orders.  That case is pending, but the Cyprus Court entered an interim worldwide freezing order against Poymanov and certain Poymanov Affiliates prohibiting any of them from, on behalf of various Affiliates, pursuing any claims relating to, among other things, PNH.  This freezing order remains in effect.

F.     **Poymanov's Russian Insolvency Proceedings**

26.     On November 18, 2011, Poymanov registered as a so-called "individual entrepreneur" under Russian law[11], and then, on December 9, 2011, he applied to the Commercial (Arbitrazh) Court of the Moscow Region to recognize himself as bankrupt so as to halt the levy of execution of his Pavlovskgranit shares in the framework of enforcement proceedings.  On December 12, 2011, Poymanov requested interim measures to halt trading of

---

[11]     See Russian Counsel Declaration ¶ 8 (discussing that prior to October 1, 2015, only individuals registered as "individual entrepreneurs" could be declared bankrupt).

his Pavlovskgranit and P-Invest shares.   On December 19, 2012, the Russian court denied Poymanov's request to implement interim measures and on March 26, 2012, the Tenth Commercial (Arbitrazh) Court of Appeal upheld the ruling, denying Poymanov's appeal.   In the meantime, execution was levied on Poymanov' shares.   Following the loss of his request and sale of his shares, Poymanov withdrew his Russian bankruptcy petition in January 2012 and in March 2012 discontinued his status as an individual entrepreneur.

27.   On October 1, 2015 (the "**Poymanov Petition Date**"), following a change in the Russian Bankruptcy Law permitting bankruptcy proceedings for individual debtors, Suintex – one of Poymanov's creditors – initiated a case against Poymanov under the Russian Bankruptcy Law in the Russian Bankruptcy Court.[12]   On the same day, Poymanov and Podgornaya separately attempted to initiate a bankruptcy case, for Poymanov as an individual, under the Russian Bankruptcy Law.   On February 8, 2016, the Russian Bankruptcy Court ruled that the petition filed by Suintex had merit and was filed before the cases initiated by Poymanov and Podgornaya and therefore initiated bankruptcy procedure of debt restructuring for Poymanov, and appointed Bazarnov as the financial administrator.[13]   On July 21, 2016, since neither Poymanov nor his creditors had proposed a debt restructuring plan meeting the statutory requirements, the Russian Bankruptcy Court declared Poymanov insolvent and initiated procedures to sell his assets.[14]   Also on July 21, 2016, the Russian Bankruptcy Court appointed Bazarnov as the receiver whose role is to oversee the collection and sale of Poymanov's assets, for the benefit of his creditors.[15]

28.   On February 16, 2016, Poymanov entered into a new alimony agreement with Podgornaya (the "**New Alimony Agreement**").   Pursuant to the New Alimony Agreement,

---

[12]   See Russian Counsel Declaration ¶¶ 8-11 (discussing the amendment to the Russian Bankruptcy Law).
[13]   Ruling of the Russian Bankruptcy Court dated February 8, 2016, in case A41-78484/15.
[14]   Decision of the Russian Bankruptcy Court dated July 21, 2016, in case A41-78484/15.
[15]   Id.

Poymanov undertook to pay Podgornaya the lump sum of RUB 24,000,000 by February 25, 2016 (approximately US $308,600 at that time), and to make monthly alimony payments of RUB 690,000 (approximately US $8,800 at that time).

29.     Based on the New Alimony Agreement, Podgornaya filed a claim in Poymanov's Russian Insolvency Proceeding for RUB 26,760,000.  Bazarnov filed an application to invalidate the New Alimony Agreement.

30.     On September 7, 2016, the Russian Bankruptcy Court found in favor of Bazarnov and ruled to invalidate the New Alimony Agreement because it violated Russian Bankruptcy Law.[16] Accordingly, the court refused to register Podgornaya's claim against Poymanov's estate.

31.     Poymanov's Russian Insolvency Proceeding remains pending and active.  On January 18, 2017, the Russian Bankruptcy Court entered an order extending the assets sale procedure with respect to Poymanov for six months, until July 21, 2017.[17]

**G.     Poymanov Commences Litigation in the United States District Court for the Southern District of New York**

32.     On or about November 21, 2016, Poymanov and his wife purportedly assigned claims related to the levy of execution on and foreclosure of his shareholding interests in Pavlovskgranit to PPF Management LLC ("**PPF**"), a Delaware limited liability corporation, formed on November 21, 2016.[18]  On November 22, 2016, PPF commenced an action in the United States District Court for the Southern District of New York (the "**SDNY Litigation**") against *inter alia* Sberbank, Sberbank Capital, Sberbank Capital's legal successors, and the receivers in both P-Invest's Russian insolvency proceeding and Poymanov's Russian Insolvency

---

[16]     Ruling of the Russian Bankruptcy Court dated September 7, 2016, in case No. A41-78484/15.
[17]     Ruling of the Russian Bankruptcy Court dated January 18, 2017, in case No. A41-78484/15.
[18]     Delaware state records show that PPF Management LLC was formed by PPF's counsel the day before PPF commenced the SDNY Litigation.

Proceeding.  The complaint in the SDNY Litigation makes clear that the claims were purportedly assigned to PPF "in order to preserve and pursue them" in the United States.[19]

33.    The SDNY Complaint rehashes the fraud and conspiracy allegations first made— and thus far rejected—in the Cyprus Court (and includes seven of the parties to the Cyprus Litigation).  Significantly, to the extent that Poymanov purports to assert rights or claims in the SDNY Litigation on behalf of certain of his Affiliates, he may be in direct violation of the worldwide freezing order entered against him in Cyprus, which prohibited him from assigning rights from those Affiliates or from pursuing claims for those Affiliates anywhere else in the world.  As noted above, the Petitioner has had to intervene in the Cyprus Litigation to try and prevent Poymanov from further interfering with his creditors and their rights.

34.    As more fully discussed in the Russian Counsel Declaration, under the Russian Bankruptcy Law, once the debtor is declared insolvent, it is the financial administrator (and not the debtor) who exercises all rights with respect to the property making up the bankruptcy estate and who is entitled to dispose of such property for the benefit of the debtor's creditors. Moreover, all transactions made by the debtor rather than by the financial administrator acting on his/her behalf with respect to the bankruptcy estate are without legal effect.[20]  Since the claims purportedly assigned by Poymanov to PPF were assets of his bankruptcy estate as of July 21, 2016 (the date when he was declared insolvent), the assignment of claims to PPF on or about November 21, 2016 is invalid under Russian law.

35.    In late 2016, Bazarnov filed a motion in the Russian Bankruptcy Court seeking an order invalidating Poymanov's supposed assignment of the claims to PPF, as such claims belong to Poymanov's bankruptcy estate, and he had no authority to transfer such property under

---

[19]    See ¶ 2 of complaint in SDNY Litigation (the "**SDNY Complaint**"), a copy of which is attached hereto as Exhibit C.
[20]    See Russian Counsel Declaration ¶¶ 18-20.

applicable Russian law. The Russian Bankruptcy Court accepted the application for consideration and scheduled the court hearing for February 1, 2017, which was subsequently adjourned until March 2, 2017.[21] To date, Poymanov has not produced an assignment agreement. Upon information and belief, at a hearing on March 2, 2017, Poymanov's lawyer represented that there is no assignment agreement between Poymanov and PPF. The hearing was adjourned until April 3, 2017.

## III.

## JURISDICTION, ELIGIBILITY AND VENUE

36.     This Court has jurisdiction to consider this Petition pursuant to 28 U.S.C. §§ 157 and 1334, sections 109 and 1501 of the Bankruptcy Code, and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re: Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "**Amended Standing Order**").

37.     This case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of this Petition for recognition of Poymanov's Russian Insolvency Proceeding as a foreign main proceeding of the Debtor pursuant to section 1515 of the Bankruptcy Code. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1410(1). The Debtor's principal U.S. assets are funds transferred by the Petitioner to a client trust account at Citibank in New York County and thus within this district. In addition to the Debtor's funds in the client trust account in New York, the Debtor has purported to take steps to assert claims and causes of action in the United States, including the claims asserted in the SDNY Litigation, which claims

---

[21]     Rulings of the Russian Bankruptcy Court dated December 30, 2016 and February 1, 2017, in case No. A41-78484/15.

also give rise to potential claims and liabilities related to the avoidance of the purported assignment to PPF.

39.     The presence of assets within the United States renders the Debtor's financial administrator eligible to file this Chapter 15 Case pursuant to section 109(a) of the Bankruptcy Code.  See In re Suntech Power Holdings Co., 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 247 (2d Cir. 2013) (applying section 109(a)'s local property requirement to chapter 15 cases).

40.     Sections 1515, 1517 and 1520 of the Bankruptcy Code form the statutory predicates for the relief requested.

## IV.

## RELIEF REQUESTED

41.     The Petitioner requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto and pursuant to sections 1515, 1517 and 1520 of the Bankruptcy Code:

a) granting recognition, pursuant to section 1517, of Poymanov's Russian Insolvency Proceeding as the Debtor's Foreign Main Proceeding, as defined in section 1502(4);

b) recognizing the Petitioner as the Foreign Representative, as defined in section 101(24), of the Debtor with respect to Poymanov's Russian Insolvency Proceeding; and

c) granting such other and further relief as the Court deems just and proper.[22]

(the "**Requested Relief**").

## V.

## BASIS FOR RELIEF

---

[22]     The Petitioner reserves the right to seek additional stay relief pursuant to section 1521(a)(1) of the Bankruptcy Code.

42.     The Court should recognize Poymanov's Russian Insolvency Proceeding as a foreign main proceeding, and the Petitioner as the duly authorized foreign representative with respect thereto.

43.     The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "**Model Law**") so as to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a).  Thus:

> The language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.  Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions.

In re Pro-Fit Holdings Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008);  see also Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.), 768 F.3d 239, 245 (2d Cir. 2014) (quoting 11 U.S.C. § 1501(a)); In re British Am. Ins. Co., 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.[23]

44.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  See 11

---

[23]     The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997)] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 109-110 (2005).

U.S.C. § 1517(a); In re Overnight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  These foregoing requirements are satisfied with respect to Poymanov's Russian Insolvency Proceeding, the Petitioner, and this Petition.

## A. Poymanov's Russian Insolvency Proceeding is the Debtor's Foreign Main Proceeding

45.    Poymanov's Russian Insolvency Proceeding is a foreign main proceeding, which satisfies the first condition for entry of an order recognizing such a proceeding under section 1517(a).

### i.    Poymanov's Russian Insolvency Proceeding is a "foreign proceeding"

46.    Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor.  See 11 U.S.C. § 101(23).  The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  See 11 U.S.C. § 1502(3).

47.    Poymanov's Russian Insolvency Proceeding meets the definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code.  As discussed in the Russian Counsel Declaration, Poymanov's Russian Insolvency Proceeding is a collective judicial proceeding brought under the Russian Bankruptcy Law and is supervised by the Russian Bankruptcy Court.   As detailed in the Russian Counsel Declaration, the Russian Bankruptcy Court has exercised its authority, held hearings and issued rulings (including the appointment of the Petitioner as receiver).

48.    Poymanov's Russian Insolvency Proceeding is pending in a foreign country – Russia – under a law relating to insolvency, pursuant to which the assets and affairs of the Debtor are subject to the control and supervision of the Russian Bankruptcy Court.  Accordingly,

18

Poymanov's Russian Insolvency Proceeding qualifies as a judicial proceeding in a foreign country.

> ii.   *Poymanov's Russian Insolvency Proceeding is a "foreign main proceeding"*

49.   Additionally, Poymanov's Russian Insolvency Proceeding is also the Debtor's "foreign main proceeding" because it is pending in Russia, which is the Debtor's center of main interests ("**COMI**").   See 11 U.S.C. § 1502(4); see also 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests").

50.   The Bankruptcy Code establishes a presumption that an individual debtor's habitual residence is the debtor's COMI.   See 11 U.S.C. § 1516(c).   The legislative history establishes that the rule of the "habitual residence" is "designed to make recognition as simple and expedient as possible" in cases where the facts are not controversial.   H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 112–13 (2005); In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 127–28 (Bankr. S.D.N.Y. 2007).   Although COMI is not defined by the Bankruptcy Code or the Model Law, U.S. courts view COMI as a concept rooted in substance over form—the debtor's "real seat."   Id. at 130.

51.   Habitual residence is not defined in the Bankruptcy Code but it has been construed as the place where an individual resides with the intention of remaining for an indefinite period of time.   In re Ran, 607 F.3d 1017, 1022 (5th Cir. 2010); In re Kemsley, 489 B.R. 346 (Bankr. S.D.N.Y. 2013).

52.   Here, Poymanov's COMI is Russia.   Russia is Poymanov's habitual place of residence, as he has resided in Russia throughout the pendency of Poymanov's Russian

Insolvency Proceeding and continues to reside in Russia at this time. Accordingly, it is beyond

dispute that Poymanov's COMI is Russia. Moreover, Poymanov's pattern of litigation from

2010-2015 show that Russia is where all the interests, claims and assets relevant to Poymanov

and his wife are located. Indeed, Poymanov tried twice on his own to initiate Russian insolvency

proceedings, thereby acknowledging that Russia is his COMI.

**B.**     **The Petitioner is the "Foreign Representative" of the Debtor's Foreign Proceeding**

53.     The second requirement for recognition of a foreign main proceeding under

section 1517(a) of the Bankruptcy Code is that a foreign representative applying for recognition

be a person or body properly authorized to represent the debtor or the foreign proceeding. See

11 U.S.C. § 1517(a)(2). Specifically, section 101(24) of the Bankruptcy Code provides that

> The term "foreign representative" means a person or body, including a
> person or body appointed on an interim basis, authorized in a foreign
> proceeding to administer the reorganization or the liquidation of the
> debtor's assets or affairs or to act as a representative of such foreign
> proceeding.

11 U.S.C. § 101(24).

54.     Here, the Petitioner is an individual, which is included in the term "person," 11

U.S.C. § 101(41), who has been duly appointed by the Russian Bankruptcy Court to act as the

receiver for Poymanov's Russian Insolvency Proceeding. As explained in the Russian Counsel

Declaration, the Russian Bankruptcy Law provides that the duly appointed receiver has the sole

authority to administer the reorganization or liquidation of a debtor's assets and affairs. Russian

Counsel Decl. ¶¶ 18-20, 23. As such, the Petitioner satisfies sections 101(24) and 1517(a)(2) of

the Bankruptcy Code. See In re Foreign Economic Industrial Bank Ltd., Case No. 16-13534

(MKV) (Bankr. S.D.N.Y. Feb. 15, 2017) (recognizing the State Corporation "Deposit Insurance

Agency," which was appointed by the Russian court to act as trustee for the debtor, as the proper

foreign representative of Russian debtor); In re CJSC Automated Services, Case No. 09-16064

(JMP) (Bankr. S.D.N.Y. Nov. 23, 2009) (recognizing an individual, who was appointed by the Russian court as the duly authorized trustee of the debtor, as a "person" pursuant to section 101(41) of the Bankruptcy Code and as foreign representative of the debtor).

**C.    The Petition Was Properly Filed under Sections 1504 and 1509 and Satisfied the Requirements of Section 1515**

55.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code. <u>See</u> 11 U.S.C. § 1517(a)(3). Here, each of those procedural requirements is satisfied.

56.    First, the Petitioner duly and properly commenced this chapter 15 case in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing its petition with all the documents and information required by sections 1515(b) and 1515(c).

57.    Second, in accordance with section 1515(b)(1)-(2) and (d) of the Bankruptcy Code, the Petitioner has submitted evidence, translated into English, of the existence of Poymanov's Russian Insolvency Proceeding and the appointment of the Petitioner as foreign representative with respect thereto. <u>See</u> <u>Exhibit B</u> and <u>Exhibit C</u> to the Russian Counsel Declaration (together containing true and correct copies of Russian Bankruptcy Court's orders finding Poymanov insolvent and appointing Bazarnov as the receiver, along with certified translations of each from Russian to English).

58.    Finally, in accordance with section 1515(c) of the Bankruptcy Code, the Petitioner identifies Poymanov's Russian Insolvency Proceeding as the only foreign insolvency proceeding currently pending with respect to the Debtor.

*        *        *

21

59.     For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied, and accordingly the Petitioner and the Debtor's Russian Insolvency Proceeding are entitled to recognition and all of the relief automatically granted under section 1520 of the Bankruptcy Code.   Thus, the Petitioner respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as Exhibit A, recognizing Poymanov's Russian Insolvency Proceeding as the foreign main proceeding of Poymanov and the Petitioner as the foreign representative with respect to that proceeding.

<u>NOTICE</u>

60.     Notice of this Petition has been provided to:

i.      Sergey Petrovich Poymanov, 13 Rozhdestvenskiy Boulevard, 107045, Moscow, Russian Federation, as the Debtor in this Chapter 15 case;

ii.     Kirill Nogotkov, 5/12 Khvalynskiy Bvd. Ap. 28, 109153, Moscow, Russian Federation, as the duly appointed receiver in the pending Russian bankruptcy case for CJSC Pavlovskgranit – Invest;

iii.    Pavel Boulatov, 4 Romanov Pereulok, 125009, Moscow, Russian Federation, as the Russian legal declarant and foreign counsel to Debtor;

iv.     The Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014;

v.      PPF Management, LLC, 160 Greentree Dr. Ste 101, Dover, DE, 19904, as the plaintiff in the litigation pending in the United States District Court for the Southern District of New York;

vi.     Caroline Heller, Greenberg Traurig LLP, 200 Park Avenue, New York, NY 10166, as U.S. counsel to PPF Management, LLC in the litigation pending in the United States District Court for the Southern District of New York

vii.    OJSC Sberbank of Russia, Vavilova 19 Street, 119997, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York;

viii.   Sberbank Capital, Vavilova 19 Street, 119997, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern

22

District of New York;

ix.   Sberbank CIB USA, Inc., Carnegie Hall Tower, 152 West 57th Street 44th Floor, New
York, NY 10019, as a defendant in the litigation pending in the United States District
Court for the Southern District of New York;

x.   Neo Centre,  41 Novoslobodskaya St., 127055, Moscow, Russian Federation, as a
defendant in the litigation pending in the United States District Court for the Southern
District of New York;

xi.   Promsvyazbank PAO, Str. Smirnoff, d. 10, 109052, Moscow, Russian Federation, as a
defendant in the litigation pending in the United States District Court for the Southern
District of New York;

xii.   JSC National Aggregates Company, AO Natsionalnaya Nerudnaya Kompaniya, 18A
Magistralnaya Street, 123290, Moscow, Russian Federation, as a defendant in the
litigation pending in the United States District Court for the Southern District of New
York;

xiii.   Klever Asset Management, 31 Novinsky Boulevard, 7th floor, 123242, Moscow, Russian
Federation, as a defendant in the litigation pending in the United States District Court for
the Southern District of New York;

xiv.   Klever Internet Investment, 31 Novinsky Boulevard, 7th floor, 123242, Moscow, Russian
Federation, as a defendant in the litigation pending in the United States District Court for
the Southern District of New York;

xv.   Aletarro Ltd., 17 Gr. Xenopoulou Street, Limassol 3106, Cyprus, as a defendant in the
litigation pending in the United States District Court for the Southern District of New
York;

xvi.   Nisoram Holding Ltd., Inc., 17 Gr. Xenopulou Street, Limassol 3106, Cyprus, as a
defendant in the litigation pending in the United States District Court for the Southern
District of New York;

xvii.   Urasay Ltd., 9 Waterfront Drive, P.O. Box 3540, Road Town, Torola, VG 1110 British
Virgin Islands, as a defendant in the litigation pending in the United States District Court
for the Southern District of New York;

xviii.   Mostra Consulting Ltd., 197 Main Street, P.O. Box 3540, Road Town, Tortola, VG 1110
British Virgin Islands, as a defendant in the litigation pending in the United States
District Court for the Southern District of New York;

xix.   Suintex Ltd., Craigmuir Chambers, Road Town, Tortola, VG 1110, British Virgin
Islands, as a defendant in the litigation pending in the United States District Court for the

Southern District of New York;

xx.     German Gref, 19 Vavilova Street, 119997, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York;

xxi.    Oleg Gref, 41 Novoslobodskaya St., 127055, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York;

xxii.   Ashot Khachyatureants, Vavilova 19 Street, 119997, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York;

xxiii.  Yuriy Zhukov, Baumanskaya St., D58A, Ap. 76, 105005, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York;

xxiv.   Gregory Shirin, 12 Krasnopresnenskaya Naberezhnaya, 26th floor, 123610, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York;

xxv.    Zoya Galeeva, 9 Demyana Bednogo Street, Ap. 49, 123423, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York; and

xxvi.   Sergey Kublitskiy, 22 Skolkovskoe drive, Coop, 1, ap.57, 121353, Moscow, Russian Federation, as a defendant in the litigation pending in the United States District Court for the Southern District of New York

### NO PENDING U.S. BANKRUPTCY CASED FILED BY THE DEBTOR

61.     The Debtor does not have a pending petition with the Court for relief under chapter 15 (other than this Petition), or any other chapter of title 11 of the U.S. Code.

### NO OTHER PENDING FOREIGN PROCEEDINGS

62.     The Petitioner is not aware of any pending foreign insolvency proceeding, other than the Russian Insolvency Proceeding.

### OTHER PERSONS AUTHORIZED TO ADMINISTER FOREIGN PROCEEDINGS

24

63.     No person or entity other than the Petitioner is authorized to act as foreign

representative over any foreign insolvency proceeding in respect of the Debtor.

### PARTIES TO LITIGATION IN THE UNITED STATES

64.     As of the date of the filing of this Petition, the Petitioner is not aware of any

pending litigation in the United States in which the Debtor is a party.

### CORPORATE OWNERSHIP STATEMENT PURSUANT TO BANKRUPTCY RULES 1007(A)(4) AND 7007.1

65.     Since the Debtor is an individual, the requirement to file a corporate ownership

statement is not applicable.

### NO PRIOR REQUEST

66.     No previous request for the relief requested herein has been made to this or any

other court.

### CONCLUSION

67.     WHEREFORE, the Petitioner respectfully requests that the Court:  (a) enter the

Proposed Order, upon notice and a hearing, substantially in the form attached hereto as Exhibit

A; and (b) grant such other and further relief as may be just and proper.

Dated:  New York, New York
March 3, 2017

Respectfully submitted,

By:    /s/ Owen C. Pell
        Owen C. Pell

        WHITE & CASE LLP

        1155 Avenue of the Americas
        New York, NY 10036
        (212) 819-8200

        —and—

        Southeast Financial Center, Suite 4900
        200 South Biscayne Blvd.
        Miami, FL  33131
        (305) 371-2700
        Richard S. Kebrdle (*pro hac vice* pending)
        Matthew A. Goldberger

        *Attorneys for Aleksey Vladimirovich*
        *Bazarnov, as   Petitioner and Foreign*
        *Representative*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Aleksey Vladimirovich Bazarnov, declare as follows:

I am the authorized foreign representative of the Debtor with respect to Poymanov's Russian Insolvency Proceeding. I have received the factual contents of the foregoing Verified Petition, including each of the attachments and appendices thereto, and I am informed and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief. My native language is Russian and I have reviewed a certified Russian translation of this Verified Petition. I have elected to sign the certified Russian translation of this Verified Petition, which is attached hereto as <u>Exhibit B</u>.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  March 3, 2017

Respectfully submitted,

_____

Aleksey Vladimirovich Bazarnov

**EXHIBIT A**
**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| SERGEY PETROVICH POYMANOV | ) Case No. 17-10516 |
| | ) |
| Debtor in a Foreign Proceeding.[1] | ) Chapter 15 |
| | ) |

## ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING
## AND CERTAIN RELATED RELIEF

Upon the *Petitioner's Verified Petition for Recognition of Poymanov's Russian Insolvency Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 1515, 1517 and 1520* (the "**Verified Petition**" and together with the Form of Voluntary Petition, the "**Petition**") dated March 3, 2017 of Aleksey Vladimirovich Bazarnov (the "**Petitioner**" or "**Foreign Representative**"), in his capacity as the receiver and authorized Foreign Representative of Sergey Petrovich Poymanov ("**Poymanov**" or the "**Debtor**") in the above-captioned chapter 15 case (the "**Chapter 15 Case**"), requesting this Order (the "**Order**") (a) granting the Petition and recognizing Poymanov's pending Russian insolvency proceeding (the "**Russian Insolvency Proceeding**") before the Commercial (Arbitrazh) Court of the Moscow Region (the "**Russian Bankruptcy Court**"), under the Russian Federal Law № 127-FZ "On Insolvency (Bankruptcy)" (the "**Russian Bankruptcy Law**") as the Debtor's foreign main proceeding pursuant to section 1517 of title 11 of the United States Code (the "**Bankruptcy Code**"), (b) recognizing the Petitioner as the Debtor's "foreign representative," as defined in section 101(24) of the Bankruptcy Code, with respect to Poymanov's Russian Insolvency Proceeding, and (c) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Petition pursuant to sections 157 and

---

[1]     The last four identifying digits of the Debtor's tax number in Russia are 6753.

1

1334 of title 28 of the United States Code, and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re:  Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "**Amended Standing Order**"); and this Court having reviewed the Petition, the *Declaration of Pavel Boulatov as Russian Counsel to the Petitioner* (the "**Russian Counsel Declaration**") and the statements of counsel with respect to the Petition at a hearing before this Court (the "**Hearing**"); and appropriate and timely notice of the filing of the Petition and the Hearing having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Petition, the Russian Counsel Declaration, the Foreign Representative Declaration and all other pleadings and papers in this case establish just cause to grant the relief ordered herein, and after notice and a hearing and due deliberation therefor;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Amended Standing Order.  This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.  Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

2

C.    The Petitioner is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

D.    This chapter 15 case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E.    The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 2002(q).

F.    Poymanov's Russian Insolvency Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

G.    Poymanov's Russian Insolvency Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

H.    The COMI of the Debtor lies in Russia and Poymanov's Russian Insolvency Proceeding is the Debtor's "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

K.    The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Debtor, its creditors and other parties in interest.

L.    Appropriate notice of the filing of and the hearing on the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

M.    The relief granted hereby is necessary and appropriate in the interests of the public and international comity, it is consistent with the public policy of the United States, and it is warranted pursuant to sections 1515, 1517 and 1520 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated by the Court at the hearing and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor,

3

it is hereby

## ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Petition is granted.

2.      The Petitioner is the duly appointed foreign representative of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Debtor in this Chapter 15 Case.

3.      Poymanov's Russian Insolvency Proceeding is granted recognition as the Debtor's foreign main proceeding pursuant to section 1517 of the Bankruptcy Code.

4.      All relief and protection afforded foreign main proceedings under section 1520 of the Bankruptcy Code is hereby automatically granted to Poymanov's Russian Insolvency Proceeding, the Debtor, the Debtor's assets located in the United States, including but not limited to assets subject to administration by the Petitioner, including the claims purportedly assigned by the Debtor currently being asserted in the action entitled PPF Management, LLC v. OJSC Sberbank, et al., No. 16-CV-16-CV-9139(PGG) (S.D.N.Y.) (the "**SDNY Litigation**"),  and the Petitioner, as applicable.

5.      Consistent with section 1520 of the Bankruptcy Code, the automatic stay under section 362 of the Bankruptcy Code applies within the territorial jurisdiction of the United States and all entities and persons are hereby stayed from:

      i.      The commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtor that was or could have been commenced before the commencement of the case under this title;

      ii.      the enforcement against the debtor or against property of the estate, of a

judgment obtained before the commencement of the case under this title;

iii.    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate (including the claims being asserted in the SDNY Litigation or any similar actions related to or based on similar claims);

iv.    any act to create, perfect, or enforce any lien against property of the estate;

v.    any act to create, perfect, or enforce against property of the debtor any lien to the extent such lien secures a claim that arose before the commencement of the case under this title;

vi.    any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

vii.    the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor.

6.    Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

7.    A copy of this Order, confirmed to be true and correct, shall be served by the Petitioner, within seven business days of entry of this Order, by facsimile, electronic mail, or overnight express delivery, on the Notice Parties, and such service shall be good and sufficient

5

service and adequate notice for all purposes.

       8.    This Court shall retain jurisdiction with respect to the enforcement, amendment,

or modification of this Order and any requests for additional relief or any adversary proceeding

brought in and through this case.

Dated: _____, 2017
New York, New York

                                                             _____
                                                             UNITED STATES BANKRUPTCY JUDGE

6

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 35 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 1 of 38

**EXHIBIT B**
**Certified Russian Translation of Verified Petition**

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 36 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 2 of 38

## CERTIFICATION

I, Anastasiya Pervova, duly certified translator (Diploma with honours issued by Peoples'
Friendship University of Russia XCV – IYAF No 110476 June 26, 2002, Registration No 35/fb),
hereby certify that the attached translation is, to the best of my knowledge and belief, a true and
accurate translation from English to Russian of the attached *Verified Petition for Recognition of
Foreign Main Proceeding And Motion for Order Granting Related Relief Pursuant to 11 U.S.C.
§§ 1515, 1517 and 1520.*

Dated: March 3, 2017

Respectfully submitted

_____
Anastasiya Pervova
Certified translator

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 37 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B - Certified Russian Translation of Verified Petition   Pg 3 of 38

## СВИДЕТЕЛЬСТВО

Я, Первова Анастасия Викторовна, надлежащим образом сертифицированный переводчик, (Диплом с отличием, выдан Российским Университетом Дружбы Народов ХCV – ИЯФ № 110476 от 26 июня 2002 г., регистрационный № 35/фб), настоящим подтверждаю, что прилагаемый перевод является, по имеющимся у меня сведениям и по моему убеждению, верным и точным переводом с английского языка на русский язык прилагаемого Заверенного Заявления о признании основного иностранного разбирательства и Ходатайства о вынесении приказа о предоставлении связанных с ним средств правовой защиты §§ 1515, 1517 И 1520 Тома 11 Свода Законов США.

Дата: 3 марта 2017 г.

С уважением,

_____

Анастасия Первова
Сертифицированный переводчик

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 38 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 4 of 38

РОССИЙСКИЙ УНИВЕРСИТЕТ ДРУЖБЫ НАРОДОВ

# ДИПЛОМ
## с отличием

ХСV - ИЯФ   № 110476

Настоящий диплом выдан _Первовой_

_Анастасии Викторовне_
(ф. и. о.)

в том, что он (она) в _1997_ / _2002_ гг. во время обучения в Российском университете дружбы народов прослушал(а) полный курс _английского_ языка и сдал(а) квалификационный экзамен.

Решением Государственной экзаменационной комиссии от " _13_ " _июня_ _2002_ г. ему (ей) присуждена квалификация "референт-переводчик" с _английского_ языка на русский.

М.П.   Председатель Государственной
экзаменационной комиссии _Мохова_

Ректор _Филиппов_

г. Москва, _26_ _июня_ _2002_ г.

Регистрационный № _35/905_

Тип. ПКФ ЭПО, Москва, з-217

---

PEOPLES' FRIENDSHIP UNIVERSITY OF RUSSIA

# DIPLOMA
## with honours

ХСV - ИЯФ   № 110476

This is to certify that _Pervova_

_Anastasiya_

completed the full course of the _English_ language during his (her) studies at the Peoples' Friendship University of Russia in _1997_ / _2002_, and passed the State Examination successfully.

By the decision of the State Examination Board of " _13_ " _june_ _2002_ he (she) has been awarded the qualification of "consultant-interpreter" from the _English_ language into Russian.

Seal   Chairman of the State
Examination Board _Mokhova_

Rector _Filippov_

Москва, _26_ _june_ _2002_

Registration № _35/905_

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 39 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 5 of 38

WHITE & CASE LLP
1155 Авеню Америки
Нью-Йорк, штат Нью-Йорк, 10036-2787
(1155 Avenue of the Americas
New York, New York 10036-2787)
Тел. (212) 819-8200
Оуэн К. Пэлл

Юго-восточный финансовый центр
200 Саус Бискейн б-р, Офис 4900
Майами, штат Флорида
(200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131)

Тел. (305) 371-2700
Ричард С. Кебрдл (ходатайство о допуске к участию находится на рассмотрении)
Мэттью А. Голдбергер

*Адвокаты Алексея Базарнова*
*в качестве Заявителя и Иностранного представителя*

**СУД США ПО ДЕЛАМ О БАНКРОТСТВЕ
ЮЖНОГО ОКРУГА НЬЮ-ЙОРКА**

| | |
|---|---|
| Дело:<br><br>СЕРГЕЙ ПЕТРОВИЧ ПОЙМАНОВ,<br><br>    Должник в иностранном<br>    разбирательстве. | Дело № 17-_____( )<br><br>Глава 15 |

**ЗАВЕРЕННОЕ ЗАЯВЛЕНИЕ О ПРИЗНАНИИ
ОСНОВНОГО ИНОСТРАННОГО РАЗБИРАТЕЛЬСТВА И ХОДАТАЙСТВО О
ВЫНЕСЕНИИ ПРИКАЗА О ПРЕДОСТАВЛЕНИИ СВЯЗАННЫХ С НИМ СРЕДСТВ
ПРАВОВОЙ ЗАЩИТЫ СОГЛАСНО §§ 1515, 1517 И 1520 ТОМА 11 СВОДА
ЗАКОНОВ США**

Алексей Владимирович Базарнов (**«Базарнов»** или **«Заявитель»**), надлежащим

образом уполномоченный арбитражный управляющий и иностранный представитель

Сергея Петровича Пойманова (**«Пойманов»** или **«Должник»**) в отношении текущего дела

о банкротстве Пойманова в России (**«Российское дело о банкротстве»**), которое

---

[1]    Последние четыре цифры ИНН Должника в России – 6753.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 40 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 6 of 38

рассматривается Арбитражным судом Московской области («**Российский суд по делу о банкротстве**») в соответствии с российским Федеральным законом № 127-ФЗ «О несостоятельности (банкротстве)» («**Российский закон о банкротстве**»),[2] через его юридических представителей в США, фирму White & Case LLP, настоящим подает *Заверенное заявление о признании основного иностранного разбирательства и ходатайство о вынесении приказа о предоставлении связанных с ним средств правовой защиты в соответствии с §§ 1515, 1517 и 1520 Тома 11 Свода законов США* («**Заверенное заявление**»). Заверенное заявление подается в продолжение официальной формы добровольного заявления о банкротстве («**Форма добровольного заявления**»), которая подается одновременно с настоящим документом (настоящее Заверенное заявление вместе с Формой добровольного заявления именуются «**Заявлением**»). Заявитель настоящим просит Суд вынести приказ в существенной степени по форме, приведенной в Приложении А («**Предлагаемый приказ**») к настоящему документу, в соответствии со статьями 1515, 1517 и 1520 Тома 11 Свода законов США («**Кодекс о банкротстве**»):

a) о признании, в соответствии со статьей 1517, Российского дела о банкротстве Пойманова «Основным иностранным разбирательством», как этот термин определен в статье 1502(4), для Должника;

b) о признании Заявителя «Иностранным представителем» (как этот термин определен в статье 101(24)) Должника в отношении Российского дела о банкротстве Пойманова; и

c) о предоставлении таких иных дополнительных средств правовой защиты, которые Суд сочтет справедливыми и надлежащими.

В поддержку настоящего ходатайства Заявитель отсылает Суд к заявлениям,

---

[2]      Как описано в *Декларации Павла Булатова в поддержку Заявления о признании* («**Декларация по российскому праву**»), Российский закон о банкротстве использует в отношении арбитражного управляющего в рамках процедуры банкротства граждан термин «финансовый управляющий».

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 41 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 7 of 38

содержащимся в Декларации по российскому праву, которая подается одновременно с настоящим документом и включается в него путем отсылки. Также в поддержку испрашиваемых средств правовой защиты Заявитель заявляет под страхом привлечения к ответственности за дачу ложных показаний по законодательству Соединенных Штатов Америки, что заявления, содержащиеся в настоящем документе, подлинны и верны, и настоящим указывает следующее:

## I.
## <u>ВСТУПИТЕЛЬНАЯ ЧАСТЬ</u>

1.      Настоящим заявлением Заявитель просит настоящий Суд признать Российское дело о банкротстве в США с тем, чтобы Заявитель, будучи единоличным арбитражным управляющим, мог надлежащим образом продолжать проведение Российского дела о банкротстве и управление им. Несмотря на то, что Должник и почти все его известное имущество находятся в России, содействие настоящего Суда стало необходимым, поскольку Пойманов, исчерпав средства судебной защиты в России и на Кипре, теперь явно обозначил США как новый фронт для продолжения своей упорной и громкой серии судебных разбирательств.

2.      Как более подробно описано ниже, в течение пяти последних лет Пойманов настойчиво инициировал судебные разбирательства с целью помешать осуществлению своими кредиторами их законных прав. Несмотря на постоянные поражения в России (и затем на Кипре), его новая тактика включает в себя уступку предполагаемых прав требования (которые с точки зрения российского права входят в состав его конкурсной массы и находятся под контролем Заявителя, его финансового управляющего) недавно созданной по праву штата Делавэр компании (зарегистрированной его юридическим представителем в США), которая недавно инициировала разбирательство в Федеральном

3

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 42 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 8 of 38

окружном суде Южного округа Нью-Йорка. Эта очередная попытка добиться повторного рассмотрения судом вопросов, ранее разрешенных в других юрисдикциях, может оказать воздействие на Российское дело о банкротстве Пойманова и в еще большей степени осложнить положение кредиторов Пойманова.

3.      С учетом подачи заявления о признании Пойманова банкротом в России в 2015 г., действия Пойманова оказывают непосредственное влияние на его конкурсную массу и возможность Заявителя исполнять свои обязанности как утвержденного надлежащим образом арбитражного управляющего, который по российскому праву является единственным лицом, уполномоченным управлять имуществом Пойманова в рамках Российского дела о банкротстве в интересах кредиторов Пойманова. Вследствие этого Заявитель просит настоящий Суд принять Предлагаемый приказ о признании Российского дела о банкротстве для того, чтобы любое имущество Пойманова, находящееся в США (включая любые возможные права требования, входящие в состав конкурсной массы и якобы уступленные Должником), могло быть возвращено под контроль Заявителя.

II
ОБСТОЯТЕЛЬСТВА ДЕЛА

A.      История спора и описание деятельности

4.      Пойманов является гражданином и резидентом Российской Федерации («Россия»). Он родился 15 февраля 1972 г. в Павловске, городе в Воронежской области России. В июле 2000 г. Пойманов стал Генеральным директором открытого акционерного общества «Павловскгранит» («Павловскгранит»). На тот момент Павловскгранит был одним из крупнейших производителей строительных материалов – гранита и щебня – в Европе. До 2008 г. Пойманов, действуя через компании и лиц, находящихся под его

4

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 43 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 9 of 38

контролем или связанных с ним (совместно – его **«Аффилированные лица»**), владел приблизительно 51% акций Павловскгранита. Его партнер, Сергей Мамедов (**«Мамедов»**) косвенно владел оставшимися акциями Павловскгранита, кроме 1% акций, которые находились в собственности иных миноритарных акционеров.

5.   В 2008 г. Пойманов принял решение приобрести акции Мамедова в Павловскграните от имени ЗАО «Павловскгранит-Инвест» (**«П-Инвест»**). Чтобы профинансировать приобретение, 4 августа 2008 г. П-Инвест заключил кредитный договор (**«Кредитный договор П-Инвеста»**) с ОАО «Сбербанк России» (**«Сбербанк»**), чтобы получить заемные средства в размере до 5,1 млрд рублей (на тот момент приблизительно 217 млн долларов США). Пойманов использовал средства, полученные по Кредитному договору П-Инвеста, чтобы приобрести Zinica Limited (**«Zinica»**),[3] кипрскую компанию Сергея Мамедова, которая владела (a) 29,46% акций Павловскгранита и (b) 50% долей в ООО «Витэра» (**«Витэра»**), российском обществе, которое владело 36,37% акций Павловскгранита. После приобретения П-Инвестом компании Zinica, Пойманов стал бенефициарным собственником (через своих Аффилированных лиц) приблизительно 99% акций Павловскгранита.

6.   После заключения Кредитного договора П-Инвеста и приобретения акций Мамедова в Павловскграните Пойманов организовал привлечение в пользу Павловскгранита от Сбербанка кредитов для пополнения оборотных средств на сумму 1,39 млрд рублей (на тот момент приблизительно 43,5 млн долларов США). Для привлечения этого финансирования Павловскгранит заключил три кредитных договора со Сбербанком: первые два были подписаны 31 марта 2009 г., а третий – 15 июня 2009 г.

---

[3]   Позднее компания Zinica была переименована в PNH Limited (**«PNH»**).

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 44 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 10 of 38

(«**Кредитные договоры Павловскгранита**», а совместно с Кредитным договором
П-Инвеста – «**Кредитные договоры**»).

7.      Для обеспечения и гарантии исполнения обязательств, возникающих из
Кредитных договоров, Пойманов и его Аффилированные лица, заключили ряд договоров
поручительства и залога (с учетом соглашений о внесудебном порядке обращения
взыскания на имущество, переданное в залог) («**Договоры поручительства и залога**»). В
соответствии с Договорами поручительства и залога Пойманов и его Аффилированные
лица передали в залог 99% выпущенных акций Павловскгранита (включая акции,
принадлежавшие Витэре и Zinica), 100% выпущенных акций П-Инвеста и 100% долю в
уставном капитале Витэры Сбербанку в качестве обеспечения по Кредитным договорам.
Таким образом, изначально Аффилированные лица Пойманова предоставили свои акции в
залог в обеспечение возврата кредита П-Инвестом, который полностью принадлежал
Пойманову. Пойманов подписал договор залога, два дополнительных соглашения к нему
и соглашение о внесудебном порядке обращения взыскания на имущество, переданное в
залог, от имени своей жены, Ирины Подгорной («**Подгорная**»), действуя на основании
доверенностей. Денежные суммы по Кредитным договорам подлежали уплате в рублях в
России, при этом как Кредитные Договоры, так и связанные Договоры поручительства и
залога предусматривали исключительную подсудность споров российским судам.

**В.      Неисполнение П-Инвестом обязательств по Кредитному договору П-Инвеста**

8.      С самого начала П-Инвест и Павловскгранит испытывали затруднения в
связи с исполнением их кредитных обязательств перед Сбербанком. П-Инвест и
Павловскгранит не возвратили указанные заемные средства и, напротив, в июне 2009 г.,
сразу после получения последнего транша по Кредитным договорам Павловскгранита,

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 45 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 11 of 38

Пойманов обратился к Сбербанку, заявив о необходимости реструктуризации кредитов. В результате в ноябре 2009 г. Сбербанк представил Пойманову официальное предложение о реструктуризации, которое предусматривало продление сроков погашения и снижение процентных ставок по Кредитным договорам в обмен на дополнительное обеспечение. Однако эти переговоры не привели к взаимоприемлемому соглашению о реструктуризации задолженности. 24 февраля 2010 г. П-Инвест и Павловскгранит допустили неисполнение их соответствующих обязательств, не совершив платежи, причитавшиеся по Кредитным договорам. 19 марта 2010 г. Сбербанк потребовал досрочной выплаты всей непогашенной задолженности по Кредитному договору П-Инвеста.

9.      В свете длящегося неисполнения обязательств П-Инвестом 20 мая 2010 г., следуя стандартной практике, Сбербанк уступил свои права по Кредитным договорам ООО «Сбербанк Капитал» (**«Сбербанк Капитал»**), 100-процентной дочерней компании Сбербанка, которая занимается исключительно проблемными задолженностями. После дальнейших переговоров с Поймановым, 25 июня 2010 г. Сбербанк Капитал предъявил полную сумму задолженности по Кредитным договорам к немедленной оплате.

10.      В июле 2010 г., по истечении более чем 15 месяцев безуспешных переговоров с Поймановым, Сбербанк Капитал инициировал дело в российском суде против Пойманова как поручителя о взыскании сумм задолженности по Кредитному договору П-Инвеста.[4]  18 января 2011 г. суд обязал Пойманова выплатить

---

[4]      Дело № 2-93/2011 в Одинцовском городском суде Московской области.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 46 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition    Pg 12 of 38

4 620 228 024,75 рублей, полную сумму, причитавшуюся по Кредитному договору П-Инвеста.[5] 14 апреля 2011 г. данное решение было оставлено без изменения.[6]

11.    Сбербанк Капитал также предъявил иски о взыскании задолженности к Павловскграниту и П-Инвесту. В рамках этих мероприятий по принудительному исполнению обязательств, 29 сентября 2011 г. Сбербанк Капитал инициировал дело в Арбитражном суде г. Воронежской области о признании Павловскгранита несостоятельным. 30 сентября 2011 г. Сбербанк Капитал инициировал дело в Арбитражном суде г. Москвы о признании П-Инвеста несостоятельным. Российские суды признали обе компании банкротами и в их отношении были начаты дела о банкротстве.

**C.    Пойманов пытается избежать исполнения своих обязательств по Кредитному договору П-Инвеста и Договорам Поручительства и залога**

12.    В августе 2010 г., всего через несколько месяцев после того, как П-Инвест и Павловскгранит допустили неисполнение своих соответствующих обязательств по Кредитным договорам, Пойманов начал реализовывать упорную и громогласную стратегию уклонения от своих обязательств по Кредитным договорам и Договорам Поручительства и залога. В общей сложности в попытке помешать своим кредиторам и их правопреемникам осуществить свои права по договорам Пойманов инициировал более 35 отдельных разбирательств в России. Ниже следует обобщение лишь некоторых судебных споров, инициированных Поймановым с целью уйти от ответственности перед кредиторами.

---

[5]    Решение Одинцовского городского суда Московской области от 18 января 2011 г. по делу № 2-93/2011.

[6]    Апелляционное определение Московского областного суда от 14 апреля 2011 г. по делу № 2-93/2011.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 47 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 13 of 38

*i.*     *Попытки Пойманова добиться признания уступки прав по Кредитным договорам недействительной*

13.     3 августа 2010 г. Павловскгранит (контролируемый на тот момент Поймановым) подал встречный иск в рамках разбирательства о взыскании долга против П-Инвеста, рассматриваемого российскими судами, о признании недействительной уступки прав по Кредитным договорам Сбербанком в пользу Сбербанк Капитала. На этом этапе Пойманов не оспаривал действительность лежащей в основе спора задолженности – его единственной явной целью было затруднить Сбербанк Капиталу обращение взыскания. 3 июня 2011 г. российский суд отказал в удовлетворении встречного иска Павловскгранита, установив, что уступка была правомерной, исполнимой и не противоречила российскому законодательству. 7 октября 2011 г. данное судебное решение было оставлено без изменения в апелляции. В рамках отдельного разбирательства П-Инвест также безуспешно пытался оспорить уступку требований Сбербанк Капиталу.

*ii.*     *Попытки Пойманова внести изменения в Кредитный договор П-Инвеста*

14.     17 сентября 2010 г. П-Инвест (контролируемый на тот момент Поймановым) обратился в российский суд с требованием о продлении судом сроков погашения и выплат по Кредитному договору П-Инвеста в связи с существенным изменением экономических факторов. 6 мая 2011 г. суд отказал в удовлетворении требований П-Инвеста, заключив, что правовые основания для изменения Кредитного договора П-Инвеста отсутствовали.

*iii.*     *Попытки Пойманова добиться признания Договоров поручительства и залога недействительными*

15.     8 ноября 2010 г. Пойманов подал иск в другой российский суд, утверждая, что его личное поручительство по обязательствам из Кредитного договора П-Инвеста

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 48 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 14 of 38

прекратилось. 8 февраля 2011 г. суд постановил, что поручительство не прекратилось и продолжало действовать по российскому праву.[7]

16.    25 мая 2010 г. Zinica и Витэра (обе компании контролировались Поймановым) обратились в Арбитражный суд Воронежской области со схожими исками о признании недействительными соглашений о внесудебном порядке обращения взыскания на имущество, переданное в залог, которые наделяли Сбербанк Капитал правом обратить взыскание на (i) 29,64% акций в Павловскграните, заложенных компанией Zinica, и (ii) 36,37% акций в Павловскграните, заложенных Витэрой. 26 ноября 2010 г. и 29 декабря 2010 г. российский суд отказал в удовлетворении требований о признании недействительными соглашений о внесудебном порядке обращения взыскания на имущество, переданное в залог, и установил, что Сбербанк Капитал вправе обратить взыскание на акции Павловскгранита, принадлежавшие соответственно Zinica и Витэре. При рассмотрении апелляционных жалоб компании Zinica и Витэры решения нижестоящих судов были оставлены без изменений соответственно 5 октября 2011 г. и 22 апреля 2011 г.

*iv.    Пойманов подает на развод в России в попытке укрыть активы*

17.    4 марта 2005 г. Пойманов заключил брак с Подгорной. Как описано в Декларации по российскому праву, по общему правилу все имущество, приобретенное любым из супругов в течение брака, включая акции Паловскгранита, принадлежавшие Подгорной, считается совместной собственностью супругов по российскому праву.

18.    19 сентября 2011 г. Пойманов подал заявление о расторжении брака со своей супругой. По имеющимся у меня сведениям и по моему убеждению, Пойманов

---

[7]    Решение Ленинского районного суда г. Воронежа от 8 февраля 2011 г. по делу № 2-248/2011.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 49 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 15 of 38

продолжал жить со своей супругой и детьми после подачи заявления о расторжении брака. 15 декабря 2012 г. Пойманов и Подгорная заключили соглашение об уплате алиментов («**Соглашение об алиментах**»). Согласно Соглашению об алиментах Пойманов был обязан выплачивать 90% своего ежемесячного дохода Подгорной, но в любом случае не менее 700 000 рублей (на тот момент приблизительно 22 800 долларов США).

19.   Компания Суинтекс Лимитед («**Суинтекс**»), правопреемник Сбербанк Капитала в отношении ряда требований к Пойманову, обратилась в Одинцовский городской суд Московской области с иском о признании недействительным Соглашения об уплате алиментов. 9 октября 2015 г. Одинцовский городской суд Московской области признал соглашение об уплате алиментов недействительным на основании статьи 10 ГК РФ, запрещающей поведение, представляющее собой злоупотребление правами во вред кредиторам.[8] Это решение было оставлено без изменения в апелляции 10 февраля 2016 г.[9]

### D.   Пойманов предпринимает попытки оспорить обращение взыскания в рамках исполнительного производства и обращение взыскания на предмет залога, обеспечивающего исполнение Кредитных договоров

20.   В течение 2011 и 2012 г., Сбербанк Капитал и лица, которым он уступил права требования, добились принудительного исполнения поручительства Пойманова путем реализации его акции в рамках исполнительного производства, а также обратили взыскание на акции Паловскгранита, заложенные его женой, семьей и компаниями, контролируемыми им, в соответствии с Договорами поручительства и залога. Пойманов предпринимал попытки препятствовать исполнительному производству и обращению

---

[8]   Решение Одинцовского городского суда Московской области от 9 октября 2015 г. по делу № 2-8804/15.
[9]   Апелляционное определение Московского областного суда от 10 февраля 2016 г. по делу № 2-8804/15.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 50 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 16 of 38

взыскания на заложенные акции Павловскгранита различными способами, включая

оспаривание результатов оценок, подготовленных в связи с торгами в отношении акций.

21.    В ходе исполнительного производства и обращения взыскания на предмет

залога Пойманов и взыскатели в различное время представляли альтернативные отчеты

касательно стоимости акций Павловскгранита, подготовленные независимыми

оценщиками в связи с обращением взыскания на акции. Вопросы, связанные с оценкой

акций, на которые было обращено взыскание, были тщательно и полно исследованы

судами. Российский суд отклонил отчет оценщика, представленный Поймановым,

поскольку «он содержит противоречивые сведения, а исходные данные, используемые в

расчетах, не подтверждены достоверными источниками, расчеты и обоснования в

документе представлены не в полном объеме».[10] Другие российские суды, включая

Арбитражный суд Воронежской области и Арбитражный суд Московской области,

рассматривали отчеты оценщиков, подготовленные как по инициативе кредиторов, так и в

рамках судебной экспертизы и исполнительного производства (по постановлению

судебного пристава-исполнителя, осуществляющего организацию торгов в рамках

обращения взыскания на имущество), и признали их обоснованными. По крайней мере в

одном российском разбирательстве одна из компаний, контролируемых Поймановым,

обратилась в суд с иском о признании недостоверной величины рыночной стоимости

объекта оценки, однако затем отказалась от иска.

22.    В итоге все акции Павловскгранит, заложенные Поймановым, его женой и

другими Аффилированными лицами по Договорам поручительства и залога, либо были

реализованы в рамках исполнительного производства (акции Пойманова), либо стали

---

[10]     Решение Красногорского городского суда Московской области от 7 ноября 2011 г. по делу № 2-4672/2011.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 51 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 17 of 38

предметом обращения взыскания по договорам залога. Также были реализованы 100% акций П-Инвеста (чьим основным имуществом были акции Павловскгранита), принадлежавшие Пойманову.

**E.** **Пойманов инициирует судебное разбирательство на Кипре**

23.     7 августа 2013 г., после нескольких лет судебных разбирательств в России, Пойманов инициировал разбирательство в судах Республики Кипр (**«Кипрский суд»**), в этот раз утверждая, что различные кредиторы и их правопреемники вступили в сговор с целью мошенническим путем лишить Пойманова и П-Инвест их соответствующих долей в Павловскграните (**«Кипрское разбирательство»**). После нескольких лет судебных разбирательств в России, в Кипрском разбирательстве Пойманов впервые заявил о том, что стал жертвой мошенничества и сговора.

24.     В итоге Кипрский суд отказал в удовлетворении требований Пойманова о применении обеспечительных мер, вынесенных без вызова сторон, в отношении ответчиков в рамках Кипрского разбирательства. 3 декабря 2013 г. Кипрский суд решил, что у Пойманова нет охраняемого законом интереса (то есть права на иск) по искам, поданным от имени двух его компаний (PNH и Витэра). Кипрский суд также пришел к выводу, что Пойманов не представил каких-либо надлежащих доказательств в поддержку своих заявлений о мошенничестве в каких-либо российских разбирательствах. В частности, Кипрский суд отклонил заключение эксперта, предоставленное Поймановым, и счел, что предшествующие решения российских судов убедительно доказывают отсутствие мошенничества в отношении Пойманова. По существу Кипрский суд пришел к выводу, что у Пойманова нет разумных шансов доказать, что отчеты оценщиков были ошибочными и заведомо ложными, что необходимо для обоснования его требований. Тем

13

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 52 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 18 of 38

временем Заявитель через своего представителя принял участие в заседании Кипрского суда и будет ходатайствовать о получении контроля над Кипрским разбирательством, поскольку Пойманов не вправе вести данное дело в суде ввиду его Российского дела о банкротстве.

25.     В рамках отдельного разбирательства на Кипре в 2013 г. российский конкурсный управляющий П-Инвеста обратился с иском к Пойманову касательно его мошеннических действий в отношении кредиторов, в том числе путем неисполнения российских судебных актов. Дело все еще находится на рассмотрении, но Кипрский суд принял обеспечительные меры в виде судебного приказа о замораживании активов по всему миру против Пойманова и некоторых Аффилированных лиц Пойманова, согласно которому любому из них запрещается предъявлять от имени различных Аффилированных лиц требования, относящиеся, в частности, к PNH. Этот судебный приказ остается в силе.

**F.     Дело о банкротстве Пойманова в России**

26.     18 ноября 2011 г. Пойманов был зарегистрирован в качестве т.н. индивидуального предпринимателя по российскому праву[11] и затем 9 декабря 2011 г. он обратился в Арбитражный суд Московской области с заявлением о признании его несостоятельным (банкротом) с целью приостановить обращение взыскания на акции Павловскгранита в рамках исполнительного производства. 12 декабря 2011 г. он подал заявление о принятии обеспечительных мер в виде запрета на проведение торгов по реализации акций П-Инвеста и Павловскгранита. 19 декабря 2011 г. российский суд отказал в удовлетворении заявления Пойманова о принятии обеспечительных мер и

---

[11]     См. Декларацию по российскому праву, п. 8 (где описывается, что до 1 октября 2015 г. только граждане, зарегистрированные в качестве «индивидуальных предпринимателей», могли быть признаны банкротами).

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 53 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 19 of 38

26 марта 2012 г. Десятый арбитражный апелляционный суд оставил это определение в силе, отказав Пойманову в удовлетворении апелляционной жалобы. Тем временем, в рамках исполнительного производства было обращено взыскание на акции, принадлежавшие Пойманову. После отказа в удовлетворении заявления о принятии обеспечительных мер и реализации его акций Пойманов отказался от своего заявления о признании его несостоятельным (банкротом) и в марте 2012 г. прекратил свой статус индивидуального предпринимателя.

27.     1 октября 2015 г. («**Дата подачи заявления Пойманова**»), после внесения в Российский закон о банкротстве изменения, сделавшего возможным разбирательство о банкротстве в отношении должников – физических лиц, компания Суинтекс - один из кредиторов Пойманова – инициировала дело против Пойманова по Российскому закону о банкротстве в Арбитражном суде Московской области.[12] В тот же день Пойманов и Подгорная самостоятельно (по отдельности) попытались инициировать дело о банкротстве Пойманова как должника – физического лица по Российскому закону о банкротстве. 8 февраля 2016 г. Российский суд по делу о банкротстве определил, что заявление, поданное Суинтекс, было обоснованным, ввел процедуру банкротства – реструктуризацию долгов – в отношении Пойманова и утвердил Базарнова финансовым управляющим.[13] 21 июля 2016 г., поскольку ни Пойманов, ни его кредиторы не предложили план реструктуризации долгов, соответствующий требованиям законодательства, Российский суд по делу о банкротстве признал Пойманова несостоятельным (банкротом) и ввел процедуру реализации имущества гражданина.[14]

---

[12]     См. Декларацию по российскому праву, пп. 8-11 (где рассматриваются поправки в Российский закон о банкротстве).
[13]     Определение Российского суда по делу о банкротстве от 8 февраля 2016 г. по делу № А41-78484/15.
[14]     Решение Российского суда по делу о банкротстве от 21 июля 2016 г. по делу № А41-78484/15.

15

Case 1:16-cv-09139-PGG  Document 53-2  Filed 03/06/17  Page 54 of 135

17-10516  Doc 2-2  Filed 03/03/17  Entered 03/03/17 23:45:24  Exhibit B -
Certified Russian Translation of Verified Petition  Pg 20 of 38

Также 21 июля 2016 г. Российский суд по делу о банкротстве утвердил Базарнова финансовым управляющим, в чьи задачи входит надзор за сбором и продажей активов Пойманова в интересах его кредиторов.[15]

28.   16 февраля 2016 г. Пойманов заключил новое соглашение об уплате алиментов с Подгорной («*Новое соглашение об алиментах*»). Согласно Новому соглашению об алиментах Пойманов обязался выплатить Подгорной единовременно денежную сумму в размере 24 000 000 рублей (на тот момент приблизительно 308 600 долларов США) до 25 февраля 2016 г., а также ежемесячно уплачивать алименты в размере 690 000 рублей (на тот момент приблизительно 8 800 долларов США).

29.   На основании Нового соглашения об алиментах Подгорная подала требование в рамках Российского дела о банкротстве Пойманова о включении в реестр требований в размере 26 760 000 рублей. Базарнов подал заявление о признании Нового соглашения об алиментах недействительным.

30.   7 сентября 2016 г. Российский суд по делу о банкротстве удовлетворил требования Базарнова и признал Новое соглашение об алиментах недействительным ввиду нарушения Российского закона о банкротстве.[16] Соответственно суд отказал во включении в реестр требований к Пойманову требования Подгорной.

31.   На настоящий момент Российское дело о банкротстве Пойманова продолжается и рассматривается судом. 18 января 2017 г. Российский суд по делу о банкротстве вынес определение о продлении срока реализации имущества в отношении Пойманова на шесть месяцев, до 21 июля 2017 г.[17]

---

[15]   Там же.
[16]   Определение Российского суда по делу о банкротстве от 7 сентября 2016 г. по делу № А41-78484/15.
[17]   Определение Российского суда по делу о банкротстве от 18 января 2017 г. по делу № А41-78484/15.

16

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 55 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 21 of 38

**G.    Пойманов инициирует <u>судебное разбирательство в Федеральном окружном суде Южного округа Нью-Йорка</u>**

32.    21 ноября 2016 г. или приблизительно в эту дату Пойманов и его жена предположительно уступили свои требования, связанные с реализацией в рамках исполнительного производства акций Павловскгранита и обращением взыскания на них по залогам, компании PPF Management LLC («**PPF**»), корпорации с ограниченной ответственностью, зарегистрированной по праву штата Делавэр 21 ноября 2016 г.[18] 22 ноября 2016 г.[19] PPF подала иск в Федеральный окружной суд Южного округа Нью-Йорка («**Разбирательство в суде Нью-Йорка**») против, в частности, следующих лиц: Сбербанка, Сбербанк Капитала, правопреемников Сбербанк Капитала и управляющих в российском деле о банкротстве П-Инвеста и в Российском деле о банкротстве Пойманова. Исковое заявление, поданное в рамках Разбирательства в суде Нью-Йорка, ясно демонстрирует, что требования якобы были уступлены PPF «с целью сохранить их и предъявить их» в США.

33.    В Иске, поданном в суд Нью-Йорка, повторно выдвигаются заявления о мошенничестве и сговоре, впервые сделанные – и на настоящий момент отклоненные – в Кипрском суде (сторонами разбирательства в котором было семеро участников Разбирательства в суде Нью-Йорка). Существенно, что в той степени, в которой Пойманов пытается заявить наличие прав или требований в рамках Разбирательства в суде Нью-Йорка от имени некоторых своих Аффилированных лиц, он может прямо нарушать судебный приказ о замораживании активов по всему миру, принятый против него на

---

[18]    Официальная информация штата Делавэр свидетельствует, что компания PPF Management LLC была зарегистрирована юридическим представителем компании PPF Management LLC за день до начала Разбирательства в суде Нью-Йорка.
[19]    См. п. 2 искового заявления, поданного в рамках Разбирательства в Федеральном окружном суде Южного округа Нью-Йорка («**Иск, поданный в суд Нью-Йорка**»), приводится в <u>Приложении C</u> к настоящему документу.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 56 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 22 of 38

Кипре, который запретил ему уступать права от этих Аффилированных лиц и предъявлять требования где-либо в мире. Как указано выше, Заявитель должен вмешаться в Кипрское разбирательство с тем, чтобы не дать Пойманову в дальнейшем оказывать влияние на отношения с его кредиторами и их правами.

34.     Как более подробно рассмотрено в Декларации по российскому праву, согласно Российскому закону о банкротстве с даты признания должника банкротом, именно финансовый управляющий (а не должник) осуществляет все права в отношении имущества, составляющего конкурсную массу, и именно он вправе распоряжаться таким имуществом в интересах кредиторов должника. Более того, все сделки, совершенные должником лично, а не финансовым управляющим от его/ее лица в отношении конкурсной массы, не влекут правовых последствий.[20] Поскольку требования, предположительно уступленные Поймановым в пользу PPF, являлись имуществом в составе его конкурсной массы по состоянию на 21 июля 2016 г. (дата его признания банкротом), уступка компании PPF требований 21 ноября 2016 г. или приблизительно в эту дату недействительна по российскому праву.

35.     В конце 2016 г. Базарнов подал в Российский суд по делу о банкротстве заявление о признании недействительным договора уступки прав требования Поймановым в пользу PPF, поскольку такие права требования входят в состав конкурсной массе Пойманова и он не имел права отчуждать такое имущество по применимому российскому праву. Российский суд по делу о банкротстве принял заявление к рассмотрению и назначил судебное заседание на 1 февраля 2017 г., затем отложив его до

---

[20]     См. Декларацию по российскому праву, пп. 18-20.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 57 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 23 of 38

2 марта 2017 г.[21] Пойманов не предоставил договор уступки прав требования до настоящего времени. По имеющейся у меня информации и пониманию, на заседании 2 марта 2017 г. представитель Пойманова заявил об отсутствии договора уступки между Поймановым и PPF. Заседание было отложено на 3 апреля 2017 г.

## II.
## ЮРИСДИКЦИЯ, ПРАВО НА ПОДАЧУ ИСКА И ПОДСУДНОСТЬ

36.   Настоящий Суд обладает юрисдикцией на рассмотрение настоящего Заявления в соответствии с §§ 157 и 1334 Тома 28 Свода законов США, статьями 109 и 1501 Кодекса о банкротстве, а также Измененными правилами процедуры от 31 января 2012 г., Документ M-431, Слушание по делу о рассмотрении Правил процедуры в отношении дел по Главам 11, 12, Разное 00032 (Федеральный окружной суд Южного округа Нью-Йорка, 2 февраля 2012 г.) (Председатель суда Преска) («**Измененные правила процедуры**»).

37.   Настоящее дело было надлежащим образом возбуждено в соответствии со статьей 1504 Кодекса о банкротстве путем подачи настоящего Заявления о признании Российского дела о банкротстве Пойманова в качестве основного иностранного разбирательства Должника согласно статье 1515 Кодекса о банкротстве. Это разбирательство является центральным согласно § 157(b)(2)(P) Тома 28 Свода законов США.

38.   Подсудность дела настоящему Суду является надлежащей в соответствии с § 1410(1) Тома 28 Свода законов США. Основными средствами Должника в США являются денежные средства, переведенные Заявителем на клиентский трастовый счет в

---

[21]   Определения Российского суда по делу о банкротстве от 30 декабря 2016 г. и от 1 февраля 2017 г. по делу № А41-78484/15.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 58 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 24 of 38

Ситибанк в округе Нью-Йорк, и находящиеся, таким образом, в пределах этого округа. Помимо средств Должника на клиентском трастовом счете в Нью-Йорке Должник попытался предъявить требования и заявить о наличии оснований для иска в США, включая требования, заявленные в рамках Разбирательства в суде Нью-Йорка, которые также могут влечь потенциальные требования и ответственность, связанные с оспариванием предполагаемой уступки PPF.

39.     Присутствие активов на территории США наделяет финансового управляющего Должника правом на иск по Главе 15 в соответствии со статьей 109(a) Кодекса о банкротстве. См. *Дело Suntech Power Holdings Co.*, Собрание дел о банкротстве, Том 520, стр. 399, 411 (Дела о банкротстве, Федеральный окружной суд Южного округа Нью-Йорка, 2014 г.); *Drawbridge Special Opportunities Fund LP против Barnet (Дело Barnet)*, Третья серия Сборника судебных решений федеральных апелляционных судов США, Том 737, стр. 238, 247 (Апелляционный суд Второго округа США, 2013 г.) (где суд применил требование о наличии имущества США по статье 109(a) к делам по Главе 15).

40.     Статьи 1515, 1517 и 1520 Кодекса о банкротстве предусматривают законодательные основания для испрашиваемых средств правовой защиты.

## IV.
## ИСПРАШИВАЕМЫЕ СРЕДСТВА ПРАВОВОЙ ЗАЩИТЫ

41.     Заявитель ходатайствует о вынесении настоящим Судом приказа в виде, в существенных вопросах соответствующем Предлагаемому приказу, приведенному в приложении к настоящему документу, в соответствии со статьями 1515, 1517 и 1520 Кодекса о банкротстве:

а)  о признании, в соответствии со статьей 1517, Российского дела о банкротстве Пойманова в качестве Основного иностранного разбирательства Должника, как этот термин определен в статье 1502(4);

20

Case 1:16-cv-09139-PGG Document 53-2 Filed 03/06/17 Page 59 of 135

17-10516 Doc 2-2 Filed 03/03/17 Entered 03/03/17 23:45:24 Exhibit B -
Certified Russian Translation of Verified Petition Pg 25 of 38

b) о признании Заявителя Иностранным представителем (как этот термин определен в статье 101(24)) Должника в отношении Российского дела о банкротстве Пойманова; и

c) о предоставлении таких иных дополнительных средств правовой защиты, которые Суд сочтет справедливыми и надлежащими,[22]

(«**Испрашиваемые средства правовой защиты**»).

## V.
## ОСНОВАНИЯ ДЛЯ ПРЕДОСТАВЛЕНИЯ ПРАВОВОЙ ЗАЩИТЫ

42. Суду следует признать Российское дело о банкротстве Пойманова в качестве основного иностранного разбирательства Должника, а Заявителя – в качестве надлежащим образом уполномоченного Иностранного представителя Должника в отношении такого разбирательства.

43. Цель Главы 15 состоит в «инкорпорации Модельного закона о трансграничной несостоятельности («**Модельный закон**») с тем, чтобы создать эффективные механизмы рассмотрения дел о трансграничной несостоятельности». § 1501(а) Тома 11 Свода законов США. Таким образом:

> Текст Главы 15 повторяет Модельный закон, с учетом корректировок, направленных на его адаптацию и сочетание с американским правом. Конгресс предусмотрел правило толкования, которое прямо требует, чтобы американские суды учитывали ее международное происхождение и содействовали такому применению Главы 15, которое соответствует редакциям Модельного закона, принятым в других юрисдикциях.

*Дело Pro-Fit Holdings Ltd.*, Собрание дел о банкротстве, Том 391, стр. 850, 857 (Дела о банкротстве, Федеральный окружной суд Центрального округа Калифорнии, 2008 г.); см. также *Krys против Farnum Place, LLC (Дело Fairfield Sentry Ltd.)*, Третья серия Сборника судебных решений федеральных апелляционных судов США, Том 768, стр. 239, 245

---

[22] Заявитель сохраняет за собой право требовать дополнительных средств правовой защиты на основании статьи 1521(а)(1) Кодекса о банкротстве.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 60 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B - Certified Russian Translation of Verified Petition   Pg 26 of 38

(Апелляционный суд Второго округа США, 2014) (где приводится отсылка к § 1501(a) Тома 11 Свода законов США); *Дело British Am. Ins. Co.*, Собрание дел о банкротстве, Том 425, стр. 884, 899 (Дела о банкротстве, Федеральный окружной суд Южного округа Флориды, 2010). Соответственно, при толковании Главы 15 суд должен «учитывать ее международное происхождение, а также необходимость способствовать такому применению [Главы 15], которое соответствует применению схожих законов, принятых иностранными юрисдикциями». § 1508 Тома 11 Свода законов США.[23]

44.     Статья 1517(a) Кодекса о банкротстве предусматривает, что после уведомления и слушания Суд должен вынести приказ о признании иностранного разбирательства основным иностранным разбирательством, если (1) такое иностранное разбирательство является основным иностранным разбирательством по смыслу статьи 1502 Кодекса о банкротстве, (2) иностранный представитель, подающий заявление о признании, является лицом или органом, и (3) заявление удовлетворяет требованиям статьи 1515 Кодекса о банкротстве. См. § 1517(a) Тома 11 Свода законов США; *Дело Overnight & Control Comm'n of Avánzit, S.A.*, Собрание дел о банкротстве, Том 385, стр. 525, 532 (Дела о банкротстве, Федеральный окружной суд Южного округа Нью-Йорка, 2008 г.). Вышеуказанные требования соблюдаются в отношении Российского дела о банкротстве Пойманова, Заявителя и настоящего Заявления.

---

[23]     В подготовительных документах отмечается, что «[е]динообразному толкованию [Главы 15] будут способствовать ссылки на Руководство [по введению Модельного закона ЮНСИТРАЛ о трансграничной несостоятельности, Генеральная Ассамблея ООН, 30-я сессия ЮНСИТРАЛ, Собрание документов ООН, A/CN.9/442 (1997)] и Отчеты, упомянутые в нем, где разъясняются причины употребления определенных терминов, а также зачастую освещается их происхождение». Отчет Палаты представителей № 109-31, Часть 1, 109-й Конгресс, 1-я сессия, стр. 109-110 (2005 г.).

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 61 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 27 of 38

**A.**   **Российское дело о банкротстве Пойманова является Основным иностранным разбирательством Должника**

45.   Российское дело о банкротстве Пойманова является основным иностранным разбирательством, которое удовлетворяет первому условию для вынесения приказа о признании такого разбирательства согласно статье 1517(а).

　　　　*i.*　　*Российское дело о банкротстве Пойманова является «иностранным разбирательством»*

46.   Статья 101(23) определяет «иностранное разбирательство» как (1) коллективное судебное или административное разбирательство, связанное с несостоятельностью или урегулированием долга, (2) которое ведется в иностранном государстве (3) под надзором иностранного суда и (4) для цели реорганизации или реализации активов и прекращения деятельности должника. См. § 101(23) Тома 11 Свода законов США. Кодекс о банкротстве определяет «иностранный суд» как «судебный или иной орган, обладающий компетенцией по контролю или надзору за иностранным разбирательством». § 1502(3) Тома 11 Свода законов США.

47.   Российское дело о банкротстве Пойманова соответствует определению «иностранного разбирательства», предусмотренному статьей 101(23) Кодекса о банкротстве. Как указывается в Декларации по российскому праву, Российское дело о банкротстве Пойманова является судебным разбирательством с участием нескольких лиц, которое было возбуждено по Российскому закону о банкротстве и ведется под контролем Российского суда по делу о банкротстве. Как подробно описано в Декларации по российскому праву, Российский суд по делу о банкротстве осуществил свои полномочия, провел слушания и вынес судебные акты (в том числе о назначении Заявителя управляющим).

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 62 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 28 of 38

48.     Российское дело о банкротстве Пойманова ведется в иностранном государстве – России – в соответствии с законом о несостоятельности, согласно которому активы и деятельность Должника подчинены контролю и надзору Российского суда по делу о банкротстве. Соответственно, Российское дело о банкротстве Пойманова должно быть квалифицировано как судебное разбирательство в иностранном государстве.

ii.     *Российское дело о банкротстве Пойманова является «основным иностранным разбирательством»*

49.     Помимо этого, Российское дело о банкротстве Пойманова также является «основным иностранным разбирательством» Должника, поскольку оно ведется в России, где находится центр основных интересов Должника («**ЦОИ**»). См. § 1502(4) Тома 11 Свода законов США; см. также § 1517(b)(1) Тома 11 Свода законов США (где предусмотрено, что приказ о признании в качестве основного иностранного разбирательства выносится, если иностранное разбирательство, в отношении которого подается заявление, «ведется в стране, в которой находится центр основных интересов должника»).

50.     Кодекс о банкротстве устанавливает презумпцию, согласно которой обычное место жительства должника – физического лица считается его ЦОИ. См. § 1516(c) Тома 11 Свода законов США. Подготовительные документы по данному закону свидетельствуют о том, что норма об «обычном месте жительства» «предназначена для того, чтобы сделать признание как можно более простым и удобным» в делах, обстоятельства которых не являются противоречивыми. Отчет Палаты представителей № 109-31, Часть 1, 109-й Конгресс, 1-я сессия, стр. 112–13 (2005 г.); *Дело Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, Собрание дел о банкротстве, Том 374, стр. 122, 127–28 (Дела о банкротстве, Федеральный окружной суд Южного округа

24

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 63 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 29 of 38

Нью-Йорка, 2007 г.). Хотя определение ЦОИ не содержится в Кодексе о банкротстве или Модельном законе, американские суды рассматривают ЦОИ как концепцию, в основе которой лежит предпочтение содержанию над формой – то есть как означающую «фактическое местонахождение» должника. *Там же*, стр. 130.

51.   Обычное место жительства не определяется в Кодексе о банкротстве, но оно толкуется как место, где физическое лицо проживает с намерением остаться на неопределенный период времени. *Дело Ran*, Третья серия Сборника судебных решений федеральных апелляционных судов США, Том 607, стр. 1017, 1022 (Апелляционный суд Пятого округа США, 2010 г.); *Дело Kemsley*, Собрание дел о банкротстве, Том 489, стр. 346 (Дела о банкротстве, Федеральный окружной суд Южного округа Нью-Йорка, 2013 г.).

52.   В настоящем деле ЦОИ Пойманова является Россия. Россия – это обычное место жительства Пойманова, поскольку он проживал в России в течение всего Российского дела о банкротстве и продолжает проживать в России в настоящее время. Соответственно, вне всяких сомнений, ЦОИ Пойманова является Россия. Более того, серия судебных разбирательств Пойманова в 2010-2015 г. демонстрирует, что все интересы, требования и имущество, относящиеся к Пойманову и его жене, находятся в России.

**B.   Заявитель является надлежащим «иностранным представителем» в контексте иностранного разбирательства Должника**

53.   Второе требование для целей признания наличия основного иностранного разбирательства по статье 1517(a) Кодекса о банкротстве – это подача заявления о признании иностранным представителем, который является лицом или органом, надлежащим образом уполномоченным представлять должника в иностранном

25

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 64 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 30 of 38

разбирательстве. См. § 1517(а)(2) Тома 11 Свода законов США. В частности, Статья

101(24) Кодекса о банкротстве предусматривает, что:

> Термин «иностранный представитель» означает лицо или орган,
> включая лицо или орган, назначенные на временной основе,
> уполномоченные управлять реорганизацией или реализацией активов
> или прекращением деятельности должника в рамках иностранного
> разбирательства или действовать в качестве представителя в
> отношении такого иностранного разбирательства.

§ 101(24) Том 11 Свода законов США.

54.     В настоящем деле Заявитель является физическим лицом, что подпадает под

термин «лицо» (§ 101(41) Тома 11 Свода законов США), которое было надлежащим

образом назначено Российским судом по делу о банкротстве действовать в качестве

управляющего в рамках Российского дела о банкротстве Пойманова. Как разъясняется в

Декларации по российскому праву, Российский закон о банкротстве наделяет

исключительно управляющего полномочиями по управлению реорганизацией или

реализацией активов и прекращением деятельности должника. Декларация по

российскому праву, пп. 18-20, 23. В связи с этим Заявитель удовлетворяет требованиям

статей 101(24) и 1517(а)(2) Кодекса о банкротстве. См. *Дело Foreign Economic Industrial*

*Bank Ltd.*, Дело № 16-13534 (MKV) (Дела о банкротстве, Федеральный окружной суд

Южного округа Нью-Йорка, 15 февраля 2017 г.) (где суд признал государственную

корпорацию «Агентство по страхованию вкладов», надлежащим образом утвержденную

российским судом в качестве конкурсного управляющего должника, надлежащим

иностранным представителем российского должника); *Дело CJSC Automated Services*, Дело

№ 09-16064 (JMP) (Дела о банкротстве, Федеральный окружной суд Южного округа Нью-

Йорка, 23 ноября 2009 г.) (где суд признал физическое лицо, утвержденное российским

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 65 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 31 of 38

судом в качестве конкурсного управляющего должника, «лицом» в значении статьи 101(41) Кодекса о банкротстве и иностранным представителем должника).

**C.** **Заявление было надлежащим образом подано в соответствии со статьями 1504 и 1509 и удовлетворяло требованиям статьи 1515**

55.     Третье и последнее требование для признания наличия иностранного разбирательства по статье 1517(а) Кодекса о банкротстве заключается в том, что признание должно выполнять процессуальные требования статьи 1515 Кодекса о банкротстве. См. § 1517(а)(3) Тома 11 Свода законов США. В настоящем деле выполняются все такие процессуальные требования.

56.     Во-первых, Заявитель надлежащим образом и своевременно инициировал настоящее дело по Главе 15 в соответствии со статьями 1504 и 1509(а) Кодекса о банкротстве путем подачи настоящего заявления вместе со всеми документами и сведениями, требуемыми согласно статьям 1515(b) и 1515(c).

57.     Во-вторых, в соответствии со статьей 1515(b)(1)-(2) и (d) Кодекса о банкротстве Заявитель подал доказательства существования Российского дела о банкротстве Пойманова и назначения Заявителя в качестве иностранного представителя в отношении него с переводом на английский язык. См. Приложение B и Приложение C к Декларации по российскому праву (содержащие верные и точные копиями определений Российского суда по делу о банкротстве о признании Пойманова несостоятельным и назначении Базарнова управляющим вместе с заверенными переводами каждого документа с русского на английский язык).

58.     Наконец, в соответствии со статьей 1515(c) Кодекса о банкротстве Заявитель указывает Российское дело о банкротстве Пойманова в качестве единственного

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 66 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 32 of 38

иностранного разбирательства о несостоятельности, которое в настоящий момент ведется в отношении Должника.

*     *     *

59.     По всем причинам, приведенным выше, Заявитель настоящим заявляет, что все требования статьи 1517(a) были выполнены и, соответственно, Должник и Российское дело о банкротстве должны быть признаны и им должны быть предоставлены все средства правовой защиты, автоматически предоставляемые с соответствии со статьей 1520 Кодекса о банкротстве. Таким образом, Заявитель просит Суд вынести Предлагаемый приказ, в существенной степени по форме приведенной в <u>Приложении А</u> к настоящему документу, о признании Российского дела о банкротстве Пойманова в качестве основного иностранного разбирательства Пойманова, а Заявителя в качестве иностранного представителя.

## УВЕДОМЛЕНИЕ

60.     Уведомление о подаче настоящего Заявления было направлено:

i.      Сергею Петровичу Пойманову, Российская Федерация, 107045, г. Москва, Рождественский бульвар, д. 13, как Должнику по настоящему делу по Главе 15;

ii.     Кириллу Ноготкову, Российская Федерация, 109153, г. Москва, Хвалынский б-р, д. 5/12, кв. 28, как надлежащим образом утвержденному конкурсному управляющему в рамках текущего разбирательства о банкротства ЗАО «Павловскгранит – Инвест»;

iii.    Павлу Булатову, Российская Федерация, 125009, г. Москва, Романов переулок, д. 4, как заявителю декларации по российскому праву и иностранному юридическому представителю Должника;

iv.     Службе управляющих по делам о банкротстве США по Южному округу Нью-Йорка, штат Нью-Йорк, 10014, г. Нью-Йорк, Варик Стрит, д. 201, оф. 1006 (201 Varick Street, Suite 1006, New York, NY 10014);

v.      Компании PPF Management LLC, штат Делавэр, 19904, г. Довер, Гринтри Драйв, 160, офис 101 (160 Greentree Dr. Ste 101, Dover, DE, 19904), как истцу в рамках

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 67 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 33 of 38

судебного разбирательства, которое ведется в Федеральном окружном суде
Южного округа Нью-Йорка;

vi.   Кэролайн Хеллер, Greenberg & Traurig LLP, 10166, штат Нью-Йорк, г. Нью-Йорк,
Парк Авеню, 200 (200 Park Avenue, New York, NY 10166), как американскому
юридическому представителю компании PPF Management LLC в рамках судебного
разбирательства, которое ведется в Федеральном окружном суде Южного округа
Нью-Йорка;

vii.   ОАО «Сбербанк России», Российская Федерация, 119997, г. Москва, ул. Вавилова,
д. 19, как ответчику в рамках судебного разбирательства, которое ведется в
Федеральном окружном суде Южного округа Нью-Йорка;

viii.   ООО «Сбербанк Капитал», Российская Федерация, 119997, г. Москва,
ул. Вавилова, д. 19, как ответчику в рамках судебного разбирательства, которое
ведется в Федеральном окружном суде Южного округа Нью-Йорка;

ix.   Sberbank CIB USA, Inc., штат Нью-Йорк, 10019, г. Нью-Йорк, Вест 57 Стрит, д. 152,
Карнеги Холл Тауэр, этаж 44 (Carnegie Hall Tower, 152 West 57th Street 44th Floor,
New York, NY 10019), как ответчику в рамках судебного разбирательства, которое
ведется в Федеральном окружном суде Южного округа Нью-Йорка;

x.   ООО «НЭО Центр», Российская Федерация, 127055, г. Москва, ул.
Новослободская, д. 41, как ответчику в рамках судебного разбирательства, которое
ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xi.   ПАО «Промсвязьбанк», Российская Федерация, 109052, г. Москва, ул.
Смирновская, д. 10, как ответчику в рамках судебного разбирательства, которое
ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xii.   АО «Национальная нерудная компания», Российская Федерация, 123290,
г. Москва, ул. Магистральная, д. 18А, как ответчику в рамках судебного
разбирательства, которое ведется в Федеральном окружном суде Южного округа
Нью-Йорка;

xiii.   «Клевер Эссет Менеджмент», Российская Федерация, 123242, г. Москва,
Новинский б-р, д. 31, этаж 7, как ответчику в рамках судебного разбирательства,
которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xiv.   «Клевер Интернет Инвестмент», Российская Федерация, 123242, г. Москва,
Новинский б-р, д. 31, этаж 7, как ответчику в рамках судебного разбирательства,
которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xv.   Aletarro Ltd., Кипр, 3106, г. Лимассол, Гр. Ксенопулу Стрит, д. 17 (17 Gr.
Xenopoulou Street, Limassol 3106, Cyprus), как ответчику в рамках судебного

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 68 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 34 of 38

разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xvi.   Nisoram Holding Ltd., Inc., Кипр, 3106, г. Лимассол, Гр. Ксенопулу Стрит, д. 17 (17 Gr. Xenopoulou Street, Limassol 3106, Cyprus), как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xvii.   Urasay Ltd., Британские Виргинские острова, VG 1110, Тортола, г. Род-Таун, Уотерфронт Драйв, д. 9, а/я 3540 (9 Waterfront Drive, P.O. Box 3540, Road Town, Tortola, VG 1110 British Virgin Islands), как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xviii.   Mostra Consulting Ltd., Британские Виргинские острова, VG 1110, Тортола, г. Род-Таун, Мэйн Стрит, д. 197. а/я 3540 (197 Main Street, P.O. Box 3540, Road Town, Tortola, VG 1110 British Virgin Islands), как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xix.   Suintex Limited, Британские Виргинские острова, VG 1110, Тортола, г. Род-Таун, Крейгмур Чемберс (Craigmuir Chambers, Road Town, Tortola, VG 1110, British Virgin Islands), как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xx.   Герману Грефу, Российская Федерация, 119997, г. Москва, ул. Вавилова, д. 19, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xxi.   Олегу Грефу, Российская Федерация, 127055, г. Москва, ул. Новослободская, д. 41, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xxii.   Ашоту Хачатурянцу, Российская Федерация, 119997, г. Москва, ул. Вавилова, д. 19, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xxiii.   Юрию Жукову, Российская Федерация, 105005, г. Москва, ул. Бауманская, д. 58А, кв. 76, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

xxiv.   Грегори Ширину, Российская Федерация, 123610, г. Москва, Краснопресненская наб., д. 12, этаж 26, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка;

Case 1:16-cv-09139-PGG  Document 53-2  Filed 03/06/17  Page 69 of 135

17-10516  Doc 2-2  Filed 03/03/17  Entered 03/03/17 23:45:24  Exhibit B -
Certified Russian Translation of Verified Petition  Pg 35 of 38

xxv.  Зое Галеевой, Российская Федерация, 123423, г. Москва, ул. Демьяна Бедного, д. 9, кв. 49, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка; и

xxvi.  Сергею Кублицкому, Российская Федерация, 121353, г. Москва, Сколковское шоссе, д. 22, корп. 1, кв. 57, как ответчику в рамках судебного разбирательства, которое ведется в Федеральном окружном суде Южного округа Нью-Йорка.

### ОТСУТСТВИЕ ТЕКУЩИХ РАЗБИРАТЕЛЬСТВ О БАНКРОТСТВЕ В США ПО ЗАЯВЛЕНИЮ ДОЛЖНИКА

61.  Отсутствуют какие-либо находящиеся на рассмотрении Суда заявления Должника о предоставлении средств правовой защиты по Главе 15 (помимо настоящего Заявления) или любой иной главе Тома 11 Свода законов США.

### ОТСУТСТВИЕ ИНЫХ ТЕКУЩИХ ИНОСТРАННЫХ РАЗБИРАТЕЛЬСТВ

62.  Заявителю не известно о каком-либо текущем иностранном разбирательстве о несостоятельности помимо Российского дела о банкротстве.

### ПРОЧИЕ ЛИЦА, УПОЛНОМОЧЕННЫЕ НА ВЕДЕНИЕ ИНОСТРАННЫХ РАЗБИРАТЕЛЬСТВ

63.  Никакое физическое или юридическое лицо помимо Заявителя не уполномочено действовать в качестве иностранного представителя в рамках какого-либо иностранного разбирательства о несостоятельности в отношении Должника.

### СТОРОНЫ РАЗБИРАТЕЛЬСТВА В СОЕДИНЕННЫХ ШТАТАХ

64.  По состоянию на дату подачи настоящего Заявления Заявителю не известно о каком-либо текущем судебном разбирательстве в Соединенных Штатах, стороной которого является Должник.

### ЗАЯВЛЕНИЕ О СОБСТВЕННИКАХ ЮРИДИЧЕСКОГО ЛИЦА СОГЛАСНО ПРАВИЛАМ БАНКРОТСТВА 1007(А)(4) И 7007.1

65.  Поскольку Должник является физическим лицом, требование о подаче заявления о собственниках юридического лица не применимо.

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 70 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 36 of 38

## ОТСУТСТВИЕ ПРЕДШЕСТВУЮЩИХ ХОДАТАЙСТВ

66.    Никакие ходатайства о предоставлении средств правовой защиты, испрашиваемых в настоящем документе, ранее не подавались в настоящий или какой-либо иной суд.

## ЗАКЛЮЧЕНИЕ

67.    В СВЯЗИ С ВЫШЕИЗЛОЖЕННЫМ, Заявитель настоящим просит Суд: (a) вынести Предлагаемый приказ после уведомления и слушания, в существенной степени по форме, приведенной в Приложении A, и (b) предоставить такие иные дополнительные средства правовой защиты, которые он может счесть справедливыми и надлежащими.

32

Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 71 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 37 of 38

Дата: г. Нью-Йорк, штат Нью-Йорк
3 марта 2017 г.

С уважением,

Подпись: [Подпись]_____
     Оуэн К. Пэлл

WHITE & CASE LLP

1155 Авеню Америки
Нью-Йорк, штат Нью-Йорк, 10036-2787
Соединенные Штаты

(1155 Avenue of Americas
New York, New York 10036-2787
United States)
Тел. (212) 819-8200

—и—

Юго-восточный финансовый центр
200 Саус Бискейн б-р, Офис 4900
Майами, штат Флорида

(200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131)
Тел. (305) 371-2700
Ричард С. Кебрдл (ходатайство о допуске
к участию находится на рассмотрении)
Мэтью А. Голдбергер

*Адвокаты Алексея Базарнова,
в качестве Заявителя и Иностранного
представителя*

33

. Case 1:16-cv-09139-PGG   Document 53-2   Filed 03/06/17   Page 72 of 135

17-10516   Doc 2-2   Filed 03/03/17   Entered 03/03/17 23:45:24   Exhibit B -
Certified Russian Translation of Verified Petition   Pg 38 of 38

## ЗАВЕРЕНИЕ ЗАЯВЛЕНИЯ ПО ГЛАВЕ 15

В соответствии с § 1746 Тома 28 Свода законов США, я, Алексей Владимирович Базарнов, заявляю следующее:

Я являюсь уполномоченным иностранным представителем Должника в отношении Российского дела о банкротстве Пойманова. Я ознакомился с фактическим содержанием вышеуказанного Заверенного заявления, включая каждое приложение и дополнение к нему, и я осведомлен и убежден, что содержащиеся в них заявления верны и соответствуют действительности согласно имеющейся у меня информации и моему пониманию. Моим родным языком является русский, и я изучил заверенный перевод Заверенного заявления на русский язык. Я принял решение подписать заверенный перевод настоящего Заверенного заявления на русский язык, который приложен в качестве Приложения В к настоящему Заверенному заявлению.

Я заявляю под страхом привлечения к ответственности за лжесвидетельство по законодательству Соединенных Штатов Америки, что вышесказанное верно и соответствуют действительности.

Дата: 3 марта, 2017 г.

С уважением,

_____
Алексей Владимирович Базарнов

**EXHIBIT C**
**SDNY Complaint**

**JUDGE GARDEPHE**   IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PPF MANAGEMENT LLC

Plaintiff,

v.

OJSC SBERBANK OF RUSSIA
SBERBANK CAPITAL
SBERBANK CIB USA, INC.
NEO CENTRE
PROMSVYAZBANK PAO
JSC NATIONAL AGGREGATES COMPANY
KLEVER ASSET MANAGEMENT
KLEVER INTERNET INVESTMENT
ALETARRO LTD.
NISORAM HOLDING LTD.
URASAY LTD.
MOSTRA CONSULTING LTD.
SUINTEX LTD.
GERMAN GREF
OLEG GREF
ASHOT KHACHYATUREANTS
YURIY ZHUKOV
GREGORY SHIRIN
KIRILL NOGOTKOV
ALEXEY BAZARNOV
ZOYA GALEEVA
SERGEY KUBLITSKIY,

Defendants.

# 16 CV 9139

COMPLAINT

DEMAND FOR JURY TRIAL

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### I.   NATURE OF ACTION

1.     This Complaint arises out of a textbook case of Russian corporate raiding against Sergey Poymanov and Irina Porgornaya ("Majority Shareholders") and their company Open Joint Stock Company ("OJSC") Pavlovskgranit ("P-Granit"), one of the largest granite producers

1

in Europe. The Defendants wanted both to eliminate P-Granit as a major competitor on the Russian granite market and to seize its assets.

2.  Majority Shareholders assigned their claims against Defendants to Plaintiff PPF Management LLC in order to preserve and pursue them in a system adherent to the Rule of Law. Majority Shareholders' main bank and largest competitor conspired to take advantage of a downturn in the market by interjecting themselves into Mr. Poymanov's refinancing negotiations. While pretending to offer realistic restructuring options, they purposefully maneuvered Mr. Poymanov into a position where he was essentially trapped. Defendants then triggered a series of phony civil divestitures proceedings and criminal cases which ultimately resulted in the main competitor taking over P-Granit.

3.  Defendant Zhukov masterminded and oversaw the conspiracy executed by Defendants and others companies and individuals under his direct and indirect control. In order to steal a company of P-Granit's magnitude, Defendant Zhukov needed the participation and protection of Defendant German Gref, the chief executive officer of the largest bank in Russia, Defendant OJSC Sberbank of Russia ("Sberbank Russia"). Although Defendant German Gref was a former Minister of Economy and Trade and one of the few Russian politicians with a moderate reputation in both the East and West, he used his reputation and influence in the government to shield Defendants' actions from the investigations and reviews of the Federal Anti-Monopoly Service (FAS) and regional and federal law enforcement. Mr. Poymanov challenged every step taken by Defendants in the local courts, initiating more than 50 legal actions. A key component to Russian corporate raiding is, however, undue influence in the captured Russian courts. Thus, each claim was, predictably, rejected.

2

4.      Defendants furthered the illegal takeover of P-Granit by using multiple offshore companies and straw men to disguise the true participants and beneficiaries of the conspiracy. Defendants implemented a complex scheme in order to hide not only from the majority shareholders of P-Granit, but also from the Department of Economy and Finance of the Government of the Russian Federation under the Prime Minister (current President, V.V. Putin), that P-Granit's shares and assets were being transferred illegally to Defendant Zhukov's company. Defendants were so efficient that, for example, they identified the assignee of shares as the winner of an auction days before they had even conducted the auction. The cover-up and crimes were of sufficient enormity and sensitivity that Defendants Gref and Zhukov were compelled to mislead President Putin's advisor, Mr. Belousov, who was asked specifically to investigate the situation with the P-Granit/Sberbank Russia debt.

5.      P-Granit shares were transferred using four different procedures: (i) shares were foreclosed pursuant to an arbitration award; (ii) shares were auctioned; (iii) shares were assigned, and; (iv) the last were dissolved in a phony bankruptcy proceeding. The assigned shares were paid for with loaned money from Defendant Sberbank Russia. All P-Granit shares ended up in Zhukov's company.

6.      Defendants also used U.S. banks in order to further the conspiracy, subsequently investing some of the apparent proceeds of the crime in the United States.

7.      This type of illicit scheme is a common *modus operandi* in Russia. It is carried out through well-known techniques and is now internationally known as "Reiderstvo." These techniques include fraud, bribery, forgery, corruption, intimidation, manufactured bankruptcy and, ultimately, expropriation of the targeted company. Reiderstvo often involves private and public sector white collar criminals conspiring with state organizations, including law

3

enforcement agencies, as well as high level sitting politicians and their family members. *See* Dr. Louise Shelley and Judy Deane, *The Rise of Reiderstvo: Implications for Russia and the West* (2016). In the end, the prevailing level of corruption in Russia makes it easier for Defendant Zhukov and his co-conspirators to steal P-Granit than compete with or pay a fair price for it.

8.     While nicknamed as a Russian phenomenon, Reiderstvo commonly includes activities outside of Russia: *e.g.*, the use of shell companies in various jurisdictions to hide the beneficial owners, the use of foreign correspondent banks to move funds in more efficient foreign currency—such as Euros and dollars—and investment of the proceeds.

9.     As demonstrated in detail below, Defendants' actions fit the pattern from the very launch of the attack; from the manipulations of local law enforcement, to the laundering of assets through offshore companies, to the use of U.S. dollars, U.S. correspondent banks and U.S. investments.

10.    A compromised, corrupt Russian judiciary facilitates the Reiderstvo phenomenon and is, thus, part of the problem. By design, it leaves victims of Reiderstvo no meaningful forum in which to seek damages for the expropriation of their assets. In this case, all of Majority Shareholders' claims for restitution and/or compensation have been denied, and its attempt to seek justice in Limassol court in Cyprus is under threat of being curtailed by the receivers from the P-Granit Invest and Mr. Poymanov's personal bankruptcy. The receivers are members of an association of receivers whose members have a well-established history of engaging in Reiderstvo. It is this same receivers association—SRO "Delo" —that manipulated the Russian bankruptcy system in the infamous case of Sergei Magnitsky and the ongoing attacks against William Browder and Hermitage Capital.

4

11.   Plaintiff, as the assignee of Mr. Poymanov and Mrs. Podgornaya's claims, now seeks redress from a competent and independent judicial authority. Specifically, this is an action for fraud and misrepresentation, conspiracy to commit fraud, breach of fiduciary duty, negligent supervision, abuse of process and unjust enrichment under common law seeking to recover, *inter alia*, damages for losses suffered as a result of the conspiracy described below.

## II.   PARTIES

12.   Plaintiff PPF Management LLC is a corporation registered under Delaware law with headquarters in Wilmington, Delaware. The purpose of the PPF Management LLC is to preserve and pursue the claims of this lawsuit in a system adherent to the Rule of Law. Plaintiff holds an assignment of the Majority Shareholders' claims for the actions against P-Granit.

13.   Sergey Poymanov is a citizen of the Russian Federation and former majority shareholder of P-Granit. P-Granit is and was at all material times a Russian company engaged in granite mining and production. Established in 1976 on the base of the Shkurlatovsk granite deposit—the largest in Europe—P-Granit has long been an industry leader. The company's assets have included full-scale quarries and equipment for the mining of raw materials and facilities for the production of reinforced concrete framings and other products. In 2008, Mr. Poymanov was the majority shareholder of P-Granit Group with a combined 90.5% shares owned directly and indirectly through Vitera and PNH/Zinika. Irina Podgornaya is a citizen of the Russian Federation and a former minority shareholder of P-Granit. In 2008, she owned 2.32% of P-Granit. She is Mr. Poymanov's former wife, the couple having divorced in 2011. They share joint custody of three minor children, and a fourth child over 18 is in school and still dependent on his parents. Mr. Poymanov's father owned 4.57%, and Mr. Poymanov's brother owned 1.61% of P-Granit. They both assigned their rights to Ms. Podgornaya. Other minority shareholders owned the remainder of approximately 1.04% of P-Granit.

5

I.   **Defendants**

a.   **Russian Corporate Defendants**

14.   Defendant Sberbank Russia, a/k/a Savings Bank of the Russian Federation is a Russian commercial bank and financial services company headquartered in Moscow, Russian Federation. Since 2011, Sberbank Russia has been trading Level II ADRs on the New York Stock Exchange. Defendant Sberbank Russia is also trading its bonds on the London Stock Exchange. Defendant Sberbank Russia interfered deliberately with Majority Shareholders' attempt to restructure their debt. Defendant Sberbank Russia assigned P-Granit's debt to Defendant Sberbank Capital, which in turn implemented—together with Defendant Zhukov and other co-conspirators—the illegal scheme to take over ownership of P-Granit shares, dismantle the company by distributing its assets to Defendant NAC and, ultimately, liquidate P-Granit.

15.   Defendant Sberbank Capital LLC is a Russian company and wholly-owned subsidiary of Defendant Sberbank Russia that, according to its website, manages assets, provides financial consultancy, and makes direct investments, including the creation of new and acquisition of existing businesses. Defendant Sberbank Capital was a key participant in the conspiracy that undertook direct actions meant specifically to strip Majority Shareholders of their assets and created the conditions for other co-Defendants to likewise take such actions.

16.   Defendant JSC National Aggregates Company (NAC) is one of the largest crashed stones (including granite) company in Russia and it is owned by Defendant Zhukov. Until 2010, P-Granit was the main competitor of Defendant NAC. Defendant NAC implemented the conspiracy developed by Zhukov and emerged as the new owner of P-Granit's assets.

17.   Defendant NEO Centre LLC is a Russian appraisal company established in 1997. Defendant Oleg Gref owns 19.9% of the company. Defendant NEO Center appraised the shares of P-Granit at a value grossly below market value, which created the conditions for the

6

implementation of the conspiracy to transfer P-Granit shares to Defendants Zhukov and NAC. Defendant NEO Center also appraised the shares of Defendant NAC in 2009-2010 supposedly for the purpose of negotiating a loan with Defendant Promsvyazbank. Although NAC's assets constituted a fraction of P-Granit's real value, NEO Centre appraised NAC at a value of RUR 7,607,172,909 (seven billion six hundred and seven million one hundred seventy two thousand nine hundred and nine), equivalent to USD 257,908,736 (two hundred fifty seven million one hundred nine thousand seven hundred thirty six) that is 2.48 times higher for the supposed purposes of receiving the loan from PSZB compared to the NAC deflated valuation of P-Granit shares which were valued by NEO Centre at 3,145,969,598.00 rubles, equivalent to USD 103,654,622.00 on the date of valuation.

18.      Defendant Promsvyazbank PAO ("PSZB") is a Russian-based commercial bank. Defendants Aletarro, Nisoram, Suintex, and Urasay opened bank accounts at PSZB's branch office in Limassol, Cyprus that were used to funnel the proceeds of the crime and make payments to Defendants Sberbank Russia and Sberbank Capital. Atlantic LLC also had accounts with PSZB in Moscow. PSZB uses the following banks for payments in U.S. dollars: Deutsche Bank Trust Company Americas, New York, NY, USA; JP Morgan Chase Bank, New York; American Express Bank, and; The Bank of New York. PSZB also participated in the conspiracy by (i) misrepresenting to P-Granit the intent to restructure Sberbank Russia's debt, and; (ii) improperly disclosing P-Granit's confidential information to further the conspiracy to steal the company while masking the role of Zhukov.

### b.      Defendant Offshore Companies

19.      Defendant Klever Group Limited ("Klever") is a Cyprus corporation specializing in private equity investments and owned by Defendant Zhukov. Klever has a representative

7

office in Moscow, and the company uses the brand name "Klever Asset Management." Klever owns Defendant Klever Internet Investment. Defendant Shirin is the Director of Defendant Klever. Co-conspirator Mayorova is the CFO of Klever.

20.     Defendant Klever Internet Investment ("KII") is, upon information and belief, a British Virgin Islands ("BVI") special-purpose vehicle established by Klever in order to diversify exposure in Internet technology markets. Defendant KII kept all its investment in Russia until 2014, when—using the proceeds of P-Granit's raid—it participated in the $5M investment to purchase a minority interest in CityAds Media Inc., which operates in the U.S. through its office in Alexandria, VA. Further, in 2015, KII made an additional investment—through the $9M Series B round of funding—in Humanity.com Inc., a company incorporated in California and headquartered in San Francisco. Defendant Shirin is a Director of KII.

21.     Defendant Aletarro is a company incorporated in Cyprus. Aletarro's director is co-conspirator Georgios Charalamous. Defendant Sberbank Capital assigned 11.37% of Vitera's shares in P-Granit to Defendant Aletarro. Upon information and belief, Defendant Aletarro is owned by Defendant Zhukov. Aletarro's corporate secretary was, during the relevant time, Totalserve Management, a services company based in Cyprus with registered offices at 17 Gr. Xenopoulou Street, Limassol 3106, Cyprus that subsequently became C. ARGYROU & ASSOCIATES SECRETARIAL LTD. In 2014, Defendant Sberbank Russia granted C. ARGYROU & ASSOCIATES SECRETARIAL LTD a $1M contract for providing services with regard to debt collection. Defendant Aletarro entered into service agreements with co-conspirator PI for the implementation of this illegal scheme.

22.     Defendant Nisoram Holding is a company incorporated in Cyprus at the same address as Defendant Alettaro. At the time of the Reiderstvo in question, Nisoram also used

8

Totalserve Management as company secretary. Defendant Sberbank Capital assigned 25% of Vitera's shares in P-Granit to Defendant Nisoram. Defendant Nisoram then entered into service agreements with co-conspirator PI for the implementation of the illegal scheme. The beneficial owner of Nisoram is unknown.

23.     Defendant Urasay is a company incorporated in the British Virgin Islands. Defendant Urasay, like Alteraro and Nisoram, hired Totalserve Management as company secretary. Co-conspirator Trade LLC, which acquired 24.67% of Mr. Poymanov's shares in P-Granit at the auction where the other bidder was Defendant Sberbank Capital, transferred those shares to Defendant Urasay. Defendant Urasay then entered into service agreements with co-conspirator PI for the implementation of the illegal scheme. Upon information and belief, Defendant Zhukov is the beneficial owner of Urasay.

24.     Defendant Mostra Consulting is a company incorporated in the British Virgin Islands that owns 100% of the shares in Atlantic LLC. Totalserve Trust is also the registered agent of Mostra. Under Defendant Atlantic's loan agreement with Defendant Sberbank Russia to finance its obligations to Sberbank Capital under the Assignment Agreement, Atlantic—being the new owner of P-Granit shares—could be sold by its sole shareholder/co-conspirator Natalia Mayorova to Mostra Consulting. Upon information and belief, the end beneficial owner of Defendant Mostra is Defendant Zhukov.

25.     Defendant Suintex is a company incorporated in the BVI in 2012 by Defendant Klever for the purposes of implementing the conspiracy and laundering money out of Russia. In 2013, the new shareholders of P-Granit—Defendants Aletarro, Nisoram, Urasay, and Atlantic LLC—voted to sell the rights of claim to Defendant Suintex at a fraction of their value. Upon information and belief, the end beneficial owner of Suintex is Defendant Zhukov.

9

        **c.**    **Russian Individual Defendants**

26.    Defendant German Gref is a citizen of the Russian Federation and the CEO and Chairman of the Executive Board of the Sberbank of Russia. Defendant German Gref is also a close associate of Defendants Khachyatureants and Zhukov. Defendant German Gref met with Zhukov during and in furtherance of the conspiracy by, *inter alia*, engaging in: a pre-determined restructuring process through phony negotiation of the restructuring; a manipulation of the appraisal of P-Granit shares; baseless criminal proceedings, and; shielding Zhukov's participation in the endeavor.

27.    Defendant Oleg Gref is a citizen of the Russian Federation and the Vice President of Defendant NEO Centre, a Russian appraisal company. Defendant Oleg Gref is a close associate of Defendant Zhukov and worked on appraisals for his company, Defendant NAC. Defendant Oleg Gref engaged in multiple communications with Zhukov during and in furtherance of the conspiracy by, *inter alia*: supervising the bogus and artificially-deflated appraisal of P-Granit; improperly disclosing P-Granit's confidential information, and; laundering the P-Granit shares. Defendant Oleg Gref owns 19.9% of Neo Center.

28.    Defendant Ashot Khachyatureants is a citizen of the Russian Federation and the CEO of Sberbank Capital. Defendant Khachyatureants worked for Defendant German Gref at the Ministry of Finance and is now part of his inner circle. Defendant Khachyatureants is also a close associate of Defendant Zhukov. Defendant Khachyatureants participated in and furthered the conspiracy by, *inter alia*, engaging in: a pre-determined restructuring process through phony negotiations; a manipulation of the appraisal of P-Granit shares, and; the shielding of Zhukov's participation.

29.    Defendant Yuriy Zhukov is a citizen of the Russian Federation, the founder of PIK Group, a publicly-traded company on the London Stock Exchange, and the owner of

10

Defendant NAC.   Defendant Zhukov is also a close associate of the Defendants Gref and Khachyatureants and, according to media reports, was proposed to be the CEO of a new Sberbank Russia subsidiary, overseeing real estate assets.   Defendant Zhukov drove the conspiracy by, *inter alia*: interfering with and corrupting P-Granit's restructuring process; manipulating the criminal justice and bankruptcy court proceedings against Poymanov and P-Granit, and; concealing his acquisition of P-Granit.

30.     Defendant Kirill Nogotkov is a Russian citizen and the receiver appointed to oversee the estate of P-Granit Invest in 2013. Defendant Nogotkov is a member of Delo, the self-regulated association of independent receivers. Defendant Nogotkov has been an active participant in the conspiracy to raid P-Granit. He has followed Defendants Zhukov and Shirin and co-conspirator Kuznetsov's instructions.   In furtherance of the Reiderstvo, Defendant Nogotkov has improperly:   a) disclosed P-Granit Invest confidential and proprietary information to co-conspirator Kuznetsov; b) filed baseless criminal charges against Mr. Poymanov; c) initiated civil proceedings in Cyprus court, and; d) adopted and approved bankruptcy plans for P-Granit Invest that were intended to benefit the conspiracy rather than the entity or its creditors. Delo is same the receivers' association whose members are involved in Mr. Poymanov's personal bankruptcy and in the ongoing attacks against William Browder and Hermitage Capital. The latter attack is part of the infamous case of Sergei Magnitsky, which was the basis for both the Russia and Moldova Jackson-Vanik Repeal and the Sergei Magnitsky Rule of Law Accountability Act of 2012, P.L. 112-208 (December 14, 2012), referred to as the "Magnitsky Act," as well as for the issuance of sanctions by the U.S. government.

31.     Defendant Alexey Bazarnov is a Russian citizen and the receiver appointed to oversee the personal bankruptcy of Mr. Poymanov. Bazarnov, like Defendant Nogotkov, is a member of Delo, the self-regulated association of independent receivers.

32.     Defendant Zoya Galeeva is a Russian citizen and employee of Defendant Project Industry. Defendant Galeeva coordinated and implemented the Reiderstvo actions against P-Granit and the majority shareholders. Defendant Galeeva also has a close personal relationship with Kuznetsov, Shirin, and Kublitskiy and acted in close coordination with them.

33.     Defendant Sergey Kublitskiy is a Russian citizen and former law enforcement agent who is now reputed to be a member of organized crime. Alexander Litvinenko, the former FSB/KGB officer who died in London of plutonium poisoning, reported that Defendant Kublitskiy was responsible for the killing of the mayor of Nefteyugansk (a crime Russian prosecutors now attribute to ex-political prisoner Mikhail Khodorkovsky).

### d.   U.S. Defendants

34.     Defendant Gregory Shirin is a U.S. citizen currently residing in Moscow. Defendant Shirin is the Director of both Defendants Klever Asset Management and KII. Defendant Shirin is also a close associate of Defendant Zhukov who participated in the majority of the meetings between Defendants Zhukov, NAC, and Mr. Poymanov in 2010, prior to Defendant Sberbank Russia's refusal to restructure P-Granit's debt.   Defendant Shirin participated in and furthered the conspiracy by, *inter alia*, engaging in: a pre-determined restructuring process through phony negotiations; a manipulation of the appraisal of P-Granit shares, and; the shielding Zhukov's participation.   Defendant Shirin was, at the time of the described events, and is currently a member of the Board of NAC.

35.     Defendant Sberbank CIB USA, Inc. ("SCIB") is a company organized in 1997 under the laws of the State of Delaware with its principal place of business and headquarters

12

located in New York, New York.  Defendant SCIB is a registered broker-dealer pursuant to Section 15(b) of the Securities and Exchange Act of 1934.  The company is also registered as an Introducing Broker with the Commodity Futures Trading Commission and is a member of the National Futures Association.  SCIB is a wholly-owned subsidiary of Troika Dialog Group Limited, which is an indirect subsidiary of Defendant Sberbank Russia.  Upon information and belief, Defendants used Defendant SCIB to launder the instrumentalities and proceeds of the wrongs described below through U.S. banks.

### 2.   Co-conspirators

36.   Arteom Chayka is a Russian citizen, the son of the Attorney General of Russia, Yuriy Chayka, and the owner of OOO-PNK, which is currently the largest producer of granit in Russia.  Chayka has stated publicly his intent to acquire major companies in the crushed stone industry, including P-Granit, the industry leader in Russia.  Chayka furthered the conspiracy by using his family influence to manipulate both criminal justice and bankruptcy court proceedings against Mr. Poymanov, with the ultimate goal of overtaking some of P-Granit's assets.

37.   Vladimir Lelukh is the general counsel of Defendant Sberbank Capital.  Lelukh provided Chayka with confidential information concerning P-Granit and coordinated with Defendant Zhukov to render impossible the restructuring of P-Granit's debt.  Lelukh sits on the board of director of Chayka's company, First Non-Ores Company.

38.   CJSC (closed joint stock company) Project Industry ("PI") is a Russian company specializing in asset and debt recovery, business recovery, and mergers and acquisitions.  Defendant Sberbank Russia is a client of PI.  Kuznetsov, an officer of PI and co-conspirator under the direction of Defendants Zhukov and Shirin, implemented the conspiracy.  Acting informally until 2011, PI entered into servicing agreements with Defendants' offshore companies Aletarro, Nisoram, and Urasay to provide legal services including, but not limited to: organizing

13

a general meeting of P-Granit's shareholders; electing four nominees to the Company's Board of directors from the customer's nominees; and, ultimately liquidating P-Granit. As employees of Defendant PI, Galeeva and Potolitsyn were straw men, organizers and actual coordinators and directors for multiple companies, including offshore companies involved in the scheme.

39.    Atlantic LLC is a Russian company incorporated in November 2011 by co-conspirator Mayorova, who is an officer of Defendant Klever under Defendant Zhukov's control. In December 2011, Defendant Sberbank Capital entered into an assignment agreement with co-conspirator Atlantic for its rights under the P-Granit Loan Agreement and the various security pledges. Atlantic received a loan for this purpose from Defendant Sberbank of Russia, which was approved by Defendant German Gref. The loan was based upon a resolution of Defendant Sberbank Russia's credit committee on December 21, 2012 that relied on events that had not yet taken place—e.g., auctions that were organized later with winners yet unknown—thus allowing co-conspirator Mayorova to transfer the shares in Atlantic to Mostra and pledge P-Granit shares that had not yet been acquired. After the original assignment, Atlantic re-assigned this debt to the new debtor, Defendant NAC, with the transfer of what was left of P-Granit assets, after which, having served its purpose as the straw company of the conspiracy, Atlantic was liquidated.

40.    Andrey Kuznetsov is a Russian citizen and employee of co-conspirator Project Industry. Co-conspirator Kuznetsov coordinated and implemented the Reiderstvo actions against both P-Granit and Majority Shareholders. Kuznetsov was the contact person for Defendants Zhukov and Shirin, and acted as the main coordinator of all activities.

41.    Andrey Potolitsyn is a Russian citizen and an employee of Project Industry. Co-conspirator Potolitsyn coordinated and implemented the Reiderstvo actions against P-Granit and

14

Majority Shareholders. Co-conspirator Potolitsyn is under Defendant Galeeva's control and, together with Kuznetsov, acted in the interests of Defendant Zhukov.  In August of 2012, co-conspirator Potolitsyn became the General Director of Atlantic, acquired by Mostra, and throughout the conspiracy acted together with the Defendant Sberbank Capital managers and other co-conspirators.

### III.   JURISDICTION AND VENUE

42.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) on the grounds that the amount at issue exceeds $75,000, that Plaintiff is a citizen of the State of Delaware, and that two of the Defendants are citizens of the States of New York and California, respectively.

43.     Jurisdiction over Defendant Sberbank Russia is proper in this court on the grounds that Defendant trades Level II ADRs on the New York Stock Exchange, conducts business within the United States directly and through its subsidiary Defendant SCIB, and has purposefully availed itself of this Court's jurisdiction in previous litigation.

44.     Jurisdiction over Defendants Klever Asset Management and Klever Internet Investments is proper on the grounds that Defendants participated in both a $9,000,000 capital raise for Humanity.com Inc., a California corporation, and in the $5M investment to purchase a minority interest in CityAds Media Inc., which operates in the U.S. through its office in Alexandria, VA.

45.     Jurisdiction over Defendants PSZB, Aletarro, Nisoram, Urasay, Atlantic, Mostra Consulting, and Suintex is proper on the grounds that Defendants furthered the conspiracy at issue by conducting transactions in U.S. dollars using U.S. banks.

46.     Jurisdiction over Defendants Sberbank Capital, NEO Center LLC, Khachyatureants, Zhukov, Shirin, Nogotkov, Bazarnov, Galeeva and Kublitskiy is proper on the grounds that they are all co-conspirators who committed acts in furtherance of a conspiracy

15

which they knew included acts in the United States, such as investing in U.S. businesses and using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of P-Granit.

47.    Venue is proper in this Court for all Defendants pursuant to 28 U.S.C. § 1391(c)(3), which authorizes an action against an alien in any district.  Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. § 1391(b)(2) because substantial actions in furtherance of conspiracy giving rise to Plaintiff's claims, including the use of U.S. banks and businesses for the transfer of U.S. dollar payments for the assets of P-Granit, occurred in this District.  Venue is proper in this court for Defendant Sberbank CIS US pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2), as the judicial district of its principal place of business.  Venue also is proper in this court for Defendants Sberbank Russia, Sberbank CIS USA, Inc., and German Gref, pursuant to 28 U.S.C. § 1391(b), (c) and (d).

## IV.    STATEMENT OF FACTS — ALLEGATIONS RELATING TO ALL COUNTS

### 1.    P-GRANIT'S BUSINESS

48.    Before the events described below, Mr. Poymanov was the owner of P-Granit—a successful business with a substantial quarrying operation, extensive real property and various production facilities.  P-Granit was the largest employer in Pavlovsk, Russia, and a major taxpayer and corporate contributor to the local economy.  P-Granit also produced non-military explosives and was considered a strategic company under a special Anti-Monopoly and Economic regime which prevents the sale of any interest in the company to a foreign-owned corporation without prior disclosure of the beneficial owner(s) and approval by a special Government committee on foreign investments into strategic companies.

49.    In 2008, Mr. Poymanov owned approximately 90% of P-Granit directly or through other companies.  The share structure was: (i) Mr. Poymanov 24.67%; (ii) P-Granit

16

Invest 29.46% through PNH (a Cyprus company owned by Mr. Poymanov); (iii) Vitera LLC 36.37% (Vitera was owned 50%/50% by Mr. Poymanov and PNH), and; (iv) individual minority shareholders 9.4% (Ms. Podgornaya and Mr. Poymanov's father and brother).

**2.      P-GRANIT INVEST'S LOAN**

50.      In early 2008, Mr. Poymanov decided to have P-Invest acquire 100% of PNH and consolidate his interest in P-Granit. Accordingly, on August 8, 2008, he entered into a credit facility agreement with the Central Black-Earth Region Bank ("CBERB"), a branch of Defendant Sberbank Russia (the "Loan Agreement") for RUB 5,100,000,000 ($215,000,000). The Credit and Risk Committee of CBERB reviewed the company's financial records and reports and did not report any negative information about the company or Mr. Poymanov, personally. CBERB concluded that P-Granit was in sound financial standing and made the loan. The repayment schedule provided for monthly instalments, the last instalment being due on July 31, 2015.

51.      The Loan Agreement provided for a series of pledges: 1) business and real property valued at 11 billion 990 million rubles; 2) 99% of shares in the authorized capital of P-Granit and other assets, including Mr. Poymanov's personal assets, and also personal guarantees by Mr. Poymanov which subsequently lead to seizure of his other assets not directly related to P-Granit. Although it was represented that Mr. Poymanov's personal guarantee was requested as a mere "formality", it was later used against him to declare him bankrupt. The pledged P-Granit shares included those Mr. Poymanov and P-Granit-Invest acquired with the CBERB loan.

52.      As part of the loan CBERB required that P-Granit enter into various agreements providing for extrajudicial foreclosure of the pledged shares. These agreements gave the creditor the right to make a claim under the various pledge agreements without recourse to a court, either by: (i) taking ownership of the pledged shares with the price of the pledged security being

17

determined in good faith by an independent appraiser; or (ii) selling the pledged security either through an auction held in compliance with the applicable Russian law or by direct sale to a third party by lawful means and on terms which ensure payment of the true value of the assets.

53.     P-Granit Invest paid a total of 730 million rubles of the principal and 1 billion rubles in interest during the time the loan was recorded on the books as a term loan asset. The Credit Control Departments of Sberbank Russia and CBERB, respectively, audited the loan and concluded that initially there were no irregularities.

### 3.     RAIDERSTVO AND THE THEFT OF MAJORITY SHAREHOLDERS' INTEREST IN P-GRANIT BUSINESS

54.     Russian-style illegal raiding is a well-developed four-stage process: (1) preparation - constitutes the selection of a target, assessment of the related risks and benefits, and collection of information about a business, its owners, and their activities; (2) negotiation - constitutes the raiders' contacts with the targeted business owners, finance, black PR campaigns, lawsuits, blackmail or intimidation tactics; (3) execution – constituting, after a legal owner refuses to capitulate to the raiders, the use of forgery and fraud, malicious prosecution, regulatory harassment, misuse of the banking system, violence and black PR; and (4) legalization - once a takeover is completed and raiders initiate the laundering of their illegally acquired property and funds. Defendants have followed all four steps to strip Majority Shareholders of their P-Granit shares and, and concomitantly, P-Granit's assets. As a result of the actions taken in furtherance of the conspiracy, described below, P-Granit is now effectively part of Defendant NAC which is owned and controlled by Defendant Zhukov.

55.     The conspiracy was to a) sell all the secured assets of P-Granit, at below distressed values; b) transfer them offshore; c) avoid detection of any connection to Defendant Zhukov; d) transfer each parcel back to Defendant NAC through these offshore entities; and e)

collect them together and repatriate them into one company under the auspices of the Defendant NAC for the benefit of Defendant Zhukov.

56.    To launch the conspiracy, Defendant Sberbank Russia negotiated in bad faith, as the restructuring of the debt was never intended to offer Majority Shareholders reasonable conditions for restructuring.   During this phase, co-conspirator Lehukh was funneling P-Granit information to co-conspirator Chayka and Defendants Zhukov as they were planning and starting the implementation of the illegal takeover.

57.    Further, Defendants manipulated the valuations of P-Granit by having them prepared by the company believed to be owned by Defendant Oleg Gref. Gref was the Vice-President of Neo Center of which he owns 19.9 since February 20, 2013. The value attributed by Sberbank Capital based on the Neo-Centre Report was in stark contrast to the value attributed by Sberbank at the time of the original loan.  For example, Sberbank division with whom Mr. Poymanov organized the Loan Agreement valued the PNH/Zinica shares at approximately the loan amount of 5,100,000,000 rubles.   Yet, Neo Center valued the entire P-Granit at 3,145,969,598 rubles.  This amount was less than the outstanding debt, and less than 13+ billion rubles – the value of P-Ganit in 2008 – 2010. The Vitera shares were taken away at valuation of 1,144,189,143 rubles, when the real value was 4.5 billion rubles. Subsequent reports valued it at lower than this amount. None of the appraisers made any requests to P-Granit for information on its activities, including any financial or operational parameters.

58.    Defendant Sberbank Capital initiated the transfers of shares to companies out of Russia, and into Cyprus. Within just one day of receiving the Vitera shares,-Sberbank Capital transferred the shares into Nisoram and Aletarro, both of which are owned, controlled by or otherwise connected to Defendant Zhukov, the owner of Defendant NAC.

19

59.     Despite the fact that the shares were transferred using three different procedures, they were all transferred ultimately to the Defendant NAC. The following acts were committed in furtherance to the conspiracy:

1.  Defendants communicated during the conspiracy in order to develop tactics and share details on the progress of the conspiracy among themselves.

2.  Defendants incorporated Aletarro, Urasay and Atlantic specifically for the purpose of the conspiracy. Defendant Nisoram was an off-the-shelf company.

3.  Defendants auctioned Mr. Poymanov's shares at below market value to LLC Trade which re-directed the shares to Urasay, another company linked to Defendant Zhukov.

4.  Defendants Sberbank Russia and German Gref included the name of the winner of an auction in one of the assignment agreements before the auction was held, and allowed in the same Credit Committee decision the sale of Atlantic to an offshore company in order to conceal Zhukov was behind the scheme.

5.  Defendants obtained a low valuation by a company known as FAC and used it as a basis to justify the extra-judicial foreclosure of the PNH/Zinica shares at a price substantially below market value.

6.  Defendant Sberbank Russia financed Defendant Atlantic for the purpose of illegal acquisition of the P-Granit shares and took pledges over the shares of Nisoram, Aletarro and Urasay in P-Granit.

7.  Defendants opened fabricated criminal cases against Mr. Poymanov and attempted to block his efforts to seek relief in Cyprus. The Defendants

20

collaborated with the individuals associated with infamous raider Kluyev included in the Magnitsky list.

8. Defendants took advantage of captured courts and bankruptcy court procedures and personnel.

9. Defendants used US intermediary banks to make payments during the implementation of the conspiracy.

60. Defendants invested alleged proceeds of the conspiracy in the U.S.

**B.   Phase one - PREPARATION**

61. In late 2008 and the first half of 2009, the global economy in general caused unfavorable market conditions in Russia and specifically resulted in a considerable decline in the demand for, and the price of, P-Granit's products. Therefore, in July 2009, P-Granit approached CBERB to restructure the loan, seeking a 2-year extension of the loan and a principal payment deferral.

62. In August 2009, Mr. Poymanov and CBERB discussed restructuring the loan, and CBERB proposed draft terms that Mr. Poymanov found acceptable. CBERB concluded that under the new terms of the loan, P-Granit would be in a position to timely and fully settle all of the obligations under its Loan Agreement with the bank.

63. Although CBERB issued preliminary approval for the restructuring of the loan, the Sberbank Russia Loan and Investment Committee of Defendant had to review and approve the CBERB's opinion regarding the feasibility of the restructuring. . Thus, on November 18, 2009, the Sberbank Russia Loan and Investment Committee endorsed the proposed restructuring parameters, but added an extreme provision: the transfer of 51% of P-Granit's shares to Defendant Sberbank Capital's books within 3 months, with the right to repurchase them upon

21

repayment of the loan (hereinafter "Zhukov/Sberbank "deal"). In addition, Defendant Sberbank Russia demanded that control of the Board of Directors of P-Granit be transferred to Defendant Sberbank Russia's subsidiary Defendant Sberbank Capital.

64.     Defendant Sberbank Russia gave Mr. Poymanov a very short time to assess its additional demands. The failure to accept these requirements would void the offer to restructure, and the original loan immediately would become due and payable.

65.     The aforementioned restructuring presumed major changes to the loan agreement: (i) the term was extended through July 31, 2017 with payments deferred through March 27, 2010, and (2) an interest rate of 14.75% per annum, with monthly interest payment. If Mr. Poymanov did not consent to Sberbank's additional demands the restructuring would consist of a repayment deferment only through February 27, 2010.

66.     Between August 2009 and January 2010, CBERB staff, including the CBERB Chairman, Mr. A.K. Soloviev, who also served as the Deputy Chairman of the Board of Directors [of Sberbank Russia], conducted repeated negotiations with S.P. Poymanov regarding the implementation of Defendant Sberbank Russia's proposal. Later, after the debt was assigned to Sberbank Capital, negotiations were held with the participation of Defendant Sberbank Capital.

67.     In essence, Defendant Sberbank Russia demanded a deal that created a situation whereby Mr. Poymanov, essentially, was handing over control of his company to the bank. The transfer of 51% of the shares and change of management meant that Mr. Poymanov would give up all control of the business, and there were zero guarantees that the changed management would attempt to arrange for repayment of the loan rather than make sure the company stayed in default and was taken over. The condition of the transfer of 51% for the nominal amount of 1

22

million rubles and the buyout for 350 million rubles following successful repayment of a significant part of the loan – more than $ 10 million at the then rate – was also outrageously excessive. Mr. Poymanov refused to accept the offer. He knew of Sberbank Capital's prior record of acquiring 51% of a company that was in distress for the purported purpose of restructuring, but ultimately bankrupting the company and selling its assets. For example, Mosmart, the Russian mega-company owning multiple malls, defaulted on a Sberbank Russia loan in 2009 and as part of the restructuring Sberbank Capital insisted in acquiring 51% of its shares. Nonetheless, despite obvious financial restructuring opportunities, Sberbank Capital initiated bankruptcy proceedings against the company and sold its assets.

68. Instead, Mr. Poymanov tried to save P-Granit from a Mosmart fate and offered to transfer 25% plus 1 share of P-Granit to Defendant Sberbank Capital. Defendant Sberbank Russia refused this counter offer and retaliated by demanding that CBERB transfer the debt from its books to the books of Defendant Sberbank Capital and declare P-Granit in default. At subsequent negotiations at Sberbank Capital, of which there are voice recordings and transcripts, it was confirmed that the goal of Defendant Sberbank Capital was "to change the owners" of P-Granit.

69. Defendant Sberbank Russia was well aware that P-Granit could not meet the shortened deadline, and on March 19, 2010, it issued a formal demand for immediate repayment of the entire outstanding amount under the Loan Agreement -- RUB 4,457,364,652.00 (equivalent to USD 152,532,985.00).

70. Contemporaneously, between August 2009 and February 2010, Defendant Zhukov, collected confidential and proprietary information about P-Granit's business in

23

preparation for the illegal takeover. Several of the sources of the information were subject to a duty to keep the information confidential.

71.     Specifically, further in 2010 Defendant Galeeva, together with co-conspirators Kuznetsov and Potolitsyn, illegally obtained confidential information on both P-Granit and Majority Shareholders, by bribing local government officials. Specifically, Galeeva secured confidential information regarding the financial and business activities of P-Granit from the Deputy Head of Control and Audit Department of the Voronezh Region Government.

### C.     Phase two - NEGOTIATION

72.     Between November 2009 and February 2010, while Mr. Poymanov was negotiating in good faith to restructure P-Granit's debt, Defendants German Gref and Khachyatureants conspired with Defendant Zhukov to devise and demand conditions that compelled Mr. Poymanov to seek alternative possibilities for the restructuring of the debt. Eventually, Mr. Poymanov had no viable alternative but to accept the Zhukov/Sberbank "deal" in order to salvage a long-shot opportunity of keeping a small portion of his business and not to be declared bankrupt.

73.     In the beginning of 2010, Mr. Poymanov met Defendant Zhukov during the meetings on the creation of an Association of the Russian stone and granite producers that Defendant Zhukov feigned an interest in forming. Defendant Shirin represented Defendant NAC at the meetings.

74.     During one of these meetings, Defendant Zhukov approached Mr. Poymanov and said that he is aware of Poymanov's difficulties regarding restructuring Sberbank's loan. Defendant Zhukov made the unsolicited aggressive proposal that Mr. Poymanov should merge P-Granit with his company, Defendant NAC. Defendant Zhukov's promised to fix all the challenges faced by P-Granit, specifically including that he guaranteed that he could persuade

24

Defendant Sberbank Russia to restructure its debt on favorable terms.  Defendant Zhukov

boasted that he was on friendly relations with Defendants Gref and Khachyatureants.

75.    In February 2010, a couple of days prior the expiration of the one month

extension granted by Defendant Sberbank Russia, Defendant Zhukov presented Mr. Poymanov

with a an "offer" to form a "NewCo."  The terms included the establishment of a new business

entity with an ownership interest distribution of 70 % to Defendants NAC and 30 % to P-Granit.

Defendant Zhukov told Mr. Poymanov that the new company would apply for a loan to

Defendant PSZB to fully repay P-Granit's Sberbank loan.

76.    In February 2010, Defendant Shirin and other NAC employees had multiple

meetings with Mr. Poymanov to discuss a merger.

77.    In summer of 2010 Zhukov offered to Poymanov to use PSZB to restructure the

debt, for which purposes introduced him to Mr. Ananyev.  In December 2010, Mr. Ananyev

offered Mr. Poymanov to apply separately for a loan to repay Defendant Sberbank Russia's loan.

The Director of Defendant PSZB, Dmitry Ananiev, confirmed the bank's availability to provide

the refinancing needed to extinguish the Sberbank debt.

78.    P-Granit, based solely on the premise that it was negotiating a re-financing solely

on its own behalf, provided all the documents, including confidential and proprietary data,

requested by Defendant PSZB to review the issue of re-financing.  In violation of Russian

banking secrecy law and breaching the fiduciary duty to P-Granit, Defendant PSZB conspired

with and Defendants Khachyatureants, Zhukov, Shirin and co-conspirator Lelukh and Chayka

disclosed all P-Granit confidential and proprietary information.

79.    In early March 2011, shortly before the PSZB Credit Committee was to meet on

the P-Granit loan, Mr. Ananyev called Mr. Poymanov on his cell phone and told him that,

despite the necessary economics and financial information for a positive decision, PSZB would

not be moving forward with P-Granit. Mr. Ananyev stated that he was instructed by Defendant

Khachyatureants to deny P-Granit the loan. Mr. Ananyev said that the stakes were too high for

his bank to be on bad terms with Defendants Sberbank Russia and Sberbank Capital, plus he

could not afford to jeopardize his relationship with Defendants Gref and Khachyatureants. Mr.

Anayev said that if Mr. Poymanov convinces Defendant Khachyatureants not to object,

Defendant PSZB would come back and issue the refinancing loan.

80.   As it became known later, during the time Mr. Poymanov was negotiating with

Defendant PSZB and co-conspirator Ananyev, Defendants Aletarro (in March 2011), Nisoram

(in September 2010) and Urasay (in July 2011) were opening bank accounts with Defendant

PSZB's Cyprus branch to receive funds in US dollars from offshore companies associated with

Defendants Zhukov and Klever Group, such as Maritrade Investment Limited, Monbee Trading

Limited and to transfer money to Defendant Sberbank Capital as alleged consideration for the P-

Granit shares assignment.

81.   Throughout the conspiracy, Defendant Zhukov was informing Defendant German

Gref on the progress of his securing ownership of P-Granit. For example, on May 25, 2013,

Defendant Zhukov in a phone conversation with Defendant Shirin told him that he had discussed

P-Granit related issues with Defendant Gref earlier in the day.

82.   During the meetings with Mr. Poymanov in August 2010, Defendant Zhukov

threatened Mr. Poymanov that, if he declined the merger offer, the P-Granit group would face

major difficulties in its relationship with Defendants Sberbank Russia and Sberbank Capital. Mr.

Poymanov rejected Defendant Zhukov's "offer." Immediately thereafter, Defendants co-

26

conspirators took a series of actions aimed at essentially stealing P-Granit's shares for the benefit of Defendant Zhukov and the co-defendants.

### D.  EXECUTION OF THE SCHEME

1.   Transfer of P-Granit Debt to Defendant Sberbank Capital & Criminal Investigation against Mr. Poymanov

83.   While P-Granit thought it was independently negotiating with Defendant Sberbank Russia to restructure its loan and with Defendant PSZB to apply for and receive a new loan to repay Sberbank Russia, Defendant co-conspirators already were readying to steal P-Granit if Mr. Poymanov did not accept Defendants Zhukov and NAC's sweetheart deal. Between March 2010 and June 2013, Defendants planned and implemented a series of assignments under the Loan Agreement to multiple companies that owned by or for the benefit of Defendants Zhukov and other unknown beneficiaries.

84.   On May 20, 2010 Defendant Sberbank Russia assigned all its interests under the Loan Agreement to Defendant Sberbank Capital LLC by entering into an Assignment Agreement of Rights with Sberbank Capital ("Assignment Agreement").

85.   Immediately thereafter, P-Granit realized that Defendants had manipulated the situation as to all of them so as to shield themselves from the Courts and the public disclosure of Zhukov's interests by invoking the out-of-court settlement clause they had forced P-Granit/Poymanov to accept in the Loan Agreement.  P-Granit/Poymanov filed a claim with the local court in Voronezh to nullify the clause.  That claim, along with the other 60 claims filed by P-Granit between May 2010 and August 2016 in courts of different jurisdictions, predictably was rejected by the Russian Courts.  The court proceedings were tainted with multiple procedural rights violations, for example: (i) failing to provide Mr. Poymanov's counsel sufficient time to study the court filing; (ii) appointing an appraiser who had a conflict of interests and who had

27

been accredited professionally by Defendants German Gref; (iii) failing to admit into evidence properly authenticated documents favourable to Mr. Poymanov's position; and (iv) approving auctions conducted without proper notice to Mr. Poymanov. Defendant Chayka was involved in court proceedings against P-Granit through Elizaveta Berezina and her law firm "Zvezda Resource" that acted as the outside counsel of Defendant Sberbank Capital in the litigations with Mr. Poymanov over the shares and assets of P-Granit.

86.    On July 6, 2010, Defendant Sberbank Capital filed a claim in the Arbitrazh Court of Voronezh District for the recovery of RUB 4,649,293,410 under the pledge agreements. The court granted Defendant Sberbank Capital's claim on July 3, 2011.

87.    Thus, Defendant Sberbank Capital sought a court order against all P-Granit's property mortgaged as a guarantee for loan payment and valued as at 11 billion 990 million rubles and 99% of shares in the authorized capital of P-Granit. Pursuant to the Loan and Assignment Agreements, Defendant Sberbank Capital could enforce the court order either by: (i) taking ownership of the pledged shares with the price of the pledged security being determined in good faith by an independent appraiser; or (ii) selling the pledged security either through an auction held in compliance with the applicable Russian law or by direct sale to a third party by lawful means and on terms which ensure payment of the true value of the assets.

88.    Defendants conspired to falsify the fair market value of the assets by engaging captured appraisers who joined the conspiracy and helped rig the auctions. Defendants Sberbank Russia and German Gref included the name of the winner of an auction in one of the assignment agreements before the auction was held.

89.    Between July 2010 and fall 2010, P-Granit unsuccessfully filed counterclaims to nullify the assignment agreement between Sberbank and Sberbank Capital. While using all

28

available legal actions in local courts, Mr. Poymanov brought Defendants' conspiracy into the public limelight. He published open letters addressed to Defendant German Gref, and then wrote letters to the then Prime Minister of Russia, now President V.V. Putin.

90.     In response to his persistence and resilience, Defendant Chayka had used his family connection, as the son of the attorney General of the Russian Federation, to commence and continue criminal investigation against Mr. Poymanov to pressure him to relinquish his rights and claims regarding illegal takeover of P-Granit. Defendant Sberbank Capital in the person of Defendant Khachyatureants filed a criminal complaint with the law enforcement in Voronezh claiming that Mr. Poymanov was attempting to bankrupt P-Granit.

91.     Later, in 2011 Defendant Sberbank Capital filed a bankruptcy petition itself to the Voronezh oblast Arbitrazh court. Later in the spring of 2011, the investigative department of Voronezh police indicted Mr. Poymanov on these charges. These criminal cases against Mr. Poymanov have been closed. Further on, Defendant Sberbank Capital filed a bankruptcy petition against P-Invest.

92.     In 2014, the receiver of P-Invest, Defendant Nogotkov filed another criminal complaint claiming that Mr. Poymanov, as a shareholder of one of his smaller companies, P-Beton, attempted to cause damage to the company. The complaint was prepared by employees of NAC. P-Beton was 50% owned by P-Invest, and 50% by Mr. Poymanov.

93.     The bankruptcy of P-Beton was initiated by another company of Mr. Poymanov's group, P-Zhilstroy. Its bankruptcy was initiated by P-Nerud, the company which acquired assets of P-Granit. The charges are baseless since Mr. Poymanov was not an officer or a director of the company, a threshold requirement necessary for the crime. The co-conspirators used the

29

bankruptcy procedures to destroy Mr. Poymanov's businesses, undercutting his ability to fight the Reiderstvo.

94.     The supervisor in Moscow for the criminal investigation against Mr. Poymanov was reporting to Mr. Glukhov, who is well known for his involvement in corrupt schemes and Reiderstvo. He is included on various international sanctions lists and has difficulty traveling outside of Russia.

95.     While Mr. Poymanov initially was defending the fabricated criminal charges against him and litigated in local and regional courts, the Defendants were transferring money from one offshore account to another in order to acquire Granit's shares and assets while hiding Defendant Zhukov's role in the scheme.  For example, on September 25, 2010, Defendant Nisoram, whose end beneficial owners are unknown received $30 million US dollars from Marbello Holdings limited, which is owned by Defendant Zhukov.  Nisoram made payments to Sberbank Capital for the shares in P-Granit. Similarly, on December 24, 2011 Urasay, which is believed to be owned by Defendant Zhukov, received in its US Dollars account with the Promsvyazbank Cyprus branch, a loan of US $ 18 million from Monbee Trading Ltd. – the same company which provided loans to Atlantic and which is mentioned in the Atlantic/Sberbank loan agreement as a member company of the NAC group.

96.     At the same time, in November 2010, co-conspirator Galeeva communicated via co-conspirator Kuznetsov with other co-conspirators and sent P-Granit's confidential financial information received from public officials and other P-Granit proprietary information to other co-conspirators. By email, she instructed them to construct a harassment and intimidation campaign against Mr. Poymanov.  In particular, Galeeva in the email instructions to the infamous Defendant Kublitskiy demanded that he coordinate the involvement of law

30

enforcement agencies to put pressure on Mr. Poymanov. She specifically stated that "[i]n order to reach the objective, namely to gain control over the authorized capital and the operating activities of P-Granit in addition to the list of corporate measures [ ...the following ... ] need to be arranged: wiretapping of S.P. Poymanov; field surveillance of the opponent with a view of revealing the persons, assisting S.P. Poymanov in terms of the conflict; search of premises; pre-trial restrictions (arrest, custody, overseas travel ban)." Defendant Kublitskiy remained in constant communication with Defendants Shirin, Zhukov and co-conspirator Kuznetsov and his involvement has been instrumental in the current persecution against Mr. Poymanov. Also, Defendant Kublitskiy is an associate of, and communicates often with, the infamous raider Kluyev.

2.   False Appraisal and Auction of P-Granit's Shares

97.   To further implement their fraudulent scheme, and prior to the Court's decision issued on July 3, 2011 granting Defendant Sberbank Capital's claims to enforce the pledge agreements, Defendant co-conspirators secured artificially deflated valuation reports wherein far below market or distress values were attributed to P-Granit's shares and assets. Defendants relied upon this value in order to justify transfers of the shares at deflated prices to companies connected to Defendants Zhukov and Oleg Gref.

98.   Although these valuation reports were used as supposed benchmarks for the sale price of the shares, at the time of the appraisals, none of the appraisers made any requests to P-Granit for information on its activities, including any financial or operational parameters.

99.   Thus, on or about April 6, 2011, Defendant co-conspirators Sberbank Capital, Khachyatureants, German Gref and Zhukov co-ordinated with Defendants Neo Centre and Oleg Gref to obtain an artificially deflated appraisal report for P-Granit's shares and assets. Defendant Oleg Gref, the son of Defendant German Gref, and a close associate with Defendant Zhukov,

31

quickly performed his role, and, only two weeks later, issued the appraisal report of P-Granit valuing its shares at a fraction of the real market value.

### a.   The Vitera Shares

100.   On 8 April 2011, for the purpose of enforcing the Sberbank Russia debt, Defendant Neo Center issued its appraisal for the P-Granit shares. It valued the shares at RUB 3,035,319,747. Defendant NEO Center estimated P-Granit at a value five times lower compared to the value determined for the purpose of the original CBERB loan. Between June 3 and June 14, 2011 Defendants Sberbank Capital, through co-conspirators Lelukh and Kuznetsov communicated with notary Kharnaukhova causing the latter to purposefully and knowingly send Vitera LLC a notice of the enforcement of the pledge against Vitera shares in P-Granit to an incorrect address. The co-conspirators were well-aware of that Vitera LLC was not located at the address 12 Ostapovskiy projezd, b. 3, Moscow, because on the enforcement application by Defendant Sberbank Capital dated 31 May 2011 it states that "Vitera LLC office is not located at the legal address 12 Ostapovskiy projezd, b. 3, Moscow, there are no Vitera LLC representatives at the stated address". This was done despite the fact that Sberbank Capital was notified in writing about the actual correct address for Vitera. Khnaraukova's sister, Lobakh also a notary, later issued the final enforcement notice of the pledge against Vitera shares after the 1year statute of limitation for challenging the enforcement order had passed.

101.   Having issued its final enforcement notice against Vitera shares, Defendants Sberbank Capital, P1 and Zhukov contacted bailiff Burmistrov to initiate enforcement proceeding against Vitera.

102.   On June 22, 2011, Burmistrov, having avoided a challenge to the order, arranged the withdrawal of Vitera LLC's shares of P-Granit, and their transfer to Defendant Sberbank

32

Capital. Thus, on June 22, 2011 the Vitera shares at the deflated value set forth in the Defendant Neo Centre's Report passed under the control of Defendant Sberbank Capital.

103.    On the same day, on June 22, 2011, Defendant Aletarro received in its account at Defendant PSZB's branch in Cyprus a $10 million US dollars loan from Zasteni Investment Ltd., a BVI company owned by Defendant Zhukov. On the same day, Defendant Aletarro transferred the $10 million US dollars in two payments of $3 million and $7 million to its bank account with Bordier & CIE, Geneva Switzerland, a correspondent (intermediary bank) of UBS.

104.    On 23 June 2011, Defendant Sberbank Capital transferred the Vitera shares [36.37% of P-Granit] to Defendants Nisoram – 25%, and Aletarro – 11.37%. Aletarro paid Sberbank Capital $10 million US dollars from its account with Bordier & CIE bank in Switzerland.   Because the transfer was in US dollars the Swiss banks had to use a US correspondent bank.

105.    Defendants Sberbank Capital and Zhukov intentionally split the Vitera shares in order to circumvent general anti-monopoly restrictions and the restrictions imposed under Russian law on the acquisition of shares in strategically important companies by foreign subjects. P-Granit is a strategically important company and acquisition by a foreign entity of more than 51% shares would require the permission of a special committee under the Federal Government of the Russian Federation.   One of these proceedings would have exposed Defendant Co-conspirators Zhukov's, Gref's, Khachaturyants's and the other co-conspirators' roles in the scheme.

106.    Vitera challenged the administrative act/transfer of its shares to Defendants Nisoram and Aletarro directly in the Arbitrazh courts in Russia.   Predictably, the court rejected their claims.

33

107.   While the case was still pending, on 19 April 2012, and before Court issued its appeal decision on the validity of the transfer of Vitera shares, a bankruptcy manager was appointed over Vitera. Defendant Atlantic LLC was the only Vitera creditor at that stage and the bankruptcy manager that was appointed was nominated by Defendant Atlantic LLC. Thus, the sole creditor controlled the entire process. The bankruptcy manager did not support the claim on appeal and left it to the court to decide as it saw fit. The 19th Arbitrazh Appellate Court predictably allowed the appeal against Vitera, without objection by its receiver, in relation to Defendant Nisoram on May 15, 2012 and in relation to Defendant Aletarro on July 20, 2012. Contrary to the professional rules, the receiver acted in the interests of the co-conspirators, rather than defending the interest of Vitera.

108.   Once the Vitera Bankruptcy Trustee withdrew support for Vitera's claim for recovery of the Vitera shares from Nisoram and Aletarro, PNH issued petitions with the Central District Federal Arbitrazh court and Supreme Arbitrazh court for their supervisory review of the decisions of the 19th Arbitrazh Appellate court. However, it was held that PNH, as a third party, did not have the right to appeal the decisions of the 19th Arbitrazh Appellate court in relation to Vitera's claim, despite the obvious fact that the judgments, effectively refusing to return the shares to Vitera and keeping the enforcement of the pledge over Vitera shares at the deflated value determined by NEO Centre, affected PNH as the provider of pledge of its shares in P-Granit. Effectively the Trustee and the Court insulated the distribution of Vitera shares from independent review.

### b.   Mr. Poymanov's Shares

109.   After the Vitera shares, Defendant Sberbank Capital moved to enforce the pledges against Mr. Poymanov's 24.67% shares in P-Granit. Thus, on July 8, 2011, for the purpose of obtaining a bailiff order in the enforcement proceedings, the bailiffs in co-ordination with PI co-

34

conspirators retained Sokolov of appraiser Primula LLC to issue an artificially deflated valuation report for Mr. Poymanov's shares. Sokolov is an acquaintance of Ms. Galeeva, and his wife is an employee of Promsvyazbank.

110.   The Primula LLC Report valued Mr. Poymanov's shares at approximately RUB 496,174,826. This value was lower than that attributed to comparable shares appraised by Defendant Neo Centre, which was RUB 733 million.

111.   On December 30, 2011, the Task Quadro Securities LLC organized an auction of Mr. Poymanov's shares. The auction of Mr. Poymanov's shares was designed and conducted in a manner that minimized participation by potential bidders. A temporary decision of the Supreme Court of Russia suspended the auction date. When the temporary decision was lifted, the auction was held on only one day's notice. There were only two participants at the auction: LLC Trade and Defendant Sberbank Capital. The winner of the action was declared LLC Trade that paid RUB 516,174,826 for the share.

112.   Later, believed to be in or around February 2012, LLC Trade transferred Mr. Poymanov's P-Granit shares to Defendant Urasay. On December 24, 2011 Urasay received in its US Dollar account with the Promsvyazbank Cyprus branch a loan of US $ 18 million from Monbee Trading Ltd. – the same company which provided loans to Atlantic and which is mentioned in the Atlantic – Sberbank loan agreement as a company of the NAC group. On January 25 and 31, 2012 Urasay transferred 12,953,367.87 US Dollars and 4,281,949.93 US Dollars under the Contract of Purchase and Sale of Securities dated 23.01.2012. The amount corresponds to the price of the shares purchased by OOO Trade at the auction. OOO Trade is mentioned in the Sberbank credit committee decision approving the loan to Atlantic as the winner-to-be of the auction. These movements clearly establish the additional financial flows in

35

US dollars by the NAC. Upon information and belief, Defendant Zhukov owns Defendant Urasay.

### c.   The PNH/Zinika Shares

113.   Disposing of PNH/Zinika shares took place after Defendant Sberbank of Russia assigned its debt to Defendant Atlantic. Before that assignment, Sberbank Capital worked on the enforcement of pledges on the shares in P-Granit in the interests of Zhukov and other co-conspirators.

114.   On November 9, 2011, co-conspirator Nataliya Maiorova, the Chief Accountant (as co-defendant Shirin informed the criminal investigator in the course of interrogation) of Defendant Klever Asset Management and acting under Defendant Zhukov's control, incorporated Defendant Atlantic LLC.

115.   On 20 December 2011, Defendant Sberbank Capital entered into an assignment agreement with Defendant Atlantic LLC transferring all of its rights under the Loan Agreement and the various security pledges to Defendant Atlantic LLC for a consideration of 4,140,550,564 (the "Assignment Agreement"). Department of the Economy and Finance of the Government of the Russian Federation, in a letter dated 30 December 2011, described the party receiving assignment from Defendant Sberbank Capital in its report to then Prime Minister, now President of Russia Mr. Putin, signed by Mr. Belousov as "'structures owned by' Zhukov."

116.   The Assignment Agreement listed a series of pledge agreements also assigned by Sberbank Capital to Atlantic LLC. Further, it provided that Defendant Atlantic LLC had to pay within 20 business days of the date of the Assignment Agreement. The Assignment Agreement links the failure to perform to the termination of the option agreement between Defendants Sberbank Capital, Atlantic LLC, Aletarro and Nisoram (the "Option Agreement").

36

117.   On December 21, 2011, one day after the Assignment and the Option Agreements were signed, the Defendant Sberbank Russia's Credit Committee ("Credit Committee"), chaired by Defendant German Gref, approved the issuance of a loan to Defendant Atlantic LLC. The amount of the loan was, surely not by coincidence, equivalent to the amount payable by Atlantic to Sberbank Capital for the assignment of the debt less the amount which was subsequently paid by the winner-to-be of the auction LLC Trade for the 24.67% block of shares owned by Mr. Poymanov in P-Granit.

118.   As a loan condition, the Credit Committee listed multiple events that had not taken place yet, but happened within several weeks after the date of the Credit Committee decision and the date when the loan agreement was signed. In particular, the agreement listed Trade LLC as the winner of the auction for P-Granit shares organized by the State Agency for Russian Property before the auction was conducted and approved the sale of the yet to be acquired shares to Defendant Urasay.

119.   Furthermore, the Credit Committee minutes of the meeting on the loan to Defendant Atlantic described how the founder of Atlantic, co-conspirator Mayorova would be allowed to sell P-Granit debt to Defendant Mostra Consulting which is allegedly owned by Defendant Zhukov.   The minutes omitted that the Credit Committee was retroactively authorizing the transaction and made no reference to failure to secure proper authorization in the future.

120.   On 27 January 2012, Defendant Atlantic entered into a loan agreement with Defendant Sberbank of Russia to finance its obligations to Defendant Sberbank Capital under the Assignment Agreement. ("Sberbank's Loan Agreement to Atlantic").

37

121.   Defendant Sberbank's Loan Agreement to Defendant Atlantic identifies that Defendant Sberbank of Russia would provide a credit line to Atlantic with a limit of RU 3,624,400,000 to finance the transaction to buy the debt under the various agreements including the Loan Agreement. The credit line balance had to be completely repaid by 25 December 2018.

122.   Further, the agreement provided that the credit would be issued on execution of certain guarantees, including a guarantee by Defendant Atlantic in favor of Defendant NAC.

123.   As security, Defendant Atlantic guaranteed to provide to Defendant Sberbank the following pledges: a pledge of the ordinary shares in Defendant Aletarro; a pledge of the ordinary shares in Defendant Urasay; a pledge of the ordinary shares in Defendant Nisoram; a pledge of an 11.37% shares in P-Granit; a pledge of a 25% shares in P-Granit; a pledge of a 24% shares in P-Granit; and a pledge of a 38.63% shares in P-Granit.

124.   These pledges had to be signed within 30 days of the transfer of the shares in P-Granit to Defendant Atlantic or affiliates of the Defendant NAC controlled by Defendant Zhukov.

125.   Defendant Sberbank of Russia also required Defendant Atlantic to ensure that the Defendant NAC maintained a particular Debt/EBITDA ratio as specified in the agreement and that the debts owed by three companies associated with Defendant Zhukov are not to be taken into account when assessing the overall exposure of his companies to Defendant Sberbank of Russia. The companies noted in the agreement are: *"Tankard Trading & Investments Limited; Monbee Trading Limited; and IBG Development Group Inc."* The exemption amounts to a total not exceeding $80,000,000 (eighty million US dollars).

126.   Under Defendant Sberbank Russia's Loan Agreement to Defendant Atlantic, Defendant Sberbank Russia can demand an early repayment of the credit funds given to Atlantic

38

and provides Defendant Sberbank of Russia's irrevocable and unconditional consent to the sale of shares in Atlantic to Mostra by the founder and General Director of Atlantic, Natalia Mayorova by 1 March 2012.

127.    The agreement also contemplates and records the eventual transfer of shares in P-Granit to Defendant Atlantic and or affiliates of the Defendant NAC controlled by Defendant Zhukov.

128.    Thus, Defendant Sberbank Russia financed Defendant Atlantic LLC's acquisition of the Pavlovskgranit shares and took pledges for the shares of Defendant Nisoram, Aletarro and Urasay in P-Granit, at more favourable terms than it was willing to give P-Granit/Poymanov to re-finance the original debt. If the P-Granit restructuring negotiated by Mr. Poymanov had been accepted, Sberbank Russia would have recovered, before July 31, 2017, the entire loan amount plus 3.635 billion rubles interest just on the main loan, not counting interest on other smaller loans. Under the Atlantic loan agreement, Sberbank Russia would recover the loan amount, but only 2.047 billion rubles interest, i.e., 1.588 billion rubles less. On the date Sberbank Russia signed the loan agreement with Atlantic, the ruble rate was 30.3600 rubles for 1 US dollar, i.e., the difference amounted to a lesser interest return of US $ 52.3 million.

129.    On February 17, 2012, Mayorova entered into a sale agreement with Defendant Mostra Consulting, under direct control of Defendant Zhukov, for the purchase of 100% of participatory interest in the authorized capital of Defendant Atlantic.

130.    On March 28, 2012, Defendant Aletarro and Sberbank Russia entered into a share pledge agreement for the pledge of shares owned by Aletarro in P-Granit to Sberbank, whereby Defendant Zhukov is the direct beneficiary of Defendant Aletarro for the purpose of Defendant Atlantic enforcement proceedings under the Sberbank Loan Agreement to Atlantic.

39

131.   On September 6, 2012, by resolution of the sole member of Defendant Atlantic - Mostra Consulting - drafted by attorney Kozyr, under the direct control of Defendant PI. Defendant Atlantic changed its address to 21 Bolshoy Sukharevskiy pereulok, b. 2, Moscow, 127051.   This is the same address as VEB Upravlenie Projektami, another of Defendant Zhukov's registered companies.

132.   During this entire process, as mentioned above, the Majority Shareholders used all available legal means to protect their interest, including filing criminal complaints for the theft of the company.  It is no surprise that the Russian authorities only pretended to investigate the facts.  Moreover, the investigation was delayed and ultimately thwarted when Russian law enforcement attempted to secure a response to a Mutual Legal Assistance Request seeking the identity of the beneficial owners of the offshore Defendant companies named herein. Despite the fact that the Russian court in due order authorized such request for legal assistance, the request of the court was never even sent to the Office of Attorney General of Russia, whose Department of International Co-Operation is sending such requests to foreign authorities in the normal procedure of international assistance on legal and judicial matters.

133.   Nonetheless, as part of its investigation on the theft of Vitera shares, the Moscow Tver Interdistrict Prosecutor sent official letters to Defendant Neo Center regarding its appraisal of Vitera shares.

134.   On September 25, 2012, receiving this letter, Defendant Oleg Gref emailed Defendant Zhukov (from e-mail o.gref@neoconsult.ru) forwarding the aforementioned letters to Yuri Zhukov (e-mail yz@klever.com), with the following accompanying letter: "Hello Yura. For your information: the show goes on". On 25 September 2012 at 12:40 Yuri Zhukov (from e-mail yz@klever.com) responded to Gref Oleg (to e-mail o.gref@neoconsult.ru): "I think the

40

show will not be long, neither will it be interesting, but it's worth being attended. Need a contact person for my legal advisors to arrive at a certain decision".

135.   On 28 September 2012, Defendant Atlantic ordered a valuation report from Financial Appraisal Consulting LLC ("FAC") for the purpose of enforcement proceedings against PNH/Zinica shares (the "FAC Report"). According to the agreement Defendant Atlantic had to fulfil the requirement of obtaining a supposed independent valuation under the assignment and loan agreements on extrajudicial foreclosure of the pledged shares. The FAC Report valued the PNH/Zinica shares at RUB 760 million a value even lower than the value for the PNH/Zinica shares given by Neo Centre, which was RUB 926 million. The appraisal specialist doing that report was member of SMAO – the same guild of appraisers to which the NEO Centre appraiser was a member.

136.   On 2 October 2012, Defendant Atlantic served notice on PNH under the ,agreement on extrajudicial foreclosure of the PNH/Zinica shares, which was assigned to it pursuant to the Assignment Agreement. Defendant Atlantic notified PNH of its intention to take over the PNH/Zinica shares at the value assigned to it by the FAC Report, i.e. RUB 760,000,000.

137.   On October 26, 2012, Defendant Atlantic LLC acquired the PNH/Zinica shares through an out-of-court foreclosure of these shares.

E.   **LEGALIZATION**

a.   **Illegal bankruptcies**

138.   In April 2012, Defendants started implementing their plan to bankrupt P-Granit and funnelling its assets to Defendant NAC.

139.   Thus, in December 2012, Defendants Atlantic, NAC, Zhukov, Shirin, and PI conspired to initiate the extrajudicial bankruptcy proceedings against P-Granit.

41

140.    Contrary to the receiver's obligation to act independently and his fiduciary duty to the company's creditors, correspondence of December 2012 between Defendants Sberbank of Russia, NAC, Zhukov, and Galeeva and co-conspirators PI, Kuznetsov, and Potolitsyn demonstrates that they controlled the bankruptcy receivers, including Defendants Nogotkov and Bazarnov. They were instructing Defendant Nogotkov, who were in turn was reporting back on all actions taken during the proceedings. For example, in December 2012 co-conspirator Kuznetsov and the receiver Zaytsev and receiver Defendant Nogotkov exchanged emails sharing: 1) reconciliation statement between Vitera LLC, Evrogranitinvest LLC and Pavlovskgranit-INVEST CJSC; 2) Evrogranitinvest LLC progress report for November 2012; 3) Vitera LLC progress report for November 2012. Defendant Nogotkov sent to co-conspirator Kuznetsov (from his e-mail knogotkov@gmail.com to the e-mail K.andrey@bk.ru) the aforementioned reconciliation statements and progress reports with the following comments: "Hello! Please find attached the reports on two bankruptcies (same like we do it for Slava in Samara) and financial expenses report. Is it ok for you? If yes, will discuss everything in detail on Friday. Kirill." The same receiver, Zaytsev, although appointed receiver to protect its interests, did not oppose Aletarro and Nisoram's appeal of the initial court judgment ordering them to return P-Granit shares to Vitera.

b.    **Transfer of P-Granit Assets to Defendants NAC and Zhukov**

141.    On January 29, 2013, Defendant NAC, emailed Defendant Sberbank Russia, a comprehensive plan for the future steps to be taken by Defendants to accomplish the takeover of P-Granit's assets for the benefit of Defendants NAC and Zhukov. The plan detailed the following actions that ultimately were implemented by Defendants: (1) Defendant Atlantic assigned the debt of Defendant Sberbank Russia to Defendant NAC as a payment for obligation assumed and Defendant NAC acquired receivables as to P-Granit and 20.86 % block of shares;

42

(2) P-Granit established an associated company (JSC) and funneled almost all the assets into it;

(3) P-Granit and Defendant NAC made an amicable settlement agreement, whereby Defendant NAC changed receivables as to P-Granit; and (4) Defendant NAC owns a new JSC.  Defendants Shirin, Zhukov and Khachyatureants signed off this plan.

142.   Thus, on June 27, 2013, Defendant Atlantic applied to the Russian Federal Anti-Monopoly Service (the "FAS") for permission to acquire two entities Pavlovskgranit-Promvzryv ("P-Prom") and Pavlovskgranit-Nerud ("P-Nerud") created by new shareholders of P-Granit, to which most of the assets of P-Granit were to be moved.  On 23 July 2013, Defendant Atlantic obtained such approval.

143.   On July 17, 2013, Defendant Atlantic and P-Granit entered in to a comprehensive settlement in the process of the P-Granit bankruptcy case in court, whereby the assets of P-Granit were transferred to P-Prom and P-Nerud.  The settlement was also approved by the Russian Court on the basis that the other creditors of P-Granit (very minor) would be paid in full ("the Settlement").

144.   On August 15, 2013, subsequent to Defendant Atlantic's application, Defendant NAC applied to the FAS for permission to acquire 100% shares in P-Prom and P-Nerud and implement the Settlement.  On September 2, 2013, Defendant NAC obtained such approval for P-Prom and on  September 5, 2013, it got similar permission for P–Nerud.

145.   On September 23, 2013, Defendant Atlantic and co-conspirator Vetrolin, a BVI company, entered into a sale and purchase agreement of P-Nerud 100% shares for the amount of 2 billion rubles.  The deposit for the transaction in the amount of almost 1 billion RUB was transferred from Vetrolin's bank account in the Defendant Promsvyazbank Cyprus branch in US dollars.

146.   In accordance with the Settlement, on November 1, 2013 P-Granit paid Defendant Atlantic two amounts totalling 1,009,665,613 rubles.  Subsequently, on November 14, 2013, P-Granit transferred to Defendant Atlantic its shares in P-Nerud and in P-Prom, and unilaterally cancelled the agreement with Vetrolin, allegedly due to a more favourable offer.

147.   The agreement between Defendant Atlantic and Vetrolin had an arbitration clause and the forum was the Arbitration court of non-profit organization fund "Pravo and Ekonomika TEK".  Shortly after the alleged breach, co-conspirators Gorbunov and Kuznetsov, pursuant to Zhukov's instruction, filed a claim in the Moscow City Arbitrazh Court to enforce the arbitration clause and seek compensation from Defendant Atlantic.  Right before canceling the agreement, Defendant Atlantic was renamed into AlfaMarket LLC.  This was done to prevent the public, including the Majority Shareholders, from finding the pending case between Atlantic and Vetrolin on the docket.  Under Russian law, if the contract requires an "earnest payment" by buyers to secure the transactions, and the seller cancels the deal, then the seller has to return double the "earnest payment".  Earnest payments are routinely set between 1% and 5% of the purchase price.  In this case, the "earnest payment" was 75% of the 2 billion rubles purchase price.  The reasonable explanation for this extraordinary "earnest payment" is to launder the funds.  By getting a court order for the distribution of the "earnest payment," Defendants legalized that outflow of funds.

148.   As a result of the Settlement between P-Granit and Defendant Atlantic/AlfaMarket, in exchange for payments in cash and in shares of P-Nerud and P-Promvzryv described above, P-Granit acquired the rights of Defendant Atlantic/AlfaMarket under the Loan Agreement, which were valued at 3,326,210,254 RUR.  This amount is the

44

equivalent of US $ 92,578,498 at an exchange rate of 1 RUR = 0.278 USD (as of March 19, 2014).

149.    On November 29, 2013 P-Granit entered into an agreement with Suintex Ltd, a BVI company, whereby P-Granit (the Assignor) assigned to Suintex Ltd. (the Assignee) the creditor's rights under the Loan Agreement for only 137,000,000 RUR, which is the equivalent of US $ 4,301,953, as per the exchange rate on October 29, 2014, and today of US $2,194,830. The agreement to sell the rights to bring the claim to Suintex Ltd was a transaction which required approval by the P-Granit shareholders. Defendant Atlantic put forward the proposal to sell the claim to Suintex Ltd for 137 million rubles at the shareholders' meeting.

150.    On December 3, 2013, the new General Director of Defendant Atlantic/AlfaMarket, co-conspirator Potolitsyn distributed to P-Granit's new shareholders a draft "Resolution of P-Granit General meeting of shareholders, to be held on 27 December 2013". The first item on the agenda was approval of the major transaction, formulated as follows: "To approve the Company's major transaction, namely Receivables assignment contract (cession) between P-Granit and the company Suintex Ltd."

151.    On December 23, 2013, Defendant Atlantic/AlfaMarket, acting as the borrower under the non-revolving loan facility agreement dated January 27, 2012 with Defendant Sberbank of Russia and concluding a tri-party agreement between Atlantic, Sberbank and NAC, assigned the 3 billion 636 million 257 thousand 963 rubbles debt to the new debtor – Defendant NAC. The consideration was the transfer to NAC of 100% of shares in P-Prom and P-Nerud, the latter holding most of the assets of the former P-Granit. As a result, NAC formally held the assets and the business of P-Granit, which was at the final stage of being raided.

45

152.    At the shareholders meeting on December 27, 2013 shareholders Defendants
Aletarro, Nisoram, Urasay and Atlantic/AlfaMarket voted in favor of the Suitnex proposal.
Thus, Suintex, together with the right to the debts, accepted the corresponding receivables on the
guarantees for the debt as to:

> a. primary debtor – P-Granit-INVEST; and
>
> b. guarantors and pledgers: I.Y. Podgornaya, O.P. Poymanov, P.A.
> Poymanov, S.P. Poymanov, VISKOM LLC, Evrogranit LLC, Evrogranit-
> Invest LLC, Vitera LLC, and Dorspetsstroy LLC.

The latter arose from the agreement on the non-revolving loan facility dated August 4, 2008,
with supplementary agreements between Defendant Sberbank of Russia and P-Granit-INVEST
and the security interest agreements. The decisions adopted at this shareholders meeting violated
the law as related parties voted on matters in which they had a self-interest.

153.    Also during the December 27, 2013 shareholders meeting, Defendants Aletarro,
Nisoram, Urasay and Atlantic/AlfaMarket voted to liquidate P-Granit. Subsequently, in
furtherance of the conspiracy and to cover it up, on June 17, 2014, Defendant
Atlantic/AlfaMarket was dissolved. Thus, Defendants liquidated the corporate entities which
could be parties to court proceedings challenging the validity of the performed transactions and
restitution of assets.

154.    Mr. Poymanov continued to fight for his company in actions pending in Russian
court. During this period, he was threatened multiple times with physical violence by an
unknown person who demanded that he drop his claims. Although Mr. Poymanov filed a
complaint with the local police, the criminal case was closed due to a supposed dead-end in the
investigation.

46

155.    In a further attempt to intimidate Mr. Poymanov, on July 15, 2014, the Investigative Committee for Voronezhkaya Oblast initiated a new criminal case against him based on the complaint of the P-Invest receiver. The receiver Defendant Nogotkov alleged that Mr. Poymanov, as the shareholder of a OOO Pavlovskgranit-Beton through P-Granit Invest abused his authority and sold certain assets to a third party, avoiding payment to the existing creditors and the tax authority. The case against Mr. Poymanov was baseless as a matter of Russian law, because a derivative action only can be brought against an officer of the company, while Mr. Poymanov was a shareholder. Contrary to the allegation, on December 14, 2008, Mr. Poymanov personally loaned 3.4 million rubles to the company, the balance of which is outstanding. He never took measures to recover this debt.

156.    On August 13, 2015, the Defendants' accomplished the next step in the conspiracy -- the takeover of P-Granit -- when the Voronezh Regional Arbitrazh Court recognized the liquidation of P-Granit. P-Granit ceased to exist and was erased from the National Registry of companies.

157.    Thus, Defendants successfully transferred the assets of P-Granit from the Majority Shareholders to the Defendants NAC Group and Zhukov. Defendant Atlantic LLC was re-named and ultimately liquidated. P-Granit also has been liquidated.

158.    The personal bankruptcy of Mr. Poymanov that followed the bankruptcy and liquidation of P-Granit is part of the conspiracy to raid his company and eliminate his ability to enforce his rights. In furtherance of this segment of the conspiracy, Defendant Suintex acquired P-Granit's alleged claims for a nominal value and then initiated the bankruptcy proceedings purportedly to enforce those claims.

47

159.    On October 2, 2015, Defendant Suintex filed for Mr. Poymanov to be put into personal bankruptcy. On February 8, 2016, the Moscow Oblast Arbitrazh Court approved the restructuring of the debt and, at the request of Defendant Suintex, approved Defendant Bazarnov as the receiver. Shortly after his appointment, Defendant Bazarnov requested the Court freeze Mr. Poymanov's bank accounts and real estate. Although acting as the receiver for Mr. Poymanov's bankruptcy estate, Defendant Bazarnov refused to seek the re-evaluation of the P-Granit shares and to contest the previous artificially deflated transactions which led to Mr. Poymanov's bankruptcy.

160.    On July 21, 2016 the Moscow Oblast Arbitrazh Court declared Mr. Poymanov bankrupt and initiated the sale of his assets. On July 29, 2016, co-conspirator Arismet, an entity controlled by Defendant Zhukov, joined Suintex as one Mr. Poymanov's creditors. The personal bankruptcy of Mr. Poymanov is part of the conspiracy to raid his company and eliminate his ability to enforce his rights. In furtherance of this segment of the conspiracy, Defendant Suintex acquired P-Granit's alleged claims for a nominal value and then initiated the bankruptcy proceedings purportedly to enforce those claims. Although the alleged claims against Mr. Poymanov were valued at the deflated price by Defendant Neo Centre at 1.144.189.143,00 rubles, Arismet purchased them for 2.656.800,00 rubles. On November 11 2016, P-Nerud, controlled by Defendants NAC and Zhukov joined Suintex and Arismet as creditors in Mr. Poymanov's personal bankruptcy.

161.    Although the original debt of P-Granit to Defendant Sberbank Russia was 4.5 billion rubles, Defendants became owners of shares and/or received cash in excess of 7 billion rubles despite the intentional low-ball appraisal of the shares and assets. Yet, in Mr. Poymanov's personal bankruptcy, Defendants are claiming an additional 4 billion rubles.

48

### 4. LITIGATIONS IN CYPRUS

162.    Right after Defendant Atlantic executed the Settlement agreement with P-Granit's new shareholders, on August 7, 2013, Mr. Poymanov filed a request for preliminary injunction in the Limassol District Court in Cyprus, requesting the Court enjoin them from disposing of P-Granit shares and an order for the return of the shares to Mr. Poymanov or monetary compensation and the disclosure of the beneficial owners of the offshore companies ("Limassol Litigation").

163.    Although the Court originally granted the preliminary injunction, the decision was reversed on the appeal.   The matter of the preliminary injunction is currently pending at the Supreme Court.  The District Court postponed the disclosure of the beneficial owners until the case is adjudicated on the merits, it is being further heard.  The claims alleged in the Limassol Litigation are conspiracy to defraud Mr. Poymanov and other shareholders of their shares in P-Granit.

164.    On September 12, 2016, the court appointed receiver in Mr. Poymanov's personal bankruptcy case, defendant Bazarnov, submitted a letter to Mr. Poymanov's Cyprus counsel revoking any power of attorney (including retainers) issued by Mr. Poymanov for the Limassol Litigation and demanded that counsel "stop with immediate effect any legal work and/or proceedings and/or services rendered, as regards any property movable or immovable, in which Mr. Poymanov is directly or indirectly involved or interested in and/or any representation on behalf of Mr. Poymanov in court or elsewhere." Mr. Poymanov challenged the authority of the receiver in Russian Court and the hearing has been scheduled for late November.  Obviously, this latest move by the co-conspirators demonstrates that there is no available forum for the Majority Shareholders to seek redress for the expropriation of their assets in P-Granit.

49

165.   Mr. Poymanov filed a complaint against Defendant Bazarnov's actions canceling the powers of attorney, but the Court, again, denied Mr. Poyamnov's request.  On November 7, 2016, alleged creditors – Suintex and Arismet – approved the hiring of the law firm, Panagos and Panagos, to purportedly represent Mr. Poymanov in the court cases in Cyprus. The same alleged creditors also decided that co-conspirator Arismet would finance Panagos and Panagos. Thus, the receiver is represented in court by counsel that is paid by Defendant Zhukov.

166.   To exert additional pressure on Mr. Poymanov, Defendants, through Defendant Nogotkov, brought additional proceedings in Cyprus in March 2013 against PNH, Mr Poymanov, Belim Enterprises Limited and Abacus (Cyprus) Limited. The case is currently pending in the District Court of Nicosia, with action number 1901/2013 (the "Nicosia Proceedings").

167.   In the Nicosia Proceedings Defendant Nogotkov claims that Mr. Poymanov and others conspired to cause damage to P-Invest by unlawfully diluting P-Invest's interest in PNH. In particular, Defendant Nogotkov alleges that because the shares in P-Granit owned by PNH were pledged as security for the Loan Agreement, Mr. Poymanov and others fraudulently took steps to dilute the interest of P-Invest in PNH to protect themselves from the consequences of the breach of the Loan Agreement. This is a completely unsound allegation, as this has not affected the pledge of shares owned in P-Granit by PNH in favor of Sberbank, taken over by Atlantic. The Nicosia District Court granted Defendant Nogotkov freezing orders *ex parte*. For now the case is pending and a hearing date has not been scheduled.

168.   While the Nicosia Proceedings arise from the same story as the Limassol claim, they relate to only part of it, in particular P-Invest's shares in PNH and the related pledge

50

agreement. By contrast, the Limassol Litigation relates to the shares in Pavlovskgranit, one level

up from PNH.

**COUNT I**

**Fraud**

**(Against Defendants Sberbank Russia and Sberbank Capital)**

169.   Paragraphs 1 through 168 are incorporated by referenced as if fully set forth herein.

170.   Defendants Sberbank Russia and Sberbank Capital intentionally and knowingly failed to disclose to Majority Shareholders that their purported negotiation over restructuring of the debt was for the benefit of Defendant Zhukov.   Defendants kept Zhukov as the ultimate beneficiary of the scheme a secret until the end and circulated and disclosed proprietary and confidential information of P-Granit.

171.   Defendants (a) made proposals to the Majority Shareholders regarding the restructuring, (b) told the Majority Shareholders that the negotiated terms would result in a plan that would allow Majority Shareholders to keep P-Granit, while (c) in fact Defendants intended only to make an offer in terms that could not work and would allow for the seizure of shares and non-judicial sale of assets, (d) caused issuance of deflated appraisals what justified throwing P-Granit into control by them, foreclosure and ultimately dissolution. Defendants intended for both the Majority Shareholders and P-Granit to rely on the misrepresentations.

172.   Majority Shareholders reasonably relied on Defendants' misrepresentations by commission and omission.   In detrimental reliance on Defendants' malicious, intentional and willful misrepresentations of material facts and malicious, intentional and willful failure to disclose material facts, Majority Shareholders did not seek alternative financing to restructure Sberbank debts.

52

173.   Moreover, Defendants' fraudulent interference with the appraisal process, the bankruptcy proceedings, the auctioning of P-Granit assets and the judicial process made it impossible for Majority Shareholders to stop the destructive actions Defendant undertook against their shares in P-Granit.

174.   As a direct and proximate result of Defendants' fraud, Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count 1 for the following relief:

A.   Compensatory damages of no less than $500,000,000.00;

B.   Punitive damages of no less than $250,000,000.00;

C.   Costs, attorney's fees, and post-judgment interest; and

D.   Such other and further relief as the Court deems proper.

## COUNT II
### Conspiracy to Commit Fraud
#### (Against all Defendants)

175.   Paragraphs 1 through 174 are incorporated by referenced as if fully set forth herein.

176.   Pursuant to an agreement and understanding, Defendants conspired to commit and did commit the unlawful acts of illegal takeover campaign against the Majority Shareholders' assets in P-Granit.

177.   Defendants maliciously, intentionally and willfully misrepresented to the Majority Shareholders that they intend to negotiate the restructuring of the original Sberbank debt when in

53

facts they never intended to restructure the debt but intended to steal Majority Shareholders' P-Granit shares and P-Granit's assets and transfer them to companies owned or controlled by Defendant Zhukov. The purposes of this conspiracy and common schemes were to steal P-Granit from the Majority Shareholders for the benefit of Defendants.

178.   In furtherance of the conspiracy Defendant German Gref directed Defendant Sberbank Russia to interfere with any attempts by Majority Shareholders to restructure their debt or to secure alternative financing to repay the loan and to file a criminal complaint against Mr. Poymanov to entangle him in criminal proceedings while his company was being stolen. Defendant German Gref retained his son Defendant Oleg Gref and his company Defendant NEO Centre, to appraise P-Granit group's shares. Defendant Oleg Gref and NEO Center appraised P-Granit without visiting the P-Granit. Defendant Oleg Gref regularly communicated with Defendant Zhukov as to the action plan. The appraisal of P-Granit shares was low.

179.   Thereafter, Defendants involved co-conspirators unnamed defendants such as notaries and bailiffs who sold P-Granit shares to Defendants through the following layering:

a.   the 36.37% of Vitera shares in P-Granit to two offshore companies Defendants Nisoram and Alexarro whose end-beneficiary is allegedly Defendant Zhukov;

b.   24.67% of Mr. Poymanov's shares to Defendants Urasay and Trade LLC, whose end-beneficiary is allegedly Defendant Zhukov.

c.   29.64% of PNH/Zinica shares to Defendant Atlantic LLC whose end-beneficiary is allegedly Defendant Zhukov. Just a month prior Defendant Atlantic LLC's acquisition of the shares and for this purpose, Defendant Sberbank Capital provided a loan, while still negotiating potential restructuring with P-Granit.

d.   1.85% and 8% shares of the people affiliated with Mr. Poymanov were diluted during the manufactured bankruptcy.

180.   On December, 20, 2011, Defendants Sberbank Russia and German Gref were so prescient that they included Trade LLC as the winner of an auction in one of the assignment

54

agreements before conducting the actual auction. In September 2012, Defendant Zhukov assured Defendant Oleg Gref that the scheme would not take long and it would be worth the effort.

181.   Defendants kept Defendant Zhukov as the ultimate beneficiary of the scheme a secret until the end and circulated and disclosed proprietary and confidential information of P-Granit. The offshore companies that acquired the undervalued shares ultimately sold them back to Defendant Zhukov and Defendant NAC. This way, Defendant Zhukov's original plan of taking over control over P-Granit had been accomplished.

182.   Defendants Sberbank Russia and Sberbank Capital intentionally and knowingly failed to disclose to Majority Shareholders that their purported negotiation over restructuring of the debt was for the benefit of Defendant Zhukov.

183.   In furtherance of the conspiracy, Defendants, as described in paragraph 95:

1.   Manipulated the filing of fabricated criminal charges against Mr. Poymanov. Defendant Galeeva instructed Defendant Kublitsky regarding the objective of the conspiracy "...to gain control over the authorized capital and the operating activities of P-Granit" and the law enforcement actions necessary to implement the plan, including wiretapping, field surveillance, searches, and pre-trial restrictions – all applicable to Mr. Poymanov;

2.   Communicated during conspiracy in order to developed tactics and share details on the progress of the conspiracy among themselves;

3.   Incorporated offshore companies for sole purpose of the conspiracy and used off-the-shelf company;

4.   Collaborated with criminal investigators including those known to work with infamous raider Kluyev;

5.   Took advantage of captured courts and bankruptcy court procedures and personnel;

6.   Used US intermediary banks to make payments during the implementation of the conspiracy; and

7.   Invested alleged proceeds of the conspiracy in the U.S.

55

184.    The Majority Shareholders reasonably relied on Defendants' misrepresentations by commission and omission. In detrimental reliance on Defendants' malicious, intentional and willful misrepresentations of material facts and malicious, intentional and willful failure to disclose material facts, Majority Shareholders did not seek alternative financing to restructure Sberbank debts. Moreover, Defendants' fraudulent interference with the appraisal process, the bankruptcy proceedings, the auctioning of P-Granit assets and the judicial process made it impossible for Majority Shareholders to stop the destructive, actions Defendants undertook against their shares in P-Granit.

185.    As a direct and proximate result of this conspiracy, the Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count II for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.    Costs, attorney's fees, and post-judgment interest; and

D.    Such other and further relief as the Court deems proper.

## COUNT III

### Negligent Supervision

### (Against Defendants German Gref and Sberbank Russia)

186.    Paragraphs 1 through 185 are incorporated by referenced as if fully set forth herein.

56

187.    Defendant German Gref, as the CEO of Defendant Sberbank Russia had a duty to properly supervise Defendant Khachyatureants, the CEO of Sberbank Russia's subsidiary Defendant Sberbank Capital and Defendant German Gref breached that duty. Defendant Sberbank Russia had a duty to supervise Defendant German Gref and Defendant Sberbank Russia breached that duty.

188.    As a result of Defendants Gref and Sberbank Russia's failure to properly exercise this duty, Defendants conspired with Defendant Zhukov to develop and implement the scheme to defraud Majority Shareholders of their shares in P-Granit, dismantle P-Granit's assets and transfer them into Defendant Zhukov's company, Defendant NAC.  Defendants German Gref and Sberbank Russia knew or should have known Defendants' propensity for the illegal conduct that caused Majority Shareholders' injury.

189.    As a direct and proximate result of Defendants German Gref and Sberbank Russia's failure to supervise Defendants Khachyatureants and German Gref, the Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count III for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.    Costs, attorney's fees, and post-judgment interest; and

D.    Such other and further relief as the Court deems proper.

## COUNT IV

### Breach of Fiduciary Duty

### (Defendant Sberbank Russia)

190.    Paragraphs 1 through 189 are incorporated by referenced as if fully set forth herein.

191.    Defendant Sberbank Russia owed a duty to Majority Shareholders to treat them fairly in the restructuring process and to avoid self-dealing.

192.    Defendant Sberbank Russia breached that duty by purposefully interfering with Majority Shareholders' attempt to restructure their debt and assigning P-Granit's debt to Defendant Sberbank Capital that in turn implemented together with Defendant Zhukov and other co-conspirators the illegal scheme to expropriate ownership of the P-Granit shares and dismantle the company by distributing its assets at below market value to Defendant NAC, and ultimately liquidating P-Granit.

193.    Defendant Sberbank Russia disclosed proprietary and confidential P-Granit information.

194.    As a direct and proximate result of Defendant Sberbank Russia's breach of its fiduciary duty, the Majority Shareholders were stripped of their assets and are entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count IV for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.    Costs, attorney's fees, and post-judgment interest; and

D.      Such other and further relief as the Court deems proper.

## COUNT V

### Tortious Interference with Business Relations

### (Defendants German Gref, Zhukov, and Khachyatureants)

195.    Paragraphs 1 through 194 are incorporated by referenced as if fully set forth
herein.

196.    The Majority Shareholders attempted to restructure P-Granit's debt to Defendant
Sberbank Russia.  As part of this process, Majority Shareholders disclosed P-Granit confidential
and proprietary information, requested by Defendant PSZB to assess the potential re-financing.
Defendants German Gref, Zhukov and Khachyatureants were aware of Majority Shareholders'
negotiation with PSZB Credit Committee, and interfered with the process.  Defendants told the
CEO of Defendant PSZB to not move forward with the P-Granit refinancing.  Mr. Ananyev
stated that he was instructed by Defendant Khachyatureants to deny P-Granit the loan. He also
said that should Mr. Poymanov convince Defendant Khachyatureants not to object, Defendant
PSZB would issue the refinancing loan.

197.    Defendants conduct was malicious and wanton.  As a direct and proximate result
of Defendants' conduct, the Majority Shareholders have been damaged and are entitled to relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count V for the
following relief:

A.      Compensatory damages of no less than $500,000,000.00;

B.      Punitive damages of no less than $250,000,000.00;

C.      Costs, attorney's fees, and post-judgment interest; and

D.      Such other and further relief as the Court deems proper.

59

## COUNT VI

### Abuse of Process

**(Against Defendants German Gref, Zhukov, Khachyatureants, Nogotkov and Bazarnov)**

198.    Paragraphs 1 through 197 are incorporated by referenced as if fully set forth herein.

199.    Defendants Gref, Zhukov, Khachyatureants and Nogotkov filed criminal complaints against Mr. Poymanov that resulted in criminal charges. Defendants maliciously and intentionally misused the Russian criminal legal process and manufactured charges against Mr. Poymanov. Defendants used their reputation and power to control the criminal cases in order to force Mr. Poymanov to cease his fight over the stolen P-Granit shares and assets. Defendants Nogotkov and Bazarnov impeded Mr. Poymanov's ability to defend himself outside Russia as he cannot travel during the investigation.

200.    Co-conspirator Galeeva went so far as to instruct a law enforcement agent regarding the objective of the conspiracy "...to gain control over the authorized capital and the operating activities of P-Granit" and the law enforcement actions necessary to implement the plan, including wiretapping, field surveillance, searches, and pre-trial restrictions – all applicable to Mr. Poymanov.

201.    As a direct and proximate result of Defendants' conduct, the Majority Shareholders have been damaged and are entitled to relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count VI for the following relief:

A.    Compensatory damages of no less than $500,000,000.00;

B.    Punitive damages of no less than $250,000,000.00;

C.      Costs, attorney's fees, and post-judgment interest; and

D.      Such other and further relief as the Court deems proper.

## COUNT VII

### Unjust Enrichment

### (Against All Defendants)

202.    Paragraphs 1 through 201 are incorporated by referenced as if fully set forth herein.

203.    Through their wrongful actions described above, Defendants stole the assets of P-Granit and diverted them into Defendant NAC for the benefit of Defendant Zhukov. By reasons of the foregoing, Defendants have been unjustly enriched at the Majority Shareholders' expense.

204.    As a direct and proximate result of Defendants' conduct, the Majority Shareholders have been damaged and are entitled to relief.

WHEREFORE, Plaintiff seeks judgment against Defendants, under Count VII for the following relief:

A.      Compensatory damages of no less than $500,000,000.00;

B.      Punitive damages of no less than $250,000,000.00;

C.      Costs, attorney's fees, and post-judgment interest; and

D.      Such other and further relief as the Court deems proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court award a judgment on all claims and award it such damages and compensation, interest, attorneys' fees, costs and such other relief as this Court may deem just.

61

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

Dated: November 22, 2016    Respectfully Submitted,

Caroline Heller
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
202-801-9200
hellerc@gtlaw.com

Sanford M. Saunders, Jr. (*pro hac vice
application forthcoming*)
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, D.C. 20037
202-331-3130
saunderss@gtlaw.com

Nicoleta Timofti
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, D.C. 20037
202-530-8536
timoftin@gtlaw.com

Counsel for PPF Management LLC